ORIGINAL

1  PHILIP T. BESIROF (CA SBN 185053)
   PBesirof@mofo.com
2  ALEXEI KLESTOFF (CA SBN 224016)
   AKlestoff@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California 94105-2482
   Telephone: 415.268.7000
5  Facsimile: 415.268.7522

6  Attorneys for Plaintiffs
   3A ENTERTAINMENT LTD. and LABCROFT LTD.
7

E-filing

FILED
MAR - 4 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11  CV 08    1274 PVT

12  3A ENTERTAINMENT LTD. and LABCROFT     Case No.
    LTD.,
13                                          **COMPLAINT FOR RESCISSION,**
                  Plaintiffs,               **BREACH OF CONTRACT,**
14                                          **FRAUD, AND NEGLIGENT**
                                            **MISREPRESENTATION**
15        v.
                                            **DEMAND FOR JURY TRIAL**
16  CONSTANT ENTERTAINMENT, INC. and
    PHILIP HO,
17
                  Defendants.
18

19       Plaintiffs 3A ENTERTAINMENT LTD. and LABCROFT LTD. allege against defendants

20  CONSTANT ENTERTAINMENT, INC. and PHILIP HO as follows:

21                          **INTRODUCTION**

22       1.    This action seeks damages incurred by plaintiffs as a result of Constant

23  Entertainment, Inc.'s ("Constant") continual failure to deliver on its promises, as well as it and its

24  president Philip Ho's misrepresentations regarding Constant's ownership of certain rights to

25  software games.

26                            **PARTIES**

27       2.    Plaintiff 3A Entertainment Ltd. ("3A") is a British Virgin Islands corporation with

28  its principal place of business in Tortola, British Virgin Islands. 3A is in the business of

sf-2427303

1  purchasing licensing and distribution rights to software games from various software developers

2  for development and distribution in the Russian Federation.

3      3.    Labcroft Ltd. is a Cyprus corporation with its principal place of business in

4  St. Omologites, Nicosia, Cyprus.  Labcroft is in the business of purchasing licensing and

5  distribution rights to software games from various software developers for resale to 3A and its

6  affiliates.  On occasion, Labcroft negotiates on behalf of 3A and its affiliates for the purchase of

7  licensing and distribution rights directly by 3A and its affiliates.

8      4.    Upon information and belief, defendant Constant is a California corporation with

9  its principal place of business in Sunnyvale, California.

10     5.    Upon information and belief, defendant Philip Ho is an individual residing in

11 Sunnyvale, California.  Upon information and belief, Ho is the Managing Partner, Chief

12 Executive Officer, Secretary, Chief Financial Officer, and sole Director of Constant.

13                    **JURISDICTION AND VENUE**

14     6.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332

15 because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of

16 California and citizens of foreign states.

17     7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Constant

18 transacts business in this district and because a substantial portion of the events or omissions

19 giving rise to this lawsuit occurred within this district.

20                    **GENERAL ALLEGATIONS**

21                    ***Resident Evil 4* Contract**

22     8.    In or about September 2005, Constant entered into a contract with 3A for the

23 development of an adaptation of game developer Capcom's highly popular *Resident Evil 4* game

24 for distribution in Russia.  3A paid Constant a $200,000 licensing fee and an additional $200,000

25 to begin development of the product.  3A was to make additional payments to Constant, for a total

26 of $600,000, when certain development milestones were met.  A true and correct copy of the

27 *Resident Evil 4* contract is attached as Exhibit A.

28

sf-2427303

9.      Approximately a month after the parties executed the contract and 3A paid Constant $400,000, Constant informed 3A that Capcom would not allow Constant to develop a game based on *Resident Evil 4*, but instead only would allow development of a spin-off game based on the *Resident Evil* "brand." Because 3A contracted for the highly successful *Resident Evil 4*, not a *Resident Evil* spin-off, and Constant could not deliver that product, 3A cancelled the contract.

10.     Constant decided to continue its development of the spin-off game without 3A's involvement, and the parties agreed that Constant would sell 3A the product for sales in Russia when the game was completed. The parties orally agreed that the $400,000 that 3A had paid to Constant would be consideration for this agreement.

11.     Constant never completed the game and eventually cancelled the project. Despite several requests, Constant has refused to return 3A's payment of $400,000.

### *Warhammer: Mark of Chaos/Mage Knight* Contract

12.     On or about November 29, 2005, Constant entered into a contract with 3A for the right to manufacture, sell, and distribute two games developed by Namco: *Warhammer: Mark of Chaos* and *Mage Knight*. Pursuant to the terms of the contract, 3A paid Constant $300,000 to begin the project. 3A was to make additional payments to Constant, for a total of $150,000, when the master copies of the two games were delivered. A true and correct copy of the *Warhammer: Mark of Chaos/Mage Knight* contract is attached as Exhibit B.

13.     Approximately three months after the contract was signed and 3A paid Constant the first installment of $300,000, Constant informed 3A that Namco had withdrawn the rights to the two games from Constant. Because Constant could not deliver the games for which 3A contracted, 3A cancelled the contract. Constant has acknowledged that it must return the money paid by 3A pursuant to the contract and has since returned approximately $167,518. Constant has not returned the remaining $132,482 that 3A paid for the project.

### *Flight Simulator X* Contract

14.     In or about December 2006, Serguei An of Labcroft contacted Constant on 3A's behalf to inquire about the potential purchase of rights to Microsoft Corporation's *Flight*

*Simulator X.* Ho told An that Constant was in the process of acquiring the rights to that game. Later that month, Ho represented to An via telephone and email that Constant had secured the distribution rights to *Flight Simulator X* and could provide these rights to 3A. An relayed this information to 3A. At 3A's request, Ho faxed An a copy of the signature page to a purported contract between Microsoft and Constant for the rights to *Flight Simulator X.*

15.    On or about December 21, 2006, Constant entered into a contract with 3A for the sale of distribution rights to *Flight Simulator X.* The original purchase price for the rights was $145,000, but 3A agreed to forgive $35,000 of Constant's *Warhammer/Mage Knight* debt in return for an equivalent discount on the price of *Flight Simulator X.* Pursuant to the parties' agreement, 3A paid Constant $110,000 for the distribution rights. A true and correct copy of the *Flight Simulator X* contract is attached as Exhibit C.

16.    Ho signed the contract on behalf of Constant, which specifically contained a representation that "Company [Constant] publishes and distributes certain computer software products, including the products listed in Exhibit A hereto." (Exh. C at 1.) Exhibit A to the contract specifically lists Microsoft *Flight Simulator X* in paragraph 1. (Exh. C at 25, ¶ 1.) 3A relied on Ho's written and oral representations when it entered into the contract and made its initial payment to Constant.

17.    3A and Akella, a 3A affiliate that is involved in game distribution in Russia, began creating an advertising campaign for the game and purchasing advertising time on Russian television stations. A representative from Microsoft Russia discovered this and contacted Akella with questions as to its rights to the game. The representative informed Akella that Microsoft had not provided any rights to *Flight Simulator X* to Constant.

18.    An contacted Ho regarding this issue, who told An that Microsoft had withdrawn the rights to *Flight Simulator X* from Constant. Because Constant, yet again, was unable to provide what 3A contracted for, 3A cancelled the contract. The cancellation of this contract also terminated the agreement to forgive $35,000 of the *Warhammer/Mage Knight* debt. Constant has acknowledged the need to return 3A's $110,000 payment. Despite this acknowledgement, Constant has failed to refund the $110,000.

1      19.     On or about February 23, 2007, a representative from Microsoft Game Studios

2    emailed Akella with additional questions regarding 3A and Akella's distribution rights to

3    Microsoft games.  Microsoft was not aware of any such rights and wanted to determine how the

4    rights were acquired.

5      20.     After some discussion, Akella informed Microsoft that the rights were acquired

6    from Constant and inquired whether Philip Ho or Constant had legitimate distribution rights to

7    any Microsoft titles.  On June 7, 2007, Microsoft informed Akella that Microsoft had never

8    received any monies from Constant and that Constant and Ho had "no rights to distribute any

9    [Microsoft] titles directly or indirectly."  A true and correct copy of the email correspondence

10    between Microsoft and Akella is attached as Exhibit D.

11                   **Microsoft Back Catalog Contract**

12      21.     In or about October 2006, Ho and An entered into discussions regarding Labcroft's

13    acquisition of rights to several of Microsoft's "back catalog" titles, which Labcroft intended to

14    sublicense to 3A.  In the course of the negotiations, Ho telephoned An and stated that Constant

15    owned the distribution rights to the back catalog titles.  In addition, Ho faxed An a copy of the

16    signature page to a purported contract between Microsoft and Constant for the rights to the back

17    catalog titles.

18      22.     On October 11, 2006, Constant entered into a contract with Labcroft for

19    distribution rights to the "back catalog" titles, which included: *Age of Mythology*; *Age of*

20    *Mythology: The Titan Expansion*; *Dungeon Siege: Legends of Aranna*; *MechCommander*;

21    *MechWarrior 4: Vengeance*; *Mechwarrior 4: Mercenaries*; *Mechwarrior 4: Black Knight*;

22    *MechWarrior 4: Mech Paks*; *Racing Madness 2*; *Rallisport Challenge*; *Rise of Nations*; *Rise of*

23    *Nation: Thrones and Patriots*; *Train Simulator*; and *Zoo Tycoon Bundle Pack*.  Labcroft paid

24    $128,000 to Constant for those rights.

25      23.     Ho entered into the contract on behalf of Constant, which specifically contained a

26    representation that "Each of Licensor [Constant] and Sub-licensee [Labcroft] hereby represent

27    and warrant to the other party that it has all power and authority to enter into this Term Sheet and

28

sf-2427303

1  to perform its obligations hereunder." Labcroft relied on Ho's written and oral representations

2  when it entered into the contract and made its initial payment to Constant.

3      24.    Shortly after the contract was signed and Labcroft made its initial payment to

4  Constant, a representative from Ubisoft emailed a representative of Akella with questions

5  regarding the distribution rights to the back catalog titles. When An contacted Ho regarding this

6  issue, Ho informed him that Microsoft had withdrawn the rights to the titles from Constant.

7  Labcroft then cancelled the contract. Despite Constant's acknowledgment that the money must

8  be returned, Labcroft still has not received a refund of its $128,000 payment.

9      25.    As stated in paragraphs 19 – 20 above, Microsoft stated on June 7, 2007 that

10  neither Constant nor Philip Ho has any distribution rights to any Microsoft titles and that

11  Microsoft has never received any monies from Constant. In that same email, Microsoft stated

12  that Ubisoft was Microsoft's exclusive distributor of its back catalog in Russia and that Ubisoft

13  confirmed that it had not provided Constant with rights to any games either. (*See* Exh. D.)

**Valusoft Titles Contracts**

15      26.    Over the course of several months in 2006, Constant and 3A entered into three

16  contracts for distribution rights to twenty-two games created by Valusoft, for which 3A paid a

17  total of $172,000. True and correct copies of these contracts are attached as Exhibits E, F, and G.

18      27.    The last of these contracts, dated November 13, 2006, was for the game *Sprint*

19  *Cars*, among others. Ho signed this contract on behalf of Constant. The contract specifically

20  contained a representation that "Company [Constant] owns or has rightfully acquired the rights

21  and proprietary interest in the Products and any and all other rights necessary to grant Licensee

22  [3A] all rights and licenses granted to Licensee under this Agreement[.]" (Exh. G at § 12(b).)  3A

23  relied on Ho's written representations when it entered into the contract and made its payment to

24  Constant.

25      28.    In or about March 2007, Ho entered into negotiations with An for 3A's purchase

26  of distribution rights to an additional forty Valusoft games. During the negotiations, Ho emailed

27  a list of the game titles to An. These titles included: *Crisis Team Ambulance Driver*; *I Was an*

28  *Atomic Mutant*; *King's Collection – Classic Card Games*; *Let's Ride Silver Buckle Stables*;

*Prison Tycoon 3*; *Ride! Midway Tycoon*; *Ride! Carnival Tycoon*; *Prison Tycoon 3*; *Border Patrol*;

and *First Line of Defense: Border Patrol*. Ho informed An that Constant had acquired the rights

to the titles from Valusoft and could sell them to 3A. An relayed this information to 3A.

29.    On March 30, 2007, Constant entered into an agreement with 3A for exclusive

distribution rights to forty games created by Valusoft, including the titles listed in paragraph 27,

above. This agreement took the form of an addendum to the contract. 3A paid $170,000 to

Constant for those rights. A true and correct copy of this Addendum is attached as Exhibit H.

30.    Ho signed the Addendum on behalf of Constant. The November 13, 2006 contract

specifically contained a representation that "Company [Constant] owns or has rightfully acquired

the rights and proprietary interest in the Products and any and all other rights necessary to grant

Licensee [3A] all rights and licenses granted to Licensee under this Agreement[.]" (Exh. G at

§ 12(b).) 3A relied on Ho's written and oral representations when it entered into the contract and

made its initial payment to Constant.

31.    On or about October 31, 2007, a representative of Valusoft contacted Labcroft,

inquiring about Akella and 3A's distribution of several Valusoft titles. Valusoft's email attached

a copy of the agreement between Constant and Valusoft, which contained a list of the only titles

that Valusoft licensed to Constant. This list did not include several of the titles included in 3A's

contracts with Constant, including: *Sprint Cars; Crisis Team Ambulance Driver*; *I Was an Atomic*

*Mutant; King's Collection – Classic Card Games*; *Let's Ride Silver Buckle Stables*; *Prison*

*Tycoon 3*; *Ride! Midway Tycoon*; *Ride! Carnival Tycoon*; *Prison Tycoon 3*; *Border Patrol*; and

*First Line of Defense: Border Patrol*.

32.    In the same email, Valusoft informed Labcroft that Constant had breached its

agreement with Valusoft and that the terms of their agreement required a cancellation of all of

Constant's distribution rights to Valusoft titles in Russia. A true and correct copy of Valusoft's

email is attached as Exhibit I.

33.    Valusoft emailed Labcroft again on or about November 20, 2007, indicating that

*Ride! Midway Tycoon* and *Ride! Carnival Tycoon* were the same title. Valusoft also informed

Labcroft that *Border Patrol* and *First Line of Defense: Border Patrol* were the same title. In

1    other words, in two instances, Constant sold 3A the same product twice.  A true and correct copy

2    of the email is attached as Exhibit J.

3    **FIRST CLAIM FOR RELIEF**

4    **(Rescission of *Resident Evil 4* Contract)**

5    **(By 3A against Constant)**

6        34.    Plaintiffs incorporate paragraphs 1 - 33 above as if fully set forth herein.

7        35.    In or about September 2005, 3A and Constant entered into a written contract for

8    the development of an adaptation of the software game *Resident Evil 4*.  A copy of this contract is

9    attached as Exhibit A and made a part of this pleading.

10        36.    3A has performed all conditions, covenants, and promises required on its part to be

11    performed in accordance with the terms and conditions of the contract.

12        37.    In or about October 2005, Constant indicated that it would be unable to produce a

13    version of *Resident Evil 4* and in fact failed to produce the game, resulting in a total failure of

14    consideration.

15        38.    3A intends service of the summons and complaint in this action to serve as notice

16    of rescission of the *Resident Evil 4* contract and hereby demands that Constant restore to it the

17    consideration furnished by 3A, specifically $400,000, plus consequential damages according to

18    proof.

19    **SECOND CLAIM FOR RELIEF**

20    **(Breach of *Resident Evil 4* Contract)**

21    **(By 3A against Constant)**

22        39.    Plaintiffs incorporate paragraphs 1 - 38 above as if fully set forth herein.

23        40.    In addition to being a failure of consideration, Constant's failure to deliver a

24    version of *Resident Evil 4* to 3A was a material breach of the contract.

25        41.    As a result of Constant's breach of the contract and the failure of the consideration

26    to be received by 3A under the contract, 3A has been damaged in the sum of $400,000, which is

27    the amount of initial payments 3A made on the contract, plus interest.

28

COMPLAINT

8

1    42.    In addition, 3A suffered consequential damages including, but not limited to, lost

2    profits, according to proof.

### THIRD CLAIM FOR RELIEF

3

4    **(Rescission of *Warhammer: Mark of Chaos/Mage Knight* Contract)**

5    **(By 3A against Constant)**

6    43.    Plaintiffs incorporate paragraphs 1 - 42 above as if fully set forth herein.

7    44.    On or about November 29, 2005, 3A and Constant entered into a written contract

8    for the right to manufacture, sell and distribute the software games *Warhammer: Mark of Chaos*

9    and *Mage Knight*. A copy of the contract is attached as Exhibit B and made a part of this

10   pleading.

11   45.    3A has performed all conditions, covenants, and promises required on its part to be

12   performed in accordance with the terms and conditions of the contract.

13   46.    In or about February 2006, Constant indicated that it would be unable to provide

14   either *Warhammer: Mark of Chaos* or *Mage Knight* and in fact failed to provide the games,

15   resulting in a total failure of consideration.

16   47.    3A intends service of the summons and complaint in this action to serve as notice

17   of rescission of the *Warhammer: Mark of Chaos/Mage Knight* contract and hereby demands that

18   Constant restore to it the remaining unreturned consideration furnished by 3A, specifically

19   $132,482, plus consequential damages according to proof.

### FOURTH CLAIM FOR RELIEF

20

21   **(Breach of *Warhammer: Mark of Chaos* and *Mage Knight* Contract)**

22   **(By 3A against Constant)**

23   48.    Plaintiffs incorporate paragraphs 1 - 47 above as if fully set forth herein.

24   49.    In addition to being a failure of consideration, Constant's failure to deliver

25   *Warhammer: Mark of Chaos* and *Mage Knight* to 3A was a material breach of the contract.

26   50.    As a result of Constant's breach of the contract and the failure of the consideration

27   to be received by 3A under the contract, 3A has been damaged in the sum of $132,482, which is

28

sf-2427303

1    the amount of initial payments 3A made on the contract less the sum of $167,518 (which

2    Constant has returned to 3A), plus interest.

3         51.    In addition, 3A suffered consequential damages including, but not limited to, lost

4    profits, according to proof.

5    ### FIFTH CLAIM FOR RELIEF

6    ### (Rescission of *Flight Simulator X* Contract)

7    ### (By 3A against Constant)

8         52.    Plaintiffs incorporate paragraphs 1 - 51 above as if fully set forth herein.

9         53.    In or about December 2006, 3A and Constant entered into a written contract

10   regarding the license and distribution of *Flight Simulator X.* A copy of this contract is attached as

11   Exhibit C and made a part of this pleading.

12        54.    3A has performed all conditions, covenants, and promises required on its part to be

13   performed in accordance with the terms and conditions of the contract.

14        55.    In or about March 2007, Constant indicated that it would be unable to provide

15   *Flight Simulator X* and in fact failed to provide the game, resulting in a total failure of

16   consideration.

17        56.    3A intends service of the summons and complaint in this action to serve as notice

18   of rescission of the *Flight Simulator X* contract and hereby demands that Constant restore to it the

19   consideration furnished by 3A, specifically $110,000, plus consequential damages according to

20   proof.

21   ### SIXTH CLAIM FOR RELIEF

22   ### (Breach of *Flight Simulator X* Contract)

23   ### (By 3A against Constant)

24        57.    Plaintiffs incorporate paragraphs 1 - 56 above as if fully set forth herein.

25        58.    In addition to being a failure of consideration, Constant's failure to deliver *Flight*

26   *Simulator X* to 3A was a material breach of the contract.

27

28

sf-2427303

59.     As a result of Constant's breach of the contract and the failure of the consideration to be received by 3A under the contract, 3A has been damaged in the sum of $110,000, the amount 3A paid on the contract, plus interest.

60.     In addition, 3A suffered consequential damages including, but not limited to, lost profits, according to proof.

### SEVENTH CLAIM FOR RELIEF

### (Fraud Arising Out of *Flight Simulator X* Contract)

### (By 3A against Constant and Philip Ho)

61.     Plaintiffs incorporate paragraphs 1 - 60 above as if fully set forth herein.

62.     3A is informed and believes and thereon alleges that defendant Philip Ho, who made the representations herein alleged, is the Managing Partner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of the representations herein alleged and at all times herein mentioned was acting within the course and scope of his employment and authority for Constant.

63.     Ho telephoned Serguei An of Labcroft in or about December 2006 and stated that Constant owned the distribution rights to *Flight Simulator X.* Ho also faxed An a copy of the signature page to a purported contract between Microsoft and Constant for the rights to *Flight Simulator X.* An relayed this information to 3A.

64.     On information and belief, on or about September 12, 2006 in Sunnyvale, California, Ho executed the *Flight Simulator X* contract on behalf of Constant, which contained the following representations: "Company [Constant] publishes and distributes certain computer software products, including the products listed in Exhibit A hereto." (Exh. C at 1.) Exhibit A to the Contract specifically lists Microsoft's *Flight Simulator X* in paragraph 1. (Exh. C at 23, ¶ 1.)

65.     The representations made by Ho were in fact false. The true facts were that Constant had no rights to any Microsoft titles. (*See* Exh. D.)

66.     On information and belief, when Ho made these representations, he knew them to be false and made these representations with the intention to induce 3A to act in reliance on these representations in the manner hereafter alleged, or with the expectation that 3A would so act.

sf-2427303

67.    3A, at the time these representations were made by Ho and at the time 3A took the actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be true.  In reliance on these representations, 3A was induced to and did pay Constant $110,000.  Had 3A known that Constant had no rights to *Flight Simulator X*, it would not have taken such action. 3A's reliance on Ho's representations was justified because it had previously entered into contracts with Constant where Constant did in fact have rights to the games at issue and delivered them to 3A.

68.    As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was induced to make payments on the contract, by reason of which it has been damaged in the sum of $110,000, plus consequential damages according to proof.

69.    The aforementioned conduct of Ho was an intentional misrepresentation, deceit, or concealment of a material fact known to Ho with the intention on the part of Ho of thereby depriving 3A of money and otherwise causing injury, so as to justify an award of exemplary and punitive damages.

70.    Upon information and belief, Constant accepted and retained the benefits of the *Flight Simulator X* transaction, and is therefore jointly liable with Ho for 3A's damages.

## EIGHTH CLAIM FOR RELIEF

### (Negligent Misrepresentation Arising Out of *Flight Simulator X* Contract)

### (By 3A against Constant and Philip Ho)

71.    Plaintiffs incorporate paragraphs 1 - 70 above as if fully set forth herein.

72.    3A is informed and believes and thereon alleges that defendant Philip Ho, who made the representations herein alleged, is the Managing Partner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of the representations herein alleged and at all times herein mentioned was acting within the course and scope of his employment and authority for Constant.

73.    Ho telephoned Serguei An of Labcroft in or about December 2006 and stated that Constant owned the distribution rights to *Flight Simulator X*.  Ho also faxed An a copy of the

1  signature page to a purported contract between Microsoft and Constant for the rights to *Flight*

2  *Simulator X.* An relayed this information to 3A.

3        74.    On information and belief, on or about September 12, 2006 in Sunnyvale,

4  California, Ho executed the *Flight Simulator X* contract on behalf of Constant, which contained

5  the following representations: "Company [Constant] publishes and distributes certain computer

6  software products, including the products listed in Exhibit A hereto." (Exh. C at 1.)  Exhibit A to

7  the Contract specifically lists Microsoft's *Flight Simulator X* in paragraph 1. (Exh. C at 23, ¶ 1.)

8        75.    The representations made by Ho were in fact false. The true facts were that

9  Constant had no rights to any Microsoft titles. (*See* Exh. D.)

10        76.    On information and belief, when Ho made these representations, he had no

11  reasonable ground for believing them to be true, in that Microsoft never had provided Constant

12  with rights to any of its game titles.

13        77.    On information and belief, Ho made these representations with the intention of

14  inducing 3A to act in reliance on these representations in the manner hereafter alleged, or with the

15  expectation that 3A would so act.

16        78.    3A, at the time these representations were made by Ho and at the time 3A took the

17  actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be

18  true.  In reliance on these representations, 3A was induced to and did pay Constant $110,000. Had

19  3A known that Constant had no rights to *Flight Simulator X*, it would not have taken such action.

20  3A's reliance on Ho's representations was justified because it previously had entered into

21  contracts with Constant where Constant did in fact have rights to the games at issue and delivered

22  them to 3A.

23        79.    As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was

24  induced to make payments on the contract, by reason of which it has been damaged in the sum of

25  $110,000, plus consequential damages according to proof.

26        80.    Upon information and belief, Constant accepted and retained the benefits of the

27  *Flight Simulator X* transaction, and therefore is jointly liable with Ho for 3A's damages.

28

1

### NINTH CLAIM FOR RELIEF

### (Rescission of Microsoft Back Catalog Contract)

### (By Labcroft against Constant)

81.    Plaintiffs incorporate paragraphs 1 - 80 above as if fully set forth herein.

82.    On or about October 11, 2006, Labcroft and Constant entered into a written contract wherein Constant sub-licensed to Labcroft the rights to distribute several of Microsoft's "back catalog" titles in Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan, and Uzbekistan for three years.  Labcroft paid $128,000 for these rights.  The sub-licensed titles included: *Age of Mythology*; *Age of Mythology: The Titan Expansion*; *Dungeon Siege: Legends of Aranna*; *MechCommander*; *MechWarrior 4: Vengeance*; *Mechwarrior 4: Mercenaries*; *Mechwarrior 4: Black Knight*; *MechWarrior 4: Mech Paks*; *Racing Madness 2*; *Rallisport Challenge*; *Rise of Nations*; *Rise of Nation: Thrones and Patriots*; *Train Simulator*; and *Zoo Tycoon Bundle Pack* (collectively "the back catalog titles").

83.    Labcroft has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the contract.

84.    On or about February 20, 2007, Constant indicated that it was unable to provide the back catalog titles and in fact failed to provide the games, resulting in a total failure of consideration.

85.    Labcroft intends service of the summons and complaint in this action to serve as notice of rescission of the Microsoft back catalog contract and hereby demands that Constant restore to it the remaining consideration furnished by Labcroft, specifically $128,000, plus consequential damages according to proof.

### TENTH CLAIM FOR RELIEF

### (Breach of Microsoft Back Catalog Contract)

### (By Labcroft against Constant)

86.    Plaintiffs incorporate paragraphs 1 - 85 above as if fully set forth herein.

sf-2427303

87.    In addition to being a failure of consideration, Constant's failure to deliver the back catalog titles to Labcroft was a material breach of the contract.

88.    As a result of Constant's breach of the contract and the failure of the consideration to be received by Labcroft under the contract, Labcroft has been damaged in the sum of $128,000, the amount Labcroft paid on the contract, plus interest.

89.    In addition, Labcroft suffered consequential damages including, but not limited to, lost profits, according to proof.

### ELEVENTH CLAIM FOR RELIEF

### (Fraud Arising Out of Microsoft Back Catalog Contract)

### (By Labcroft against Constant and Philip Ho)

90.    Plaintiffs incorporate paragraphs 1 - 89 above as if fully set forth herein.

91.    Labcroft is informed and believes and thereon alleges that defendant Philip Ho, who made the representations herein alleged, is the Managing Partner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director of defendant Constant and, at the time of the making of the representations herein alleged and at all times herein mentioned was acting within the course and scope of his employment and authority for Constant.

92.    Before the contract was executed, Philip Ho telephoned Serguei An of Labcroft in or about October 2006 and stated that Constant owned the distribution rights to the back catalog titles.  Ho also faxed An a copy of the signature page to a purported contract between Microsoft and Constant for the rights to those titles.

93.    On information and belief, on or about October 11, 2006 in Sunnyvale, California, Ho entered into the Microsoft back catalog contract on behalf of Constant, which contained the following representations: "Each of Licensor [Constant] and Sub-licensee [Labcroft] hereby represent and warrant to the other party that it has all power and authority to enter into this Term Sheet and to perform its obligations hereunder."

94.    The representations made by Ho were in fact false. The true facts were that Constant had no rights to any Microsoft titles, and therefore had no power or authority to perform the obligations under the contract. (*See* Exh. D.)

sf-2427303

1    95.    On information and belief, when Ho made these representations, he knew them to

2    be false and made these representations with the intention to induce Labcroft to act in reliance on

3    these representations in the manner hereafter alleged, or with the expectation that Labcroft would

4    so act.

5    96.    Labcroft, at the time these representations were made by Ho and at the time

6    Labcroft took the actions herein alleged, was ignorant of the falsity of Ho's representations and

7    believed them to be true.  In reliance on these representations, Labcroft was induced to and did

8    pay Constant $128,000.  Had Labcroft known that Constant had no rights to the Microsoft back

9    catalog titles, it would not have taken such action.  Labcroft's reliance on Ho's representations

10   was justified because it had previously entered into contracts with Constant where Constant did in

11   fact have rights to the games at issue and delivered them to Labcroft.

12   97.    As a proximate result of the fraudulent conduct of Ho as herein alleged, Labcroft

13   was induced to make payments on the contract, by reason of which it has been damaged in the

14   sum of $128,000, plus consequential damages according to proof.

15   98.    The aforementioned conduct of Ho was an intentional misrepresentation, deceit,

16   or concealment of a material fact known to Ho with the intention on the part of Ho of thereby

17   depriving Labcroft of money and otherwise causing injury, so as to justify an award of exemplary

18   and punitive damages.

19   99.    Upon information and belief, Constant accepted and retained the benefits of the

20   Microsoft back catalog transaction, and is therefore jointly liable with Ho for Labcroft's damages.

21                          **TWELFTH CLAIM FOR RELIEF**

22        **(Negligent Misrepresentation Arising Out of Microsoft Back Catalog Contract)**

23                     **(By Labcroft against Constant and Philip Ho)**

24   100.    Plaintiffs incorporate paragraphs 1 - 99 above as if fully set forth herein.

25   101.    Labcroft is informed and believes and thereon alleges that defendant Philip Ho,

26   who made the representations herein alleged, is the Managing Partner, Chief Executive Officer,

27   Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of

28

sf-2427303

1  the representations herein alleged and at all times herein mentioned was acting within the course

2  and scope of his employment and authority for Constant.

3      102.    Before the contract was executed, Philip Ho telephoned Serguei An of Labcroft in

4  or about October 2006 and stated that Constant owned the distribution rights to the back catalog

5  titles.  Ho also faxed An a copy of the signature page to a purported contract between Microsoft

6  and Constant for the rights to those titles.

7      103.    On information and belief, on or about October 11, 2006 in Sunnyvale, California,

8  Ho entered into the Microsoft back catalog contract on behalf of Constant, which contained the

9  following representations: "Each of Licensor [Constant] and Sub-licensee [Labcroft] hereby

10  represent and warrant to the other party that it has all power and authority to enter into this Term

11  Sheet and to perform its obligations hereunder." (*See* Exh. E at 4.)

12      104.    The representations made by Ho were in fact false. The true facts were that

13  Constant had no rights to any Microsoft titles, and therefore had no power or authority to perform

14  the obligations under the contract. (*See* Exh. D.)

15      105.    On information and belief, when Ho made these representations, he had no

16  reasonable ground for believing them to be true in that Microsoft had never provided Constant

17  with rights to any of its game titles.

18      106.    On information and belief, Ho made these representations with the intention of

19  inducing Labcroft to act in reliance on these representations in the manner hereafter alleged, or

20  with the expectation that Labcroft would so act.

21      107.    Labcroft, at the time these representations were made by Ho and at the time

22  Labcroft took the actions herein alleged, was ignorant of the falsity of Ho's representations and

23  believed them to be true.  In reliance on these representations, Labcroft was induced to and did

24  pay Constant $128,000.  Had Labcroft known that Constant had no rights to the Microsoft back

25  catalog titles, it would not have taken such action.  Labcroft's reliance on Ho's representations

26  was justified because it had previously entered into a number of contracts with Constant where

27  Constant did in fact have rights to the games at issue and delivered them to Labcroft.

28

108.   As a proximate result of the fraudulent conduct of Ho as herein alleged, Labcroft was induced to make payments on the contract, by reason of which it has been damaged in the sum of $128,000, plus consequential damages according to proof.

109.   Upon information and belief, Constant accepted and retained the benefits of the Microsoft back catalog transaction, and is therefore jointly liable with Ho for Labcroft's damages.

## THIRTEENTH CLAIM FOR RELIEF

### (Rescission of Valusoft Contracts)

### (By 3A against Constant)

110.   Plaintiffs incorporate paragraphs 1 - 109 above as if fully set forth herein.

111.   On or about February 1, 2006, Constant entered into a written contract with 3A for distribution rights to thirteen games created by Valusoft. 3A paid $73,000 to Constant for those rights. A copy of this agreement is attached as Exhibit E and made a part of this pleading.

112.   On or about September 12, 2006, Constant entered into a written contract with 3A for distribution rights to six games created by Valusoft. 3A paid $27,000 to Constant for those rights. A copy of this agreement is attached as Exhibit F and made a part of this pleading.

113.   On or about November 13, 2006, Constant entered into a written contract with 3A for distribution rights to *Sprint Cars* and two other games created by Valusoft. 3A paid $72,000 to Constant for those rights. The portion of the purchase price attributable to *Sprint Cars* was approximately $10,000. A copy of this agreement is attached as Exhibit G and made a part of this pleading.

114.   On or about March 30, 2007, Constant and 3A executed an addendum to the November 13, 2006 contract (the "Addendum"), adding forty games to the list of titles to which 3A would purchase distribution rights. These titles included: *Crisis Team Ambulance Driver*; *I Was an Atomic Mutant*; *King's Collection – Classic Card Games*; *Let's Ride Silver Buckle Stables*; *Prison Tycoon 3*; *Ride! Midway Tycoon*; *Ride! Carnival Tycoon*; *Sea Scene: Living Underwater Worlds*; *Prison Tycoon 3*; *Border Patrol*; and *First Line of Defense: Border Patrol*. Philip Ho signed the Addendum on behalf of Constant. 3A paid $170,000 to Constant for those rights. A copy of this agreement is attached as Exhibit H and made a part of this pleading.

sf-2427303

1   115. 3A has performed all conditions, covenants, and promises required on its part to be

2 performed in accordance with the terms and conditions of the four contracts.

3   116. On or about October 31, 2007, Labcroft was informed by Valusoft that Constant

4 had breached its agreement with Valusoft and that the terms of their agreement required a

5 cancellation of all of Constant's distribution rights to Valusoft titles in Russia.  Because this

6 resulted in Constant being unable to provide 3A with the Valusoft titles for which it contracted

7 and the halt of the publication of titles 3A had already received, consideration for the Valusoft

8 Contracts has failed.  A true and correct copy of Valusoft's email discussing the terms of its

9 agreement with Constant is attached as Exhibit I.

10   117. 3A intends service of the summons and complaint in this action to serve as notice

11 of rescission of all the Valusoft agreements listed in paragraphs 111 - 114 above and hereby

12 demands that Constant restore to it the remaining consideration furnished by 3A in those

13 contracts, specifically $342,000 plus consequential damages according to proof, less any revenue

14 3A has earned on delivered Valusoft titles.

**FOURTEENTH CLAIM FOR RELIEF**

**(Breach of Valusoft Contracts)**

**(By 3A against Constant)**

18   118. Plaintiffs incorporate paragraphs 1 - 117 above as if fully set forth herein.

19   119. In addition to being a failure of consideration, Constant's breach of its agreement

20 of the Valusoft contracts, which resulted in a cancellation of its distribution rights to all Valusoft

21 titles, including those licensed to 3A, was a breach of the four Valusoft agreements listed in

22 paragraphs 111 - 114 above.

23   120. As a result of Constant's breach of the contract and the failure of the consideration

24 to be received by 3A under the contract, 3A has been damaged in the sum of $342,000, the

25 amount 3A paid under the contracts, less any revenue 3A has earned on delivered Valusoft titles.

26   121. In addition, 3A suffered consequential damages including, but not limited to, lost

27 profits, according to proof.

28

sf-2427303

**FIFTEENTH CLAIM FOR RELIEF**

**(Fraud Arising Out of November 13, 2006 Contract)**

**(By 3A against Constant and Philip Ho)**

122.    Plaintiffs incorporate paragraphs 1 - 121 above as if fully set forth herein.

123.    3A is informed and believes and thereon alleges that defendant Philip Ho, who made the representations herein alleged, is the Managing Partner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of the representations herein alleged and at all times herein mentioned was acting within the course and scope of his employment and authority for Constant.

124.    On information and belief, on or about November 13, 2006 in Sunnyvale, California, Ho executed a contract on behalf of Constant for the sale of rights to *Sprint Cars* and two other games.  The contract specifically contained a representation that "Company [Constant] owns or has rightfully acquired the rights and proprietary interest in the Products and any and all other rights necessary to grant Licensee [3A] all rights and licenses granted to Licensee under this Agreement[.]" (Exh. G at § 12(b).)

125.    3A relied on Ho's representations when it entered into the contract and made its initial payment to Constant.

126.    The representations made by Ho were in fact false. The true facts were that Constant had no rights to *Sprint Cars*.  (See Exhs. I, J.)

127.    On information and belief, when Ho made these representations, he knew them to be false and made these representations with the intention to induce 3A to act in reliance on these representations in the manner hereafter alleged, or with the expectation that 3A would so act.

128.    3A, at the time these representations were made by Ho and at the time 3A took the actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be true.  In reliance on these representations, 3A was induced to and did pay Constant approximately $10,000.  Had 3A known that Constant had no rights to *Sprint Cars*, it would not have taken such action.  3A's reliance on Ho's representations was justified because it had previously entered into

sf-2427303

1 contracts with Constant for Valusoft titles where Constant did in fact have rights to the games at
2 issue and delivered them to 3A.

3    129.    As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was
4 induced to make payments on the contract, by reason of which it has been damaged in the sum of
5 approximately $10,000, plus consequential damages according to proof.

6    130.    The aforementioned conduct of Ho was an intentional misrepresentation, deceit,
7 or concealment of a material fact known to Ho with the intention on the part of Ho of thereby
8 depriving 3A of money and otherwise causing injury, so as to justify an award of exemplary and
9 punitive damages.

10    131.    Upon information and belief, Constant accepted and retained the benefits of the
11 Addendum, and is therefore jointly liable with Ho for 3A's damages.

12                    **SIXTEENTH CLAIM FOR RELIEF**
13        **(Negligent Misrepresentation Arising Out of November 13, 2006 Contract)**
14                    **(By 3A against Constant and Philip Ho)**

15    132.    Plaintiffs incorporate paragraphs 1 - 131 above as if fully set forth herein.

16    133.    3A is informed and believes and thereon alleges that defendant Philip Ho, who
17 made the representations herein alleged, is the Managing Partner, Chief Executive Officer,
18 Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of
19 the representations herein alleged and at all times herein mentioned was acting within the course
20 and scope of his employment and authority for Constant.

21    134.    On information and belief, on or about November 13, 2006 in Sunnyvale,
22 California, Ho executed a contract on behalf of Constant for the sale of rights to *Sprint Cars* and
23 two other games.  The contract specifically contained a representation that "Company [Constant]
24 owns or has rightfully acquired the rights and proprietary interest in the Products and any and all
25 other rights necessary to grant Licensee [3A] all rights and licenses granted to Licensee under this
26 Agreement[.]"  (Exh. G at § 12(b).)

27    135.    3A relied on Ho's representations when it entered into the contract and made its
28 initial payment to Constant.

sf-2427303

136.   The representations made by Ho were in fact false. The true facts were that Constant had no rights to *Sprint Cars*.  (See Exhs. I, J.)

137.   On information and belief, when Ho made these representations, he had no reasonable ground for believing them to be true in that Valusoft had not provided Constant with rights to *Sprint Cars*.

138.   On information and belief, Ho made these representations with the intention of inducing 3A to act in reliance on these representations in the manner hereafter alleged, or with the expectation that 3A would so act.

139.   3A, at the time these representations were made by Ho and at the time 3A took the actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be true.  In reliance on these representations, 3A was induced to and did pay Constant approximately $10,000.  Had 3A known that Constant had no rights to *Sprint Cars*, it would not have taken such action.  3A's reliance on Ho's representations was justified because it had previously entered into contracts with Constant for Valusoft titles where Constant did in fact have rights to the games at issue and delivered them to 3A.

140.   As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was induced to make payments on the contract, by reason of which it has been damaged in the sum of $10,000, plus consequential damages according to proof.

141.   Upon information and belief, Constant accepted and retained the benefits of the Addendum, and is therefore jointly liable with Ho for 3A's damages.

### SEVENTEENTH CLAIM FOR RELIEF

### (Fraud Arising Out of Addendum to November 13, 2006 Contract)

### (By 3A against Constant and Philip Ho)

142.   Plaintiffs incorporate paragraphs 1 - 141 above as if fully set forth herein.

143.   3A is informed and believes and thereon alleges that defendant Philip Ho, who made the representations herein alleged, is the Managing Partner, Chief Executive Officer, Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of

sf-2427303

1    the representations herein alleged and at all times herein mentioned was acting within the course

2    and scope of his employment and authority for Constant.

3        144.    On several occasions between January and March 2007, Ho telephoned Serguei

4    An of Labcroft and stated that Constant owned the rights to several Valusoft titles, including

5    *Crisis Team Ambulance Driver*; *I Was an Atomic Mutant*; *King's Collection – Classic Card*

6    *Games*; *Let's Ride Silver Buckle Stables*; *Prison Tycoon 3*; *Ride! Midway Tycoon*; *Ride! Carnival*

7    *Tycoon*; *Sea Scene: Living Underwater Worlds*; *Prison Tycoon 3*; *Border Patrol*; and *First Line*

8    *of Defense: Border Patrol*, and was able to license those rights to 3A.  Pursuant to Ho's request,

9    An relayed this information to 3A.

10        145.    On information and belief, on or about March 30, 2007 in Sunnyvale, California,

11    Ho executed the Addendum to the November 13, 2006 contract on behalf of Constant.  The

12    November 13, 2006 contract specifically contained a representation that "Company [Constant]

13    owns or has rightfully acquired the rights and proprietary interest in the Products and any and all

14    other rights necessary to grant Licensee [3A] all rights and licenses granted to Licensee under this

15    Agreement[.]"  (Exh. G at § 12(b).)

16        146.    Both Ho's written and oral representations also contained the implied

17    representation that *Ride! Midway Tycoon* and *Ride! Carnival Tycoon*, as well as *Border Patrol*

18    and *First Line of Defense: Border Patrol* were separate and distinct titles.

19        147.    3A relied on Ho's representations when it entered into the contract and made its

20    initial payment to Constant.

21        148.    The representations made by Ho were in fact false. The true facts were that

22    Constant had no rights to the Valusoft titles listed in paragraph 144 above and that *Ride! Midway*

23    *Tycoon* and *Ride! Carnival Tycoon* were the same title, as were *Border Patrol* and *First Line of*

24    *Defense: Border Patrol*.  (*See* Exhs. I, J.)

25        149.    On information and belief, when Ho made these representations, he knew them to

26    be false and made these representations with the intention to induce 3A to act in reliance on these

27    representations in the manner hereafter alleged, or with the expectation that 3A would so act.

28

1    150.    3A, at the time these representations were made by Ho and at the time 3A took the

2    actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be

3    true.  In reliance on these representations, 3A was induced to and did pay Constant $170,000.

4    Had 3A known that Constant had no rights to the Valusoft titles listed in paragraph 144 above,

5    that *Ride! Midway Tycoon* and *Ride! Carnival Tycoon* were the same title, and that *Border Patrol*

6    and *First Line of Defense: Border Patrol* were the same title, it would not have taken such action.

7    3A's reliance on Ho's representations was justified because it had previously entered into

8    contracts with Constant for Valusoft titles where Constant did in fact have rights to the games at

9    issue and delivered them to 3A.

10    151.    As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was

11    induced to make payments on the contract, by reason of which it has been damaged in the sum of

12    $170,000, plus consequential damages according to proof.

13    152.    The aforementioned conduct of Ho was an intentional misrepresentation, deceit,

14    or concealment of a material fact known to Ho with the intention on the part of Ho of thereby

15    depriving 3A of money and otherwise causing injury, so as to justify an award of exemplary and

16    punitive damages.

17    153.    Upon information and belief, Constant accepted and retained the benefits of the

18    Addendum, and is therefore jointly liable with Ho for 3A's damages.

19    **EIGHTEENTH CLAIM FOR RELIEF**

20    **(Negligent Misrepresentation Arising Out of Addendum to November 13, 2006 Contract)**

21    **(By 3A against Constant and Philip Ho)**

22    154.    Plaintiffs incorporate paragraphs 1 - 153 above as if fully set forth herein.

23    155.    3A is informed and believes and thereon alleges that defendant Philip Ho, who

24    made the representations herein alleged, is the Managing Partner, Chief Executive Officer,

25    Secretary, Chief Financial Officer, and sole Director of Constant and, at the time of the making of

26    the representations herein alleged and at all times herein mentioned was acting within the course

27    and scope of his employment and authority for Constant.

28

1    156.    On several occasions between January and March 2007, Ho telephoned Serguei

2  An of Labcroft and stated that Constant owned the rights to several Valusoft titles, including

3  *Crisis Team Ambulance Driver*; *I Was an Atomic Mutant*; *King's Collection – Classic Card*

4  *Games*; *Let's Ride Silver Buckle Stables*; *Prison Tycoon 3*; *Ride! Midway Tycoon*; *Ride! Carnival*

5  *Tycoon*; *Sea Scene: Living Underwater Worlds*; *Prison Tycoon 3*; *Border Patrol*; and *First Line*

6  *of Defense: Border Patrol*, and was able to license those rights to 3A.  Pursuant to Ho's request,

7  An relayed this information to 3A.

8    157.    On information and belief, on or about October 11, 2006 in Sunnyvale, California,

9  Ho executed the Addendum to the November 13, 2006 contract on behalf of Constant.  The

10  November 13, 2006 contract specifically contained a representation that "Company [Constant]

11  owns or has rightfully acquired the rights and proprietary interest in the Products and any and all

12  other rights necessary to grant Licensee [3A] all rights and licenses granted to Licensee under this

13  Agreement[.]"  (Exh. G at § 12(b).)

14    158.    Both Ho's written and oral representations also contained the implied

15  representation that *Ride! Midway Tycoon* and *Ride! Carnival Tycoon*, as well as *Border Patrol*

16  and *First Line of Defense: Border Patrol* were separate and distinct titles.

17    159.    3A relied on Ho's representations when it entered into the contract and made its

18  initial payment to Constant.

19    160.    The representations made by Ho were in fact false. The true facts were that

20  Constant had no rights to the Valusoft titles listed in paragraph 156 above and that *Ride! Midway*

21  *Tycoon* and *Ride! Carnival Tycoon* were the same title, as were *Border Patrol* and *First Line of*

22  *Defense: Border Patrol*.  (*See* Exh. I, J.)

23    161.    On information and belief, when Ho made these representations, he had no

24  reasonable ground for believing them to be true in that Valusoft had not provided Constant with

25  rights to the titles listed in paragraph 156.

26    162.    On information and belief, Ho made these representations with the intention of

27  inducing 3A to act in reliance on these representations in the manner hereafter alleged, or with the

28  expectation that 3A would so act.

163.    3A, at the time these representations were made by Ho and at the time 3A took the actions herein alleged, was ignorant of the falsity of Ho's representations and believed them to be true.  In reliance on these representations, 3A was induced to and did pay Constant $170,000. Had 3A known that Constant had no rights to the Valusoft titles listed in paragraph 156 above, that *Ride! Midway Tycoon* and *Ride! Carnival Tycoon* were the same title, and that *Border Patrol* and *First Line of Defense: Border Patrol* were the same title, it would not have taken such action. 3A's reliance on Ho's representations was justified because it had previously entered into contracts with Constant for Valusoft titles where Constant did in fact have rights to the games at issue and delivered them to 3A.

164.    As a proximate result of the fraudulent conduct of Ho as herein alleged, 3A was induced to make payments on the contract, by reason of which it has been damaged in the sum of $170,000, plus consequential damages according to proof.

165.    Upon information and belief, Constant accepted and retained the benefits of the Addendum, and is therefore jointly liable with Ho for 3A's damages.

### PRAYER FOR RELIEF

WHEREFORE, 3A demands judgment from Constant for:

(1)    Compensatory damages in the amount of $984,482.00, plus additional compensatory damages according to proof;

(2)    Consequential damages according to proof;

(3)    Punitive damages;

(4)    Costs of suit; and

(5)    Such other and further relief as the Court may deem just and proper.

WHEREFORE, 3A demands judgment from Philip Ho for:

(1)    Compensatory damages in the amount of $290,000.00, plus additional compensatory damages according to proof;

(2)    Consequential damages according to proof;

(3)    Punitive damages;

(4)    Costs of suit; and

1    (5)    Such other and further relief as the Court may deem just and proper.

2    WHEREFORE, Labcroft demands judgment from Constant for:

3    (1)    Compensatory damages in the amount of $128,000, plus additional compensatory

4    damages according to proof;

5    (2)    Consequential damages according to proof;

6    (3)    Punitive damages;

7    (4)    Attorneys' fees;

8    (5)    Costs of suit; a

9    (6)    Such other and further relief as the Court may deem just and proper.

10    WHEREFORE, Labcroft demands judgment from Philip Ho for:

11    (1)    Compensatory damages in the amount of $128,000, plus additional compensatory

12    damages according to proof;

13    (2)    Consequential damages according to proof;

14    (3)    Punitive damages;

15    (4)    Costs of suit; and

16    (5)    Such other and further relief as the Court may deem just and proper.

17    **DEMAND FOR JURY TRIAL**

18    Pursuant to Federal Rule of Civil Procedure 38(b), 3A and Labcroft hereby demand a trial

19    by jury of all issues so triable herein.

20
Dated: March 4, 2008

21    PHILIP T. BESIROF
ALEXEI KLESTOFF
MORRISON & FOERSTER LLP

22

23    By: _____

24    Philip T. Besirof

25    Attorneys for Plaintiffs
3A ENTERTAINMENT LTD. and

26    LABCROFT LTD.

27

28

COMPLAINT    27

# PUBLISHING AGREEMENT


By and between:


**3A Entertainment Inc.**


AND


**Constant Entertainment, LLP**


For the Game: Resident Evil 4



Файл № 379

This software development agreement (hereinafter: the "Agreement") is entered into and between:

(1) **Constant Entertainment, LLP**, a California company, located at 445 Bryan Avenue, Sunnyvale, California, 94086 United States.

hereinafter referred to as "DEVELOPER"

AND

(2) **3A Entertainment Inc.**, a British Virgin Islands company, with registered office at the offices of OVERSEAS MANAGEMENT COMPANY TRUST (B.V.I.) LTD., OMC Chambers, P.O. Box 3152, Road Town, Tortola, British Virgin Islands.

hereinafter referred to as "PUBLISHER";

RECITALS

WHEREAS,

A.  PUBLISHER is engaged in the business of game software production, publishing, marketing and distribution.

B.  DEVELOPER is involved in the development of game software.

C.  PUBLISHER desires to produce and publish an original game carrying the working title "Resident Evil 4" or such other title as the parties to this Agreement may mutually decide.

D.  PUBLISHER desires to contract with DEVELOPER for the development and exploitation of the Game (this term as defined below) on the terms and conditions set forth hereinafter in the Agreement.

### NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

## 1. DEFINITIONS

For the purpose of the Agreement, the following terms shall have the following meanings:

1.1    ADAPTATION: Any Game programmed for either (i) a format other than the Format

1.2    ADVANCES: The following amounts of money shall be considered as advances recoupable against royalties: all sums paid to DEVELOPER as defined in section 8.1



2

1.2    BUDGET: The term is to be construed as ADVANCES.

1.3    BUNDLE: The combining or incorporating of a collection of computer hardware and/or software to form a single combined product.

1.4    DELIVERABLE ITEM(S): The items to be delivered by DEVELOPER to PUBLISHER pursuant to the Milestone schedule and the specification, together with any other item mutually agreed by the parties

1.5    ERROR: Any case where the Game abnormally ceases to function produces materially incorrect or misleading information or erroneously interprets proper information given to it while playing or fails to function in accordance with the specification.

1.6    FORMAT: Any medium on which the Game shall be published, such as but not limited to PC CD-ROM, PC DVD-ROM, cartridge,    Nintendo DS, Sony Playstation II, Sony Playstation III, Microsoft Xbox, Microsoft Xbox2, Nintendo 64 cartridge, Sega Dreamcast CD or any other medium whether now known or subsequently developed.

1.7    GAME: The original interactive software game programmed in accordance with the specification for the format for use on the system with the title.

1.8    GAME MATERIALS: Any and all materials and/or documentation directly connected with the Game including but not limited to user manual, instruction booklet, hint book, packaging, advertisements and promotional items developed for the promotion of the Game, and any other documentation whatsoever connected with and/or integral to the completion and/or release of the Game.

1.9    LICENSE: A personal, exclusive, transferable, terminable license to the Game to perform in relation to the Game the rights specified in this Agreement.

1.10    LOCALIZATION: The work involved in tailoring the Game to suit requirements of a specific geographic and/or cultural market without modifying the format. Such work usually involves translations and tweaks in the game play.

1.11    MASTER: Version of the Game that has passed through all phases of testing (including any Licensor authorization, if any) involved in the Game production and which has been approved in writing by PUBLISHER. The Master of the Game is the final non-copy protected and non-encrypted version, as defined in Appendix A for the PC CD-ROM version and/or MAC PC throughout the world and recorded in executable form together with any necessary supporting software and data, which fully implements the specification, is suitable for manufacturing and for commercial release by PUBLISHER and is in such form as shall enable to create copies of the Game which are of satisfactory quality for consumers. The target delivery date for the Master is October 2006.

1.12    MILESTONE: An intermediate stage of Game programming mutually agreed by the parties and capable of triggering advances.

1.13    PREQUEL: shall be taken to mean any proposed, putative or existing version of the Game with a different, reduced, enhanced or otherwise modified screenplay, plot, theme or game design which is a prologue or a precedent from a Game. The fact that two separate games may be based on the same character(s) and/or universe shall never be taken to mean that one is a prequel of the other in the absence of any stronger connection from which to infer a derivative relationship.



3

1.16    SOURCE MATERIAL: Any audio, musical, graphic, textual or visual elements included in or acquired or developed for the Game including but not limited to all concepts, plots, themes, object and source codes, names and characters, algorithms and such other elements which are a part of the Game.

1.17    SPECIFICATIONS: The fully detailed written specifications of the Game which include all technical functional specifications (including without limitation, the pre-production elements) and which is prepared by DEVELOPER pursuant to and in accordance with the Milestone schedule and approved by PUBLISHER.

1.18    SYSTEM: The open system or the closed system as set forth in Appendix A:

1.18.1    The "open system" shall mean any system (whether existing or to be invented) for which the Game can be developed without any prior arrangement between PUBLISHER and any third party, which has in its ownership or under its control intellectual property rights pertaining to the said system.

1.18.2    The "closed system" shall mean any system (whether existing or to be invented) for which the Game can be developed subject to prior arrangement(s) between PUBLISHER and any third party having in its ownership or under its control intellectual property rights pertaining to the said system, such including but not limited to Sony Playstation System, Microsoft Xbox System, Nintendo 64 System, Sega Dreamcast System.

1.19    TERM of EXPLOITATION: the full duration of the protection afforded under copyright law and all periods of renewal and extension thereof.

It is understood that nothing in this agreement shall be construed or interpreted as imposing on PUBLISHER any obligation to continue to manufacture, market sell and/or distribute the Game for the entire term of exploitation to the Game. PUBLISHER shall be entitled to decide at its sole discretion when to cease to manufacture market and/or distribute the Game within the frame of this Agreement.

**1.20**    TERRITORY: Worldwide – **Excluding Japan and North America**

PUBLISHER shall freely decide on which territories within the Territory of the Agreement the Game shall be released.

DEVELOPER retains the publishing rights for the Game in Japan and North America.

1.21    TITLE: The game software temporarily or definitively entitled "Resident Evil 4".


## 2. PURPOSE OF THE AGREEMENT

2.1    DEVELOPER agrees to develop for PUBLISHER the Game in accordance with the Specification described in Appendix A and the Milestones schedule described in Appendix B in order to enable it to function on the System.

2.2    DEVELOPER agrees to grant to PUBLISHER an express, exclusive, transferable, terminable license to the Game to perform the following acts in respect to the Game for the TERRITORY and TERM of EXPLOITATION:

(1) to reproduce the Game in copies;

(2) to distribute copies of the Game to the public by sale or other transfer of ownership, or by rental, lease or lending;



4

(3) to prepare derivative works based upon the Game limited to the right to make translations of the Game and to produce derivative products and services;

(4) to perform the Game publicly;

(5) to display the Game publicly.

2.3    DEVELOPER recognizes the ability of PUBLISHER as publisher and distributor of the Game. DEVELOPER recognizes that PUBLISHER as publisher of the Game is the one and only judge of the quality of the Game, notably with regards to the acceptance by PUBLISHER of any and all deliverable items as set forth in section 4.2.

2.4    PUBLISHER agrees to compensate DEVELOPER for performance of its obligations under sub-sections 2.1 and 2.2 as set forth in section 8 hereinafter.

## 3. OBLIGATIONS OF THE PARTIES

3.1    DEVELOPER shall be responsible for:

   3.1.1    the implementation of the translations and recordings of the translated versions and implementation of the voice-recordings provided by PUBLISHER for all the languages agreed between the parties in accordance with the Agreement;

   3.1.2    the respect of the  BUDGET (ADVANCES) mutually approved by the parties;

   3.1.3    the respect of the   specification provided by the Licensor   and/or PUBLISHER for the development of the Game, as set forth in Appendix A;

   3.1.4    the respect of Publisher's requests of minor modifications and corrections;

   3.1.5    the respect of the Milestone schedule of the Game as set forth in Appendix B;

   3.1.6    for delivery of patches and updates to ensure compatibility to existing hardware free of charge for 6 months after release of the game;

   3.1.7    for support free of charge for 6 months to hotline and support for the game by PUBLISHER;

3.2    Ensuring that during the development period DEVELOPER applies its best efforts to keep and maintain in position until delivery of the Master of the Game the Key People defined in Appendix C.

3.3    Ensuring that during the development period:

   3.3.1    DEVELOPER shall make on a daily basis sufficiently labeled, duplicated and safety "back up copies" of all deliverable items and source materials in connection with the Game;

   3.3.2    DEVELOPER shall on a fortnightly basis store a current back-up copy made in accordance with provision 3.3.1 above , at a separate, secure and approved storage site (other than DEVELOPER´s place of work);



5

3.3.3 providing PUBLISHER with a copy of the current back-up copy, as and when requested by PUBLISHER, and at all times, being in a position to reconstruct the latest version of the Game without any additional cost to PUBLISHER;

3.3.4 Implementing in-game advertising items upon PUBLISHER request, being understood that in-game advertising shall not be implemented without the prior consent of DEVELOPER which shall not be unreasonably withheld. PUBLISHER shall compensate the developer if it takes more than 5 working days for one person to implement the in-game advertising.

3.3.5 DEVELOPER shall fix bugs resulting from testing by PUBLISHER free of charge for a period of six (6) months since Gold Master (US) Delivery Date.

3.4    PUBLISHER shall be responsible for:

3.4.1  Payment of ADVANCES due to LICENSOR in conformity with 8.1.1

3.4.2  good relationship with Licensor(s), if and when applicable;

3.4.3  publishing and marketing of the Game within a reasonable period of time following final acceptance of the Game by PUBLISHER. PUBLISHER makes no representation that any minimum level of sales shall be achieved;

3.4.4  Providing DEVELOPER with 100 (hundred) samples in English version of the Game, at no cost for DEVELOPER. These samples shall not be for resale.

3.4.5  Q & A testing of the milestone versions of the product to provide feedback to DEVELOPER

3.4.6  Localization into foreign languages including but not limited to English, German, French, Spanish, Russian and Italian. DEVELOPER is responsible for implementation of the localized files.

## 4. DELIVERY AND ACCEPTANCE

4.1    Delivery:

4.1.1    DEVELOPER understands and agrees that time of delivery of the Deliverable Items is of the essence.

4.1.2    DEVELOPER shall deliver each Deliverable Item defined in Appendix B to PUBLISHER, at the dates detailed therein. Each Deliverable Item shall conform to the specification set forth In Appendix A, in accordance with the Milestone schedule set forth in Appendix B. DEVELOPER shall give PUBLISHER written notice of each delivery and no delivery shall be considered to have taken place until PUBLISHER has received written notice and verified receipt of the Deliverable Item.

4.1.3    If DEVELOPER fails to deliver Deliverable Items on or before the specified dates, PUBLISHER shall have the right to set DEVELOPER a target of thirty (30) business days to deliver. Should DEVELOPER fail to comply with this respite, PUBLISHER shall be entitled to terminate the Agreement in accordance with the provisions of section 13 hereinafter.

4.1.4    DEVELOPER shall deliver a bug free and virus free Master.



6

4.2    Acceptance:

4.2.1  Acceptance by PUBLISHER

4.2.1.1    After DEVELOPER submits to PUBLISHER a Deliverable Item, PUBLISHER shall have fifteen (15) business days to examine and test such Deliverable Item to determine whether it is acceptable to PUBLISHER.

4.2.1.2    PUBLISHER shall notify DEVELOPER of PUBLISHER's acceptance or rejections of such deliverable item and, in the case of any rejection, shall have a period of no more than 10 business days to provide DEVELOPER with a reasonably detailed list of bugs (or viruses) in such Deliverable Item Bugs or viruses discovered by PUBLISHER after expiration of this period shall be corrected by DEVELOPER within DEVELOPER's obligation under 3.1.6.

4.2.1.3    No Deliverable Item shall be deemed accepted by PUBLISHER unless and until expressly accepted in writing by PUBLISHER. Payment by PUBLISHER of a Milestone according to the schedule set forth in Appendix B shall not, under any circumstances, be considered as acceptance by PUBLISHER of any Deliverable Item as may be included in the said Milestone. If PUBLISHER fails to notify DEVELOPER of its decision within such fifteen (15) days period the Deliverable Item shall be deemed accepted.

4.2.1.4    In case of a rejection, DEVELOPER shall use diligent efforts to correct the deficiencies and shall resubmit the Deliverable Item, as corrected, within thirty (30) business days of PUBLISHER's rejection.

4.2.1.5    In the event that DEVELOPER fails to deliver an acceptable Deliverable Item with respect to the Game within thirty (30) day period following rejection, PUBLISHER may terminate the Agreement. The procedure defined in paragraphs 4.2.1.1 to 4.2.1.5 shall iterate until PUBLISHER either accepts the Deliverable Item or terminates the Agreement.

4.2.1.6    Notwithstanding the foregoing, PUBLISHER shall have no right to terminate the Agreement pursuant to this section if DEVELOPER's delay with respect to delivery of Deliverable Items is caused (i) by PUBLISHER's late delivery of items pursuant to the Agreement and/or (ii) by DEVELOPER due to Force Majeure as defined in section 16.3.

4.2.2  Acceptance by Licensor(s): DEVELOPER hereby agrees and accepts that the Game (including any of the Deliverable items part of the Game) may have to be approved by Licensor(s) during the development period and that some modifications may be required by such Licensor(s).




7

## 5. INTELLECTUAL PROPERTY RIGHTS & OTHER RIGHTS (PROPRIETARY OR OTHERWISE)

5.1    Copyright

In accordance with and except as otherwise provided in the Agreement, DEVELOPER acknowledges and agrees to grant to PUBLISHER a license to perform in respect to the Game the rights specified in this Agreement for the Term of Exploitation and within the Territory, as the work proceeds, comprising the right of reproduction, the right of representation and public performance, and such other ancillary right as merchandising and translation rights relating to the Game. It is expressly understood by PUBLISHER that the authors of the Game reserve any and all moral rights in respect to the Game.

This license shall confer on PUBLISHER the right to exercise the following rights either itself and/or through a third party:

5.1.1    The right of reproduction including:

    5.1.1.1.    The right to reproduce the Game only as a whole on PC

    5.1.1.2.    The right to manufacture, rent, lend, promote, publish, market, advertise, sell, distribute, sublicense the Game and exercise all rights granted under the Agreement, in accordance with such sales, rental or distribution methods, policies, practices, and terms as it may determine in its discretion, on all distribution channels, directly or indirectly (retail, bundle, Internet, Online distribution, any kind of merchandising, OEM, compilation, kiosk....), under any trademark, label, sticker, on any price category (full price, budget price, ....), irrespective of the number of units.

5.1.2    The right of public performance comprising and including:

    5.1.2.1.    The right to publicly display all or any part of the Game either in its original, or dubbed or subtitled version, by any means whether now known or hereafter invented, by any process especially by television broadcasting, satellite transmission, cable transmission, whether or not the sound is associated with;

    5.1.2.2.    The right to exploit or perform all or any part of the Game via any network and/or any means of telecommunication or public exhibition for the promotion and the advertising of the Game.

    5.1.2.3.    The right to authorize the broadcasting of all or part of the Game for TV commercials or other advertising/promotion of the Game.

5.1.3    The right to translate the game into foreign languages agreed between PUBLISHER and DEVELOPER.

5.1.4    The right to produce Derivative Products and Services as per section 9 below.

Trademarks

5.1.5    DEVELOPER grants PUBLISHER a non-exclusive, royalty free, license, with right to sublicense, to use, reproduce, perform and display the

 

8

DEVELOPER's trademark and related logo for the sole purpose of exercising PUBLISHER's obligation under sub-section 7.1.

5.2    DEVELOPER pre-existing technology

It is expressly understood by PUBLISHER and agreed between the parties that DEVELOPER reserves ownership of any pre-existing technology which may be used or included in the Game. This pre-existing technology is mutually defined and agreed by PUBLISHER and DEVELOPER in Appendix D. PUBLISHER agrees to use DEVELOPER pre-existing technology only to the extent needed for exercising the rights granted by DEVELOPER to PUBLISHER under this Agreement in respect to the Game as a whole and only for the purposes of this Agreement.

Protection of the Title

5.2.1    The name selected for the Title on release shall be discussed between PUBLISHER and DEVELOPER.

5.2.2    Notwithstanding any agreement to the contrary between PUBLISHER and any Licensor(s), PUBLISHER shall have the right to promote, exploit, copyright and/or protect the Title, which shall include the right to apply for registration as a trademark or application as a domain name of the name selected for the Title on release in anyone or more countries of the Territory and/or the world excluding the United States.

5.3    Image of DEVELOPER (personnel) and of Key People

In the course of exploitation, promotion, marketing and/or advertising of the Game, PUBLISHER may wish to produce some promotional, marketing or other Derivative Products such as trailers, "Making-of" or strategy guides for the Game. DEVELOPER agrees to procure its best endeavors to timely enter into all any appropriate agreements with any persons to be depicted, interviewed or otherwise involved in such products so as to allow PUBLISHER to be able to rightfully exploit Elements appearing in such items. Such agreements shall provide for any world-wide, perpetual use of such Elements, to the extent allowed by the law applicable to such agreements, under the right of reproduction as well as the right of representation. Any such rights as may be granted to DEVELOPER by any such person(s) shall be timely assigned by DEVELOPER to PUBLISHER so as to allow the quiet exploitation and enjoyment of the corresponding items by PUBLISHER.

Should DEVELOPER upon request by PUBLISHER be unable to obtain the necessary rights for one or more of the involved persons, then DEVELOPER shall inform PUBLISHER about this fact immediately. Should DEVELOPER fail to do so, then DEVELOPER shall be obliged to indemnify PUBLISHER from all damages caused directly or indirectly by any personal rights claims brought up by these persons.

## 6. KEY PEOPLE

6.1    DEVELOPER shall procure that the Key people listed in Appendix C shall work solely and exclusively for DEVELOPER so long as they are required to ensure completion and acceptance by PUBLISHER of the Deliverable Items and DEVELOPER shall ensure that such key people shall be available if and as required until PUBLISHER has finally accepted the Master that they have been working on.

6.2    The provisions of the section shall however not prevent DEVELOPER from releasing any Key People from working on the relevant Game, if DEVELOPER, acting reasonably and in good faith, considers that such Key People have completed their

 

9

appropriate tasks and PUBLISHER has agreed in writing to the release of such key people.

6.3    DEVELOPER shall enter into appropriate agreements with all Key People. In signing such agreements, Key People shall assign to DEVELOPER any and all rights and interests they may have in respect to the Game excluding any and all moral rights.

## 7. CREDITS AND PACKAGING

7.1    PUBLISHER agrees that it is PUBLISHER's obligation to place and display DEVELOPER's logos and names in the credits of the Game, in the Game manual and marketing materials as well as on the packaging next to PUBLISHER logo. It is PUBLISHER's obligation to place and display DEVELOPER's name and logo in press advertising in any and all territories where the Game is being distributed. DEVELOPER shall submit the credits of the Game to PUBLISHER prior to their integration in the Game and provide PUBLISHER with its logos.

7.2    Names and logos of third parties (partnership parties, Licensor(s), as beforehand agreed in writing by PUBLISHER shall appear in and/or on the Game (label CD, inside the CD), in its packaging (front packaging, back packaging), in the manual and on marketing materials, provided that DEVELOPER communicates it in due time to PUBLISHER in order to avoid any negligence.

7.3    The following copyright notice shall appear in and on each copy of the Game and on each marketing and advertising material related to the Game:

© Capcom © Constant Entertainment © Akella (year of 1st commercial release). (Tentative disclosure until final approval)

Licensor(s) notice shall be provided by PUBLISHER to DEVELOPER in due time, whenever necessary and applicable.

## 8. COMPENSATION

8.1    Advances against royalties

8.1.1    As consideration for the development of the Game, PUBLISHER agrees to pay to DEVELOPER a total refundable payment of 1,000,000.00 US dollars as an advance against royalties. The Budget below is calculated for the PC version of the game.

8.1.2    The amount of such Advances (i) shall be due solely once the Deliverable Items have been delivered and approved in writing by PUBLISHER and, when necessary and applicable, by the Licensor(s), if any and (ii) shall be paid upon as follows:



Milestone Schedule

| Milestone 1: | Licensing fee | 9/26/2005 | $200,000.00 |
| Milestone 1A: | Contract Execution | 9/26/2005 | $200,000.00 |
| Milestone 2: | Creative Technical Design | 9/30/2005 | N/A |
| Milestone 3: | Content Demo (Characters, levels and animation) | 11/15/2005 | $100,000.00 |
| Milestone 4: | First Playable Version (One level with basic game play) | 1/15/2006 | $100,000.00 |
| Milestone 5: | Second Playable Version (25% content complete) | 2/15/2006 | $100,000.00 |
| Milestone 6: | Alpha Version (75% content complete) | 4/15/2006 | $100,000.00 |
| Milestone 7: | Beta Version (100% content complete) | 6/30/2006 | $100,000.00 |
| Milestone 8: | Gold Master | 8/15/2006 | $100,000.00 |

All sums to be paid by PUBLISHER to DEVLOPER pursuant to the Milestone Schedule shall be paid within 10 business days since receipt of the invoice from DEVELOPER.

All invoices shall be sent to the following address:

For the attention of: Sergey Belistov; Dmitry Arhipov ; Serguei An

Akella office, 12/1, Bolshaya Novodmitrovskaya st., 127015, Moscow, Russian Federation

8.1.3    It is understood and agreed between the parties that all additional expenses relating to the production, development and/or Localization of the Game paid by PUBLISHER to third parties or to DEVELOPER as well as all other expenses incurred by PUBLISHER for tasks DEVELOPER is obliged to carry out under this agreement as per sections 3.1 – 3.4 shall be added herein and be considered as Advances counting against the amounts due under section 8.1.1 above, provided PUBLISHER shall send estimates established by its suppliers for approval by DEVELOPER, and being agreed between the parties that, failing an answer by DEVELOPER within 8 (eight) business days of the transmission of each inquiry, DEVELOPER shall be deemed to have approved the estimate or estimates concerned.




11

8.2 Earned Royalties

The royalty rate should be 25% of gross receipts received by the publisher from the sale of the Game excluding cost of goods (not exceeding US$2.00 / unit) and marketing expenses (not exceeding 10% of gross receipts). In case of sublicensing the royalty rate shall be 50% of gross receipts. The royalty is recoupable against the advance paid in accordance with section 8.1.1 and 8.1.2.

8.3    Subject to sublicensing deals, and additionally to as it set forth in Clause 8.2 here above, in all cases of sublicense in and within the territory of the following countries of the former **Soviet Union,** such as Belarus, Estonia, Latvia, Lithuania, Russia, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Tajikistan, Turkmenistan, Moldavia and Uzbekistan (said countries constituting the "Territory"), the royalty rate should be 25% of gross receipts received by the publisher from the sale of the Game excluding cost of goods (not exceeding US$2.00 / unit) and marketing expenses (not exceeding 10% of gross receipts).

8.4    For, and within the "Territory" the PUBLISHER shall have the right to sublicense sublicensees, including, but not limited to: "Izdatel'stvo "AKELLA – 1", ("Publishing House "Akella - 1"), with its principal place of business at: 12/ Building #1, Bolshaya Novodmitrovskaya Str., 127015 Moscow, Russian Federation, provided that third parties' sublicenses are restricted to the Territory.

## 9. DERIVATIVE PRODUCTS AND SERVICES

THIS PARAGRAPH INTENTIONALLY LEFT BLANK.

## 10. Marketing

DEVELOPER hereby accepts to prepare, upon reasonable request of PUBLISHER, the items necessary for (i) the promotion (high resolution images which could be used as magazine cover-sheet, screen-shots of each level, and interactive demo which could be used in the stores, magazines, on web sites, in some items of the work in progress) and/or (ii) the marketing materials including but not limited to Game manual, front and back packaging.

It is understood that PUBLISHER may exploit these items at its sole discretion.

PUBLISHER shall not present and/or warrant that the Game shall be successfully marketed or that any minimum level of sales shall be achieved.

## 11. This paragraph intentionally left blank.

## 12. WARRANTIES

12.1    WARRANTIES by DEVELOPER

12.1.1 DEVELOPER represents, warrants and undertakes that:



12

12.1.1. t has, and shall continue to retain the right, interest, title, power and authority to enter into and perform all of its obligations under the Agreement and to grant all of the rights granted in the Agreement and it has not and shall not commit any act or enter into any agreement or understanding with any third party which is inconsistent or in conflict with the Agreement;

12.1.1.2 there are no liens, claims, or encumbrances against any of the Deliverable Items and nothing contained in the Deliverable Items, the Game or the rights granted by the Agreement nor any exploitation hereof in accordance with the Agreement, shall infringe upon or violate any right or privacy or publicity or any patent, copyright, trademark, trade secret, recording rights, performers rights, or any other right of any party or be obscene, libelous or otherwise violate any law in any territory or create any liability for PUBLISHER to make a payment to a third party;

12.1.1.3 the Deliverable Items are and shall be original, have not previously been published in any form and are not in the public domain, excluding any elements of the Game which are properly licensed by or to DEVELOPER or PUBLISHER (as the case may be) in respect of the Game and advised to PUBLISHER;

12.1.1.4 prior to delivery to PUBLISHER of any of the Deliverable Items, it shall have obtained all necessary rights, clearances, licenses or consents for the full exploitation of the Deliverable Items contemplated by the Agreement and shall have paid any costs relating to them;

12.1.1.5 there is presently no litigation or other claim, pending or threatening, nor any fact which may be the basis of any claim, against any of the Deliverable Items and/or Source Materials and/or Game Materials of the Game and DEVELOPER has not taken any action or failed to take any action which should interfere with PUBLISHER's rights under the Agreement;

12.1.1.6 in performing its services under the Agreement DEVELOPER shall at all times comply with all of PUBLISHER's reasonable procedures advised in advance to DEVELOPER;

12.1.1.7 the Game shall be only of the highest quality and shall run on the relevant Format and shall conform to and perform in accordance with the Specification and with commonly accepted standards for operation of works compatible with that Format, shall, when performed or played, be materially free from Error and all Deliverable Items shall be virus free;

12.1.2 DEVELOPER shall indemnify and hold PUBLISHER harmless against all actions, claims, losses, costs, damages and expenses (including any legal costs or expenses incurred and any compensation, costs, or disbursements paid by PUBLISHER to compromise or settle any action or claim) suffered or incurred by it and arising from a breach by DEVELOPER (and its consequences) of (i) any of the warranties set out in section 12.1.1 (a), (b), (c), (d), and (e) above and (ii) the breach by DEVELOPER of any material provision herein. Such remedies shall be in addition to and without prejudice to any rights provided by law and in statute and/or any other provision in the Agreement for the benefit of PUBLISHER. For the avoidance of doubt, any limitations to the indemnity stated in this section 12.1.2 shall not affect PUBLISHER's rights for breach by the DEVELOPER of any other term of provision of the Agreement.

13

12.1.3   If any claim is asserted against either party in relation to any of the Deliverable Items or either party discovers that rights in any of the Deliverable Items have been infringed upon by a third party, then the party with knowledge of such claims or infringement shall immediately notify the other party.

12.1.4   PUBLISHER may at its own discretion and expense take or defend any claim or action relating to the establishment, security, protection, maintenance, preservation or infringement of any trademark or copyright or any other intellectual property right in any of the Deliverable Items granted by DEVELOPER to PUBLISHER under the present Agreement, and shall be entitled to do so in either its own or DEVELOPER's name and/or join DEVELOPER as a party to any such proceedings which shall be conducted entirely at PUBLISHER's expense and PUBLISHER shall be entitled to retain all of the expenses and damages recovered as a result of such proceedings. DEVELOPER shall provide PUBLISHER and its nominees with such assistance as PUBLISHER may from time to time require in connection with any such claim or action.

12.2   Warranties by PUBLISHER

12.2.1   PUBLISHER represents and warrants that it is a duly organized and existing corporation and is presently in good standing under the laws of the jurisdiction of its incorporation.

12.2.2   PUBLISHER represents and warrants that it has full power and authority to enter into and perform the Agreement.

## 13. TERMINATION

13.1 Termination following breach by DEVELOPER

PUBLISHER may terminate the Agreement:

13.1.1   In accordance with sub-section 4.1.3. In this case PUBLISHER may take and accept the Game in its non-completed form. DEVELOPER shall, in such event and upon PUBLISHER's request, deliver to PUBLISHER any and all Deliverable Items developed up to that point. Developer shall provide PUBLISHER access to any premises in order to enable PUBLISHER to take physical possession of such elements.

13.1.2 In case DEVELOPER is in breach of the warranty mentioned in 12.1.1.

13.1.3 In case DEVELOPER is unable to deliver a milestone in accordance with sub-section 4.2 and resolve the delivery of a milestone in timely matter.

13.2 Termination following breach by PUBLISHER

DEVELOPER may terminate the Agreement:

13.2.1 in case PUBLISHER is in breach of its obligation mentioned in 8.1.

13.2.2 in case PUBLISHER is in breach of its obligation mentioned in 7.1.




14

13.2.3 in case PUBLISHER unreasonably rejects the milestone in accordance with section 4.2.

Upon termination of the Agreement following breach by PUBLISHER all rights granted to PUBLISHER under this Agreement shall immediately revert back to DEVELOPER with exception of sub-section 13.2.3. If the agreement is terminated under sub-section 13.2.3 and section 13.1, PUBLISHER will decide if the money paid to DEVELOPER by PUBLISHER or GAME MATERIALS shall be returned to PUBLISHER.

## 14. THIS PARAGRAPH INTENTIONALLY LEFT BLANK

## 15. CONFIDENTIALITY

15.1   DEVELOPER acknowledges that it may be provided with, or may otherwise receive or have access to, information, whether or not in permanent or written form, which relates to proprietary information, confidential information or know how information (hereinafter "Proprietary Information"), including but not limited to:

information relating to PUBLISHER's past, present or future games (excluding the Game contemplated by the present Agreement), products, software, patents, research, development, inventions, processes, techniques, designs or other technical information or data, marketing plans;

- any source code, object code and/or documentation provided by PUBLISHER

- any Licensor's designs, products, technology, processes provided by PUBLISHER

- Information belonging to or regarding clients, suppliers, business partners, whether actual or prospective, of PUBLISHER which may have been disclosed to DEVELOPER as a result of his status as a contractor of PUBLISHER.

15.2   DEVELOPER agrees to preserve and protect the confidentiality of the Proprietary information and all physical forms thereof, whether disclosed to DEVELOPER before the Agreement is signed or afterward, including the terms of the Agreement. In addition, DEVELOPER shall not disclose or disseminate the Proprietary information for his own benefit or for the benefit of any third party.

15.3   The foregoing obligations will not apply to any information which is publicly known or is given to DEVELOPER by someone else who is not obligated to maintain confidentiality.

15.4   DEVELOPER shall not take nor cause to be taken any physical or electronic forms of Proprietary Information from PUBLISHER offices (nor make copies of same) without PUBLISHER's written consent. Within five (5) days after the termination of the agreement, DEVELOPER shall return to PUBLISHER all copies of Proprietary Information in tangible form.

15.5   The requirements of this section shall survive any termination of the Agreement.




## 16. GENERAL PROVISIONS.

16.1   Time: Time is of the essence in respect of the performance by DEVELOPER of all of its obligations under the Agreement.

16.2   Notices: Any notice to be given under the Agreement by either party to the other shall be effectively given if in writing and delivered personally or sent by facsimile (with confirming copy sent simultaneously by first class registered mail) or by first class registered mail to the other party at its address given above or in each case to such other person, address or facsimile number as may have been duly notified by the other party.

All notices shall be marked as follows:

**Publisher**

For the attention of:  Sergey Belistov;  Dmitry Arhipov ; Serguei An
Akella office, 12/1, Bolshaya Novodmitrovskaya st., 127015, Moscow, Russian Federation

**Developer**

For the attention of: Philip Ho
445 Bryan Avenue
Sunnyvale, CA 94086

Any such notice shall be deemed to be duly served:

If delivered personally, on the date of delivery or if not a working day on the next working day;

if sent by facsimile, on transmission date (on a working day or if not a working day on the next working day and subject to a postal copy being lodged);

If sent by registered mail, three working days following the date of posting.

16.3   Force Majeure: Neither party shall be deemed in default of the Agreement to the extent that performance of its respective obligations or attempts to cure any breach are delayed or prevented by reason or any act of fire, natural disaster, accident, action of government, war ("Force Majeure"), provided that such party gives the other party written notice thereof promptly, and, in any event, within fifteen (15) days of discovery thereof, and uses its diligent, good faith efforts to cure the breach. In the event of such a Force Majeure, the time for performance or cure shall be extended for a period equal to the duration of the Force Majeure.

16.4   Waiver: No failure or delay by either party in exercising any right, power, or remedy under the Agreement shall operate as waiver of such right, power, or remedy. No waiver of any provision of the Agreement shall be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. Any waiver by either party of any provision of the Agreement shall not be construed as a waiver of such provision respecting any future event of circumstance.

16.5   Modification: No modification of any provision hereof shall be effective unless in writing and signed by both of the parties to the Agreement.

 

16.6  Independent contractors: The parties to the present Agreement shall be deemed to be independent contractors. Nothing contained herein shall in any way constitute any association, partnership, or joint venture between the parties hereto, or be construed to evidence the intention of the parties to establish any such relationship. Neither party shall have any right, power or authority to make any representation or to assume or create any obligation, whether express or implied, on behalf of the other, or to bind the other party in any manner that would be contrary to the terms of the section.

16.7  Assignment: The Agreement is neither assignable nor transferable, except by PUBLISHER to any company of the I.E. Group. Any other attempt by either party to assign or transfer the Agreement or any interest herein without the prior written consent of the other is void and without effect. Subject to the foregoing, the Agreement and each and every provision hereof shall be binding on and shall inure to the benefit of the parties' respective legal successors and assignees.

16.8  Subcontracting: DEVELOPER shall inform PUBLISHER of engagement of any subcontractor to perform any of its obligations under the Agreement, and shall warrant that PUBLISHER will have full right to exploit the aforesaid contribution.

16.9  Anti-Raiding / Non-solicitation police: The parties agree to refrain from hiring one another's employees. Notification of the other party and a one-hundred and eighty (180) days waiting period is required in the event that one party seeks to enter into employment negotiations with an employee or key contractor of the other during the term of the Agreement and for one (1) year after expiration or termination of the Agreement.

16.10  Governing Law: The Agreement shall be governed by and construed according to the laws of the State of California, United States of America.

16.11  Dispute resolution: Both parties shall use their best efforts to resolve any disputes, controversies or differences which may arise between the parties out of or in connection with the Agreement by direct negotiation. Failing this, the parties to the present Agreement agree that any and all disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by a sole arbitrator appointed in accordance with the said Rules. The arbitrator shall be an attorney or retired judge with at least five (5) years experience in the software industry and shall be mutually agreed upon by the parties. The place of arbitration shall be the city of Paris, France. The language of the arbitration shall be the English language.

16.12  Severance: Should any provision of the Agreement be held void, invalid or unenforceable, the remaining provisions of the Agreement shall not be affected and shall continue in effect as though such provisions were deleted.

16.13  Headings: The headings of the sections of the Agreement are for convenience of reference only and shall not be of any effect in construing the meaning of the sections and subsections of the Agreement.

16.14  Entire Agreement: The Agreement including its appendices, state the entire agreement between the parties with respect to the subject hereof and supersedes all prior negotiations, understandings and agreements between the parties hereto concerning the subject matter hereof. No amendment or modification of the Agreement shall be made except by an instrument in writing signed by both parties.

In WITNESS WHEREOF, the undersigned hereby acknowledge that they have read and understood the terms of the Agreement, including all its Appendices A, B, C, D (which are




17

hereby deemed to be part of this Agreement). By signing the Agreement the undersigned agree to be bound by all terms, conditions, obligations and warranties contained herein.

DEVELOPER:

Name: Philip Ho
Constant Entertainment
Position: Managing Partner

PUBLISHER:

Name: Alexander Danilin
      3A Entertainment Inc.
Position: Duly authorized to sign this agreement

# List of Appendixes

Appendix A: Specifications

Appendix B: Milestone Schedule

Appendix C: Key People

Appendix D: DEVELOPER Pre-existing Technology

Appendix E: Creative Design Document (TB

## Appendix A

### Minimum specifications for Resident Evil 4 PC

To be agreed upon with the Creative Design Document





# Appendix B

# Milestone Overview for Resident Evil 4 PC

| Milestone 1 | LOI |
|---|---|
| Calendar Date | September 1, 2005 |

| Milestone 2 | Contract Execution |
|---|---|
| Delivery date | September 23, 2005 |

| Milestone 3 | Creative Technical Design |
|---|---|
| Delivery date | September 30, 2005 |

| Milestone 4 | Content Demo |
|---|---|
| Delivery date | November 15, 2005 |

| Milestone5 | First Playable Version |
|---|---|
| Delivery date | January 15, 2006 |

| Milestone5 | Second Playable Version |
|---|---|
| Delivery date | February 15, 2006 |

| Milestone 6 | Alpha Version |
|---|---|
| Delivery date | April 15, 2006 |

| Milestone 7 | Beta Version |
|---|---|
| Delivery date | June 30, 2006 |

| Milestone 8 | Gold Master |
|---|---|
| Delivery date | August 15, 2006 |



# Appendix C

# Key People

| | |
|---|---|
| Executive Producer: | Philip Ho |
| Project Manager: | Jeffery Hutt |
| Lead programmer: | David Keonig |
| Lead artist: | Brian McNeely |
| Lead producer: | Kristin Hardy |







# DISTRIBUTION AGREEMENT

Made this day of November 29th, 2005 and entered into by and between:

**Constant Entertainment LLP**, a company established under the laws of United States of America, with its registered office at 445 Bryan Ave., Sunnyvale, California, USA, 94086 duly represented by its Managing Partner, Phillip Ho

Hereafter "The Licensor"
and,

3A Entertainment Inc.,a company registered under the laws of British Virgin Islands, with its registered office at OMC Chambers, P.O. Box 3152 Road Town, Tortola, British Virgin Islands, duly represented by its director, Sergey Loshkarev

hereafter « the Distributor »,

IT HAS BEEN AGREED AS FOLLOWS:

## RECITALS

The Licensor is the Distributor of the computer entertainment software hereinafter referred to as the Licensed Products. The Distributor desires to obtain, and the Licensor is willing to grant an exclusive license and related rights to manufacture, sell and distribute the Licensed Products in the Territory.

## SECTION I - DEFINITIONS

In this Agreement:

- «Licensed Product» means the entertainment software designed for a specific platform as specified in each Appendix 1
- « Platform» means the target machine for which the software has been built up specified in each Appendix 1
- « Territory» means the market specified in each Appendix 2.
- « Trademarks» means or any other logo or trademark associated with the Licensed Products specified in each Appendix 6.
-    « Gold Master» means the Licensed Product ready for duplication and approved by the Distributor.

-Section intentionally left blank

_PH._

Distribution Agreement                     1/10                     Constant - Akella

## Файл № 421

JO5 10:29 AM    FACTORY INTERACTIVE    1 613 843    P. 01
-29-2005 3:46PM    FROM CONSTANT ENT. 4087337274    P. 3

## SECTION II: GRANT OF LICENCE

2.1 The Licensor hereby grants to the Distributor the exclusive license to represent the products described in Appendix 1 in any language within the Territory and the exclusive license to manufacture, market, advertise, distribute and sell the Licensed Products specified in each Appendix 1 within the Territory only.

2.2 By this Agreement the Distributor is granted the right to assign Distributor's manufacturing and distribution rights solely to the entities **C.I.R.** (L.L.C.) **"Izdatelstvo "Akella-1"** with its principal place of business at 12/ Building #1, Bolshaya Novodmitrovskaya Str., Moscow 127015, Russian Federation, with tel. +7 (095) 363-4612 and fax. number +7 (095) 363-4615; **C.L.R. "Multitrade"** with its principal place of business at Nemenskaya St. 10, Kiev 01130, Ukraine; and **UAB "Akelote" ir Ko** with its principal place of business at Algirdo Str. 10, 2006 Vilnius, Lithuania, provided, that their manufacturing and distribution rights are restricted to the Territory too, and requires the full and unconditional their acceptance of all the terms and conditions of this Agreement.

### 2.2 OTHER DISTRIBUTION CHANNEL

Broadband downloading is fully excluded from the Terms of this contract. Such operations may involve specific and independent contracts to be signed between the Parties.

## SECTION III: MANUFACTURE OF THE LICENSED PRODUCT

The Distributor shall be solely responsible for the manufacturing, marketing, sale and distribution of the Licensed Products, and for providing warranty and repair/replacement services for any defective units of the Licensed Products.

The Distributor shall disclose to the Licensor the exact number of copies duplicated from the original master.

The Distributor shall provide the licensor with written proof of duplication from the CD ROM duplication company.

The Distributor shall place the Copyright mentions and Trademarks as set forth in each Appendix 6 on each packaging and user manual for the Licensed Products.

## SECTION IV: APPROVAL OF THE LICENSED PRODUCT

4.1    The Distributor, prior to the release of the Licensed Product, shall submit the packaging layout featuring copyright and Trademarks for Licensor s prior review and written approval.

4.2    Once approved, the Distributor shall forward ten (10) samples of the Licensed Products to the Licensor at Distributor's costs.

---

Distribution Agreement    2/10    Constant - Akella

## SECTION V: SALES REPORT – EFFORT TO MARKET THE LICENSED PRODUCT

5.1 For each Licensed Product, the Distributor shall send to the Licensor every calendar quarter by fax, within thirty (30) days from the last day of each quarter, a detailed sales report by filling in the Sales and Stock Report Matrix (Exhibit A). The Distributor will do its best efforts to inform the Licensor about the quantity sold by the major retailers to final customers (Sell-through).

## SECTION VI: LICENSE PAYMENT

6.1 All payments shall be paid in US Dollars (USD).

6.2    Upon signature of this agreement, the Distributor shall pay to the Licensor a recoupable advance as specified in each Appendix 4, under the Payment Terms and Conditions specified in each Appendix 5.

6.3 The Distributor shall send to the Licensor every quarter by fax, within thirty (30) days of the last day of each quarter a detailed royalty statement. This statement shall include, but not necessarily be limited to, the number of copies manufactured, sold, distributed, marketed or otherwise transferred, and the retail selling prices and net sales amounts for the Licensed Products in the Territory.

6.4 Payment shall be made, unless otherwise specified, to by wire transfer to the Licensor's bank.

6.5 Payments are considered paid in a timely manner when wire transfers is executed before or on the day of payment outlined above and a copy of the wire transfer stamped and signed by the Distributor's executing bank is faxed to the Licensor before or on this date.

## SECTION VII: TERM AND TERMINATION

7.1    Subject to the remaining provisions of this Agreement, the Term of the Agreement shall commence on signature of this Agreement and shall remain in force for the period set forth in Each Appendix 3.

7.2    Immediate Right of Termination

Licensor shall have the right to terminate this Agreement immediately by giving written notice to the Distributor, in any of the following situations:

7.2.1 If the Distributor fails to pay any invoice in accordance with the provisions of this Agreement within 10 banking days.

7.2.2 If the Distributor distributes, sells, markets, advertises or promote the Product outside the Territory, or makes any use of the Copyrights or Trademarks not authorized under this Agreement.

7.2.3 If the Distributor transfers to a third party any or all of its rights or obligations under this Agreement, without the prior written consent of the Licensor.

---

Distribution Agreement              3/10              Constant - Akella



7.2.4 If the Distributor fails to submit reporting to the Licensor during the Term.

7.2.5 If the Distributor becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by the Distributor, or an agreement between the Distributor and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of the Distributor, or the assets of the Distributor are liquidated, or any distress, execution, or attachment is levied on such of its equipment as is used in the exploitation of the Product and remains undischarged for a period of thirty (30) days.

**7.3 Curable Breaches:** If either party breaches any of the terms and provisions of this Agreement other than those specified in Section 6.2, and the party involved fails to cure the breach within fifteen (15) days after receiving written notice by certified or registered mail from the other party specifying the particulars of the breach, the non defaulting party shall have the right to terminate this Agreement by giving written notice to the defaulting party by registered or certified mail.

**7.4 Failure to Deliver :** In addition to all of the other of Distributor's rights and remedies under this Agreement or at law and equity, if the Distributor elects to terminate this Agreement for material breach by the Licensor to deliver the MATERIALS, in accordance with APPENDIX 7, Distributor shall have the right to obtain a refund of unrecouped advances paid by Distributor to Licensor hereunder, subject to the conditions of the APPENDIX 4, and Licensor shall compensate to the Distributor Distributor's reasonable and documented costs and expenses for already carried out advertising and promotional campaigns of the Licensed Product in the Territory. Upon payment of this to the Distributor all rights in and to the Licensed Product shall revert to Licensor, after which neither Distributor nor Licensor shall have any further obligation to the other hereunder.

**7.4 Intentionally left blank**

**7.5    Effect of Termination:** Termination of this Agreement under the provisions of this Section 6 or the provisions set forth elsewhere in this Agreement shall be without prejudice to any rights or claims which the Licensor may otherwise have against the Distributor. Upon the termination of this Agreement, all amounts shall become immediately due and payable to the Licensor. Upon the termination of this Agreement under Section 6.2.5 of this Agreement, the Distributor, its receivers, trustees, assignees, or other representatives shall have no right to sell, exploit, or in any way deal with the Product, the Advertising Materials, or the Copyrights and Trademarks, except with the special written consent and instructions of the Licensor.

**7.6    Discontinuance of Use of Copyright, Trademarks, etc.:** Subject to the provisions of Section 7.7, upon the expiration or earlier termination of this Agreement, the Distributor agrees immediately and permanently to discontinue marketing, advertising, distributing, and using the Product and Advertising Materials; immediately and permanently to discontinue using the Copyrights and Trademarks; immediately to return to the Licensor, any element pertaining to the Licensor; immediately destroy all complete or partial copies of the Product, including all backup copies hereof; and immediately to terminate all agreements which relate to the sale, distribution, and use of the Product.

---

Distribution Agreement                    4/10                    Constant - Akella

7.7 Disposition of Inventory upon Expiration: Notwithstanding the provisions of Section 6.6, if this Agreement expires in accordance with its terms, and is not terminated for cause by the Licensor, the provisions of this Section 6.7 shall apply. If the Distributor delivers to the Licensor on or before the date thirty (30) days prior to the expiration of this Agreement a written inventory listing, on a title-by-title basis, all Product in the Distributor's possession, custody, or control as of the date of such inventory, the Distributor shall have the right to sell any Product listed on such inventory for a period of one-hundred-and-eighty (180) days immediately following such expiration (the "Sell-Off Period"), subject to the payment of royalties to the Licensor on any such sales in accordance with the terms of this Agreement. At the conclusion of the Sell-Off Period, Distributor shall destroy any and all remaining Product and Distributor shall promptly deliver to the Licensor a certificate of destruction evidencing the same.

7.8 The Distributor agrees that upon expiration or termination of this agreement, rights to manufacture, sell, market or in any other way use the product shall cease as of the date of such expiration or termination. Distributor shall return to the Licensor all the materials delivered by the Licensor specified in each Appendix 7.

## SECTION VIII: AUDIT

The Distributor agrees to keep and maintain full and accurate books and records related to the Licensed Products during the term of this Agreement and for two (2) years thereafter. These records shall include, but not necessarily be limited to, the number of copies manufactured, sold, distributed, marketed or otherwise transferred, and the retail selling prices and net sales amounts for the Licensed Products in the Territory.

Such records and accounts shall be maintained confidential but shall be available for inspection and audit, during business hours and upon reasonable notice (but not less than 5 business days) by the Licensor or its authorised representatives.

In the event that through an audit as provided for herein it is determined that there has been an underpayment by the Distributor, the Distributor shall promptly remit to the Licensor the full amount due plus interest calculated at the rate of LIBOR + 5% per annum. If the amount of any error in favour of Licensor is five percent (5%) or more during any royalty period, then the Distributor shall also pay the costs or expenses (including accounting and legal fees, if any) incurred by Licensor in reviewing and/ or auditing said books and records up to any amount equal to but not exceeding the amount of the underpayment plus interest.

## SECTION IX: CONFIDENTIALITY

The Distributor acknowledges that the source code and the development environment (collectively, the Confidential Materials) consist of confidential information of Licensor. Distributor shall treat the Confidential Materials strictly confidential and shall not use, copy, or disclose them, nor permit any of its personnel to use, copy, or disclose them, for any purpose that is not specifically specified in this agreement.

---

| Distribution Agreement | 5/10 | Constant - Akella |

## SECTION X: INTELLECTUAL PROPERTY RIGHTS

10.1 The Distributor expressly agrees that the Licensor has the exclusive title and interest in the intellectual property relating to the Licensed Products and undertakes not to do anything, which could jeopardise such rights. The Distributor undertakes not to use nor register any trademark identical or similar to the Trademarks.

10.2 The Distributor acknowledges and agrees that the Licensor is the sole owner of the Product itself, all registered trademarks and artworks supplied to the Distributor.

10.3 The Distributor shall promptly notify the Licensor in writing of any unauthorised use or imitation by a third party that may come to its notice of any of the Licensed Products and/or Trademarks. At its request, the Distributor shall cooperate with the Licensor in the defence of its rights, but at the Licensor expenses.

10.4 Distributor acknowledges and agrees that the Licensor is the non-exclusive owner of the translations and recordings.

10.5 The Licensor warrants that it shall hold harmless and indemnify the Distributor against all and any actions, claims, losses, costs, damages and expenses (including any legal costs and any compensation, costs or disbursements incurred the Distributor to compromise or settle any such action or claim) by or on behalf of any third party arising out of or resulting from the use by the Distributor of all and any rights granted herein and that shall further indemnify and hold the Distributor harmless against any third party claim relating to:

   (i)     Product liability
   (ii)    the Licensor contractual liability herein, including but not limited to : (a) the breach of any of the warranties set forth in this agreement and (b) any of the Licensor's material obligations under the present agreement. Such remedies shall be in addition to and without prejudice to any rights provided by law and in status and/or any other provision in the agreement for the benefit of the Distributor.

## SECTION XI: MARKETING, TRADEMARKS AND COPYRIGHT

11.1 The Licensor grants by written approval the right to the Distributor to use any pictorial or textual matters furnished by the Licensor and/or elements related to copyright, or concerning the Product and/or the Trademarks.

11.2 The Distributor shall submit for prior written approval by the Licensor any and all advertising and promotional materials to be used in connection with the marketing and distribution of the Product.

11.3 The Distributor shall send to the Licensor every quarter by fax, within ten (10) days of the last day of each quarter a detailed Marketing statement. This statement shall include, but not necessarily be limited to, the Marketing Plan, Press Reviews for the Licensed Products in the Territory.

R. B.

---

Distribution Agreement           6/10            Constant - Akella

## SECTION XII: INTUITU PERSONAE

This Agreement is personal to the Distributor and the Licensor. The Distributor's or Licensor's rights and obligations hereunder shall not be assigned or transferred without the prior written consent of any other party.

## SECTION XIII: FORCE MAJEURE

If one of the Parties («the Defaulting Party») is unable to perform its obligations under this Agreement due to circumstances, which it can prove to be beyond its reasonable control, it shall be discharged of its obligations for the duration of the effects of such circumstances.

In such a case, the Defaulting Party shall immediately inform the other party («the Non Defaulting Party») and shall make its best efforts to limit the adverse consequences of the situation.

If the default period exceeds three months both parties shall be entitled to terminate this Agreement without notice.

## SECTION XIV: TAXES

If a tax agreement between United States of America and the Distributor's country has been signed for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, any withholding tax shall be borne by the Distributor and may be deducted by the Distributor from periodic royalty payments, provided that the Distributor supplies the Licensor with appropriate official documentation enabling the Licensor to claim any credit from United States of America tax authorities.

## SECTION XV: REPRESENTATION AND WARRANTIES

15.1 Ownership and Non-infringement : Each of Distributor and Licensor represents and warrants that it has obtained all rights, licenses and authorizations necessary to enter into this Agreement and necessary to grant the rights, licenses and authorizations granted herein. Each of Distributor and Licensor represents and warrants that the execution and performance of this Agreement does not and will not violate or interfere with any other agreement to which it is a party. Licensor represents and warrants that the software engine, technology, source code and related development tools for the Product is or will be original to Licensor and/or exclusively owned or duly licensed by Licensor and that the software engine, technology, source code and related development tools are not, nor will they be, in violation of the rights of any other company. Licensor represents and warrants that no part of the Product or the exercise of the rights granted hereunder, violates or infringes upon any rights of any company, including copyrights, trademark rights, patent rights, or contractual, common law or statutory rights. Distributor represents and warrants that no part of the distribution or marketing of the Product violates or infringes upon any rights of any person or entity, including, but not limited to, copyrights, trademark rights, patent rights, trade secrets rights, or contractual, common law or statutory rights. Unless otherwise mutually agreed upon between Distributor and Licensor, Distributor is obligated to use the original title of the Product as used in this Agreement and/or material otherwise delivered to Distributor by Licensor in connection with the Product and this Agreement specifically, and if the title or material of the released version of the Product and/or the

---

Distribution Agreement      7/10      Constant - Abella 



marketing hereof is not the original title or material for the Product, or the equivalent of this original title or material in the Language or any other language, Distributor bears full responsibility for all matters concerning intellectual property and other rights, and hereby holds harmless Licensor hereunder.

15.2 Authority : Each of Distributor and Licensor represents and warrants that (i) it is duly organized and in good standing under the laws of the jurisdiction of its incorporation or existence; (ii) it has (and shall at all times remain possessed of) the full right, power and authority to enter into and perform this Agreement; (iii) it is not presently the subject of a voluntary or involuntary petition in bankruptcy, does not presently contemplate filing any such voluntary petition, and is not aware of any intention on the part of any other person or company to file such an involuntary petition against it; and (iv) the person(s) executing this Agreement on its behalf has the actual authority to bind it to this Agreement.

15.2 Performance : Each of Distributor and Licensor represents and warrants that (i) it is under no disability, restriction or prohibition, whether contractual or otherwise with respect to its rights to execute and perform this Agreement; (ii) the agreement of any person who is not a party to this Agreement is not necessary or required for it to carry out its obligations hereunder; (iii) during the Term of this Agreement, it will not enter into any agreement or make any commitments which would interfere with the grant of rights hereunder or its performance of any of the terms and provisions hereto; and (iv) it has not, nor will it, sell, assign, lease, license or in any other way dispose of or encumber the rights granted hereunder.

15.4 Operation : Licensor represents and warrants that the Master for the Product (i) will operate in accordance with the applicable material presented by Licensor and with commonly accepted standards for operation of such product, (ii) will be free from material bugs and significant programming errors, and (iii) will operate and run in a reasonable and efficient manner as described in Licensor's user and system configuration documentation that explains the operation and requirements of the Product.

<u>SECTION XVI</u>: APPLICABLE LAW AND JURISDICTION

This Agreement is governed by and shall be interpreted in accordance with United States of America Laws in the state of California

Any dispute arising out or in connection with this Agreement, which could not be settled amicably, will be exclusively submitted to the United States of America courts.

-Section intentionally left blank

---

Distribution Agreement                     3/10                     Constant - Akella

## SECTION XVII: CONTRACTUAL DOCUMENTS

The TITLEs attached to this Agreement form hereunder are an integral part of it.

Made in two original copies.

Fax signatures on this Agreement shall be deemed originals for all purposes.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in duplicate by their duly authorized representatives on the dates set forth below, effective as of the day and year first above written.

Date: November 28th, 2005;                     Date: November 28th, 2005;
Signed by _____ ;                     Signed by _____ ;
Name: Phillip Ho                               Name: Sergey Loshkarev;
Title: Managing Partner                        Title: Director
on behalf of the Licensor                      on behalf of the Distributor

---

30576
30.57?

TITLES

**APPENDIX 1 : LICENSED PRODUCT AND PLATFORM**
Products : Mage Knight; Warhammer : Mark of Chaos
Version : Russian Version
Platform : PC CD-Rom

**APPENDIX 2 : TERRITORY:**
Russia, Ukraine, Belarus, Estonia, Latvia, Lithuania, Moldova, Kazakhstan, Kirghizia, Georgia, Armenia, Azerbaijan, Turkmenia, Tajikistan and Uzbekistan.

**APPENDIX 3 : TERM**
The term of this agreement shall be valid for 36 months + 3 months of sell-off period from the effective date.

**APPENDIX 4 : ROYALTIES**
| | | |
|---|---|---|
| Currency: | : | US Dollars ($) |
| Recoupable advance: | : | 450,000.00 USD ( four hundred fifty thousand dollars of the United States of America) |
| Royalty: | : | $1.8 USD per copy |

**APPENDIX 5 : PAYMENT TERMS AND CONDITIONS**
Payment terms :  $300,000.00 (three hundred US dollars) upon signature;
        $75,000.00 US dollars upon delivery of the English Gold Master for Mage Knight
        $75,000.00 US dollars upon delivery of the English Gold Master for Warhammer: Mark of Chaos

Licensor will have ten (10) days from reception of the master candidate to approve or reject it. If the Licensor fails to give its written approval of the master candidate sent within ten (10) days from the date of the Distributor's receipt, the master shall be deemed approved.

Payment conditions:        By wire transfer

**APPENDIX 6 : COPYRIGHT AND TRADEMARKS**
XXXXXXXXXX, XXXXXX. Microsoft, Windows and DirectX are either registered trademarks or trademarks of Microsoft Corporation in the U.S. and/or in other countries and are used under license from Microsoft. All other brands, product names and logos are trademarks or registered trademarks of their respective owners. All rights reserved; Namco all rights reserved, Constant Entertainment LLP all rights reserved All rights reserved,

**APPENDIX 7 : MATERIALS DELIVERED BY LICENSOR**
- The Licensor shall provide the Distributor with the complete Japanese localization kit, text and voice files as well as Japanese artworks of box and manual;
- The Distributor shall fully localize the text and voice files into Russian language and integrate Russian text and voice files into product;
- The Distributor shall provide the Licensor with the Russian Artworks for approval prior to distribution in the territory;
- The Distributor shall supply the Licensor with 10 samples of the products

**APPENDIX 8 : IMPLEMENTATION AND DUPLICATION**
- The Distributor shall take in charge the discs duplication, manual and boxes.

Date: November 29th, 2005;                    Date: November 30th, 2005;

Signed by                             Signed by _____ ;

(Phillip Ho, Managing Partner)                    (Sergey Loshkarev, director),

on behalf of the Licensor                    on behalf of the Distributor

Distribution Agreement                    10/10                    Constant - Akella

## CONSTANT LICENSE AND DISTRIBUTION AGREEMENT

This License and Distribution Agreement (the "Agreement") is made and entered into this 20th day of December, 2006 (the "Effective Date"), by and between Constant Entertainment LLP, a limited-liability partnership organized under the laws of California, with its principal place of business at 445 Bryan Avenue, Sunnyvale, California 94086 ("Company") and 3A Entertainment Ltd. organized under the laws of British Virgin Islands with its principal offices at office of the Management Company Trust (B.V.I.) LTD., OMC Chambers, P.O. Box 3152, Road Town, Tortola, British Virgin Islands ("Licensee").

<u>PREMISES</u>

Company publishes and distributes certain computer software products, including the products listed in Exhibit A hereto. Company desires to distribute its products in a world market; and Licensee desire to obtain manufacturing, distribution, advertising rights as well as right to localize (modify) certain Company products stated in Exhibit A pursuant to the terms and conditions of this Agreement.

In consideration of the Premises, and of the mutual covenants and agreements hereinafter set forth, Company and Licensee agree as follows:

1.) <u>Definitions</u>. Whenever used in this Agreement, the following terms shall have the following specified meanings;

(a) "<u>Company Products</u>" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by Company and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto, but specifically excluding sequel products, along with any and all manuals, specifications, user guides and other documentation regarding such computer software programs. For the avoidance of doubt, other products may be subsequently added to this Agreement for by the mutual written agreement of the parties, in which event such products shall be deemed included in the Company Products and/or Localized Company Products.

(b) "<u>Distribution Term</u>" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which Licensee has the right to distribute the enumerated Products in the Territory.

(c) Gold Master" means a non-copy protected and non-encrypted final copy of the Product in the English language that is free of all bugs, is recorded in executable form together with any necessary supporting software and data, fully implements all features and functions, has been approved by Licensee.

(d) "<u>Territory</u>" means only the countries listed in Exhibit A attached hereto, but only as their political borders exist on the date of this Agreement. The Territory excludes foreign countries' embassies, and foreign military and governmental installations, located within the territory.

(e)    "Localization" means the modification of Company Products to meet the needs of the non-English-speaking users in the Territory. This may include but not limited to: code changes, translation of in-game texts and voices, additions and alterations to the feature set, changes in the data or new art with the intent to provide more culturally acceptable Company Products in the Territory.

(f)    "License" means an express, exclusive, transferable as stated herein, terminable license to the Product to perform in relation to the Product the acts specified in this Agreement.

(g)    "Localization Materials" means copies of the text and audio portions of the Products, including, without limitation, text which appears in graphics and audio which is included in video sequences (if any).

(h)    "Localized Company Products" means Company Products after Localization, together with the appropriate localized pre-approved collateral materials, contained in Company-approved localized packaging for Licensee's Territory.

(i)    "End-User" means an individual or entity which purchases Products for its own use, and not for redistribution.

(j)    "Dealer" means an entity which, as authorized hereunder, purchases Products and resells them to End-Users.

(k)    "EULA" means Company's standard form end-user license agreement, a copy of which is displayed on certain screens and as part of the installation of, all Company Products, as the same may be modified or amended from time to time.

(l)    "Prohibited Country" means a country to which export or re-export of any Products is prohibited by United States law without first obtaining the permissions of the United States Office of Export Administration or its successor.

(m)    "OEM" means original-equipment manufacturer, which is any natural person or legal entity which obtains a license from Company to use Products for the purpose of incorporating such Products, in whole or in part, either with or within computer hardware, software or other products for further distribution in conjunction with such products.

(n)    "Products" mean Company Products and/or Localized Company Products.

(o)    All references in this Agreement to the "sale" or "selling" of Products shall mean the sale of a license to use such Products. All references in this Agreement to the "purchase" of Products shall mean the purchase of a license to use such Products.

2.)    Grant of Rights.

(a)    This Agreement is intended as a master agreement. If the parties wish to add other products to the scope of this Agreement, they may do so by executing one or more addenda in substantially the same form as Exhibit A attached hereto (each, a "Product Exhibit"), which shall thereupon be made a part of this Agreement and incorporated herein by reference. Any products so added shall be deemed included in the Products.

2.

As applicable any references to Exhibit A in this Agreement shall be deemed to include Exhibit A and any Product Exhibits subsequently executed by the parties. Subject to the terms and conditions of this Agreement, Company hereby grants to the Licensee exclusive license to sell/distribute the Products through retail and distribution channels solely in the Territory and during the terms of the Agreement, and Licensee hereby accepts such grant of rights. It is expressly understood between parties that such grant of rights specifically excludes the right to distribute the Products through the OEM channel, or through bundling any of the Products with any other products. If Licensee desires to distribute the Products through the OEM channel, or through bundling any of the Products with any other products Licensee may request such additional rights from Company on a case by case basis. Any such approval must be in writing by the Company. All rights not expressly granted to Licensee hereunder are reserved by Company.

(b)    <u>Nature of Distribution</u>.  Company grants to Licensee a non-transferable (with exception of Clause 9.) (h)) exclusive license to distribute/sell Products to Licensee's customers in the Territory in accordance with this Agreement, and does not grant any right, title or interest in any of the Products, in whole or in part, to Licensee.

(c)    <u>Software License</u>.  Company grants to Licensee a non-transferable exclusive license (with exception of Clause 9 h)) in the Territory to (i) manufacture or have manufactured, market, distribute and sell only in the Territory the Products, (ii) modify the Company Products, only as commercially necessary and as approved in writing in advance by Company, and to manufacture or have manufactured, market, distribute and sell only in the Territory such modified versions of the Company Products as Localized Company Products, and (iii) rights to publicly perform and display the Company Product and its localized version solely for the purpose of distribution of the Product and its localized version.

(d)    <u>On-line Sales</u>.  Company hereby grants Licensee the right to market and sell the Products through on-line services and the Internet only within the Territory. Licensee is prohibited from distributing any Products via electronic means, including downloading. Company reserves the right to review Licensee's on-line materials regarding the Products, and may at any time require Licensee to modify or remove such materials. Licensee agrees to immediately comply with such notice.

3.

(e)    Company's Reserved Rights.    In the event Company believes that further distribution of any Products in the Territory will expose Company to liability, Company may delete such Product from the list of Company Products contained in Exhibit A. Licensee agrees to promptly refrain from any further distribution of the applicable Products following receipt of notice that such Product has been deleted from Exhibit A. Additionally, Company reserves the right to modify Products during the term hereof in its sole discretion; and upon any such modification, the modified version of the Product shall be the only one authorized for distribution under this Agreement. In the case, that certain products are taken off the distribution list before the expiration of the distribution term, the Publisher shall refund the Licensee on prorate basis. In case of withdrawal of the Company Product from the Exhibit A Licensee shall have the rights to obtain the full refund of Advance already paid by it to the Company for corresponding Product. Such Advance shall be  refunded to Licensee in full amount within 30 thirty days after withdrawal.

(f)    Certain Obligations of Licensee.    Licensee warrants and represents that it has, and will maintain, the capacity, facilities and personnel necessary to carry out its obligations pursuant to this Agreement, and in particular that:

(1)    Promotion Efforts.    Licensee shall use its reasonable commercial efforts to market, sell and distribute the Products both vigorously and aggressively within the Territory in accordance with the terms of this Agreement. Notwithstanding the foregoing, all promotional, advertising and/or other marketing items or the like which Licensee may desire to create must be pre-approved in writing by Company in the form attached hereto as Exhibit B.

(2)    Dealer Qualifications    Licensee shall authorize and maintain only dealers, resellers, and Licensees (collectively, the "Dealers") that have the financial capacity, facilities, technical capacity and desire to market and sell the Products competently.

(3)    Licensee-Dealer Agreement.    It is a material obligation of Licensee, prior to engaging in any transaction with a Dealer involving the Products, to enter, or have previously entered, into a written agreement with such Dealer which authorizes such Dealer to resell the Products, and which provides that as a material condition of such agreement such Dealer may resell the Products only within the Territory granted hereunder; and only in a manner consistent with the provisions of this Agreement (the "Dealer Agreement"). Licensee shall provide the Company with a copy of any such Dealer Agreement upon request. Licensee shall be responsible for the actions of all Dealers and their compliance with all of the terms and conditions of the Dealer Agreement.

(4)    Inventory.    Licensee shall maintain an inventory of Products sufficient to serve adequately the needs of Dealers and End-Users within a commercially reasonable time frame.

(5)    Dealer Support.    Licensee shall provide Dealers with training, technical support and other assistance appropriate in promoting the Products.

4.

Licensee shall transmit to Dealers all Company literature and other information that Company requests be transmitted to them.

(6) <u>Licensee Personnel</u>. Licensee shall train and maintain a sufficient number of capable technical and sales personnel at its expense; (1) to serve the needs of its Dealers or End-Users for the Products, service and support; and (2) otherwise to carry out the responsibilities of Licensee pursuant to this Agreement.

(7) <u>Technical Expertise</u>. Licensee and its staff shall be conversant with the technical language conventional to the Products and similar computer products in general.

(8) <u>Licensee-Replicator/Duplicator Agreement</u>. Licensee shall obtain Company's prior written approval before replicating any media used in the Company Products, and Company may withhold such consent in its sole discretion. Prior to engaging a replicator/duplicator to replicate/duplicate the Products as contemplated pursuant to Section 2 hereof, Licensee and such replicator/duplicator shall execute an agreement authorizing that entity to duplicate the Products. It is a material obligation of Licensee to contractually require the replicator/duplicator to refrain from replication that results in the production of gold-colored CD-ROMs.

(g) <u>Licensee Covenants</u>. Licensee covenants and agrees:

(1) To conduct business in a manner that reflects favorably on the goodwill and reputation of Company;

(2) To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Products that are inconsistent with the literature distributed by Company, including all warranties and disclaimers contained in Company literature;

(3) To refrain from selling the Products to any Dealer that cannot agree to comply with obligations similar to those contained in this Section 2;

(4) To distribute the Products only in machine-readable object code format;

(5) To refrain from permitting the copying of Company Products onto any other media for purposes of redistribution to others whether for profit, promotion or otherwise, and not to use, copy, print or display any Company Products or permit any Dealer to use, copy, print or display any Company Products, in any manner except in direct connection with, and for the sole purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(6)    To refrain from renting or lending any Products, or the use, copying, printing or display of any Products, in any manner except in connection with, and for the purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(7)    Not to add to, delete or otherwise vary any of the terms and conditions of the EULA;

(8)    Not to distribute any Products under any trade names or trademarks other than those employed by Company with respect thereto without the prior written approval of Company; and

(9)    Licensee may deduct any withholding tax required by applicable governmental taxing authorities provided that Licensee shall remit such withheld payments to the applicable government authority, shall prepare and make all filings and tax returns in connection with such remittances, and shall deliver documentation to Company in form and substance evidencing payment of same so as to enable Company to obtain a foreign tax credit against its obligations under applicable United States tax laws.

(h)    Product Support.  Licensee shall provide a level of technical support for all Products equivalent in all material respects to that which Company provides its End Users for Company Products.

(i)    Compliance with Law.  Licensee shall comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder, in any of its business with Dealers, and with respect to the Products.

(j)    Compliance with U.S. Export Laws.  Licensee acknowledges that Company's export of the Company Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data.  ("Direct Product" as used hereafter means the immediate product, including processes and services, derived from the use of Company Products.)  Licensee agrees, and shall cause each of its Dealers, employees, agents and representatives to agree, not to export or re-export any Products or Direct Products of Company Products to any Prohibited Country.  Licensee agrees to indemnify Company against any claim, demand, action, proceeding, investigation, loss, liability, cost or expense, including, without limitation attorney's fees, suffered or incurred by Company and arising out of or related to any breach (whether intentional or unintentional) by Licensee, its employees, agents, representatives or Dealers, of any of the warranties or covenants of this Section 2(j).

(k)    Governmental Approval.  If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to secure the right of remittance abroad of U.S. Dollars pursuant to Section 6 hereof, Licensee shall

immediately take whatever steps may be necessary in this respect, and any charges incurred in connection therewith shall be paid by Licensee. Licensee shall keep Company currently informed of its efforts in this connection. Company shall be under no obligation to deliver Products to Licensee hereunder until Licensee has provided Company with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(l)     Market Conditions.  Licensee shall advise Company promptly concerning any material market information that comes to Licensee's attention regarding the Products, Company's market position or the continued competitiveness of the Products in the marketplace.

(m)     Dealing with End-Users.  Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of the Products from Licensee, Licensee shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the EULA. A sample copy of the EULA shall be available from the Licensee for review by all prospective End-Users dealing with Licensee. Should any End-User return to Licensee any unopened Products in the original sealed package in which it was distributed by Licensee, Licensee shall provide such End-User with a full refund of all sums paid by the End-User therefor. In no event shall Company be required to provide any such refund to any End-User who has obtained the copy or copies in question from or through Licensee.

(n)     Adaptation for Local Market.  Company and Licensee shall consult in good faith with respect to the localization of the Company Products and Licensee shall make such changes to Company Products, packaging and related marketing materials as Licensee and Company agree would be appropriate to adapt Company Products for use in the Territory. Company shall submit to Licensee such materials as may be available to Company in order to assist in Licensee's Localization effort ("Localization Kit"). This might include, but is not limited to, scripts for speech files, and removable data storage media containing artwork. Company will reasonably cooperate in Licensee's development of the Localized Company Products. The Company shall submit no later then 1 month after the signature of this agreement English unprotected Gold Masters or US commercial versions of the products and artworks (where available). If the Company does not submit the above materials by due date the Licensee shall have the right to terminate the agreement and receive the full refund the advances paid.

- Licensee shall start acceptance testing after receipt of English Gold Master, Localization Kit and other Materials mentioned above. If the results of acceptance testing do not meet licensee's requirements, Company shall correct and modify all items free of charge as soon as reasonably possible, but at latest within three (3) weeks after informed by Licensee until there are no more material faults.

Licensee shall, at its sole cost and expense, be responsible for translating and manufacturing or having manufactured Company manuals, advertising and promotional materials into the language of the Territory if so requested by Company. Upon receipt of the approved Localization Kit and English Gold Master, Licensee shall submit, within two (2) weeks, an estimated publishing date for the localized version of the Company

7.

Product, which shall be no later than four (4) calendar months following receipt of the approved by Licensee Localization Kit and English Gold Master.    Failure to meet the publishing date deadline shall be considered a material breach and shall allow Company to terminate the Agreement upon thirty (30) days prior written notice.   During the completion of the Localization process, Licensee shall submit all localized materials to Company for approval.  Licensee must receive written approval from Company prior to any sale or demonstration of Localized Company Products.  If Licensee cannot achieve the quality or technical standards equivalent to those of the English version of the Company Product within forty-five (45) calendar days after Licensee's initial submission of the Localized Company Products to Company for approval, Company may terminate this Agreement upon seven (7) days prior notice.  Company has the exclusive right to sell Localized Company Products outside the Territory.

(o)    Packaging.  Except as provided in Section 2(n), Licensee shall distribute Products with all packaging, warranties, disclaimers and EULA intact as on Company Products prior to Localization, and shall instruct each of its Dealers as to the nature and terms of the EULA applicable to the Products.    Anything to the contrary notwithstanding, Licensee may not include any materials in or on the Product packaging which is not either (i) included in the U.S. version of the Company Product or (ii) pre-approved in writing by Company.   For the purpose of Localization, Licensee agrees to produce packaging and advertising or sales support material at the same high quality levels used by Company in the English version of the Company Products.  Licensee must receive written pre-approval from Company on all Licensee-produced marketing and sales materials, including, but not limited to, packaging and collateral material that reference the Products, prior to release of the materials, such approval shall not be unreasonable withheld.   Licensee shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the Localized Company Products within the Territory.

(p)    Quality: Samples.

    (1)    Licensee acknowledges that if the Products manufactured and sold by it hereunder were of inferior quality in design, material or workmanship, the substantial goodwill which Company has established and now possesses in the Products would be impaired.  Accordingly, Licensee agrees that the Products shall be of the highest standards and of such superior style, appearance and quality as shall be necessary and suited to their promotion, distribution, sale and exploitation to enhance the Products and the goodwill in the Products.

    (2)    Company shall approve each stage of Localization of the Products from the conception to the production thereof.  Licensee shall at each stage of Localization of the Products, before it manufactures, distributes, ships or sells any particular Products, furnish Company, free of cost, for its written approval, the Approval Request form attached hereto as Exhibit B with each of the following:

        a.    four (4) samples of preliminary art concept;

        b.    four (4) samples of color composite and/or one (1) hand sample;

c.      four (4) samples of fine art;

d.      one (1) pre-production sample; and

e.      one (1) final sample/prototype for the Product together with its cartons and containers, tags, labels, wrapping material, advertising and promotional material for use in any media in connection with the Localized Company Product ("Packaging").

(3)    Licensee shall provide Company with six (6) production samples of the Products and all sales, marketing and advertising materials prepared by Licensee in connection with its distribution of the Products, free of cost, for Company's written approval or disapproval prior to distribution of the Products. The Third Party Elements defined in Section 5 of and/or any Product Exhibit to this Agreement shall accompany delivery of the foregoing. If Company does not indicate its approval or disapproval of such submissions within seven (7) business days from the date of actual receipt of the submission, Company shall be deemed to have approved the Products. If so disapproved, and without limiting Company's approval rights, upon receipt of a written request from Licensee, Company shall notify Licensee within twenty (20) business days after the request of the proposed modifications that would render such sample approved. The foregoing approval procedure may be repeated as necessary until the Products are finally approved Once Products and collateral materials have been expressly approved, Licensee shall not depart therefrom in any material respect without first obtaining Company's written consent in accordance herewith or add any additional element(s), materials, or features without Company's prior written approval in each case. Upon the request of Company, Licensee agrees to furnish Company, at no charge, with additional samples of each Product and all sales, marketing and advertising materials which Company may deem reasonably necessary in order to permit Company to ensure that the quality of the Products have been maintained and that no deviation and/or modification of Company approved Products has occurred. Company shall have the right in its sole discretion to withdraw its approval of samples if the quality of any Products ceases to be acceptable.

(4)    Duly authorized representatives of Company shall have the right, at any and all reasonable times, upon reasonable advance notice to Licensee, to inspect all facilities or premises maintained by Licensee, including, without limitation, the plants, factories, or other manufacturing or producing facilities of Licensee or third parties at which the Products and/or any components of Products are being manufactured or produced. Said representatives shall have the right to inspect and test any Products and/or all components thereof and to take any other action which in the opinion of Company is necessary or proper to assure Company that the nature and quality of the Products and/or all components thereof are in accordance with the requirements of this Agreement.

(5)   Licensee will diligently address all legitimate complaints brought to its attention regarding the Products. Licensee will advise Company promptly of any category of recurring complaint and of any complaint which Licensee reasonably believes might result in legal or administrative action against Licensee or Company.

(q)   <u>Good Will and Protection</u>. Licensee acknowledges that:

(1)   The Products, including without limitation, the characters, character names, trademarks, service marks, trade dress, logos and images associated with the Products are unique and original and Company is the exclusive owner thereof;

(2)   As the result of the exhibition and exploitation of the Products, Company has acquired a substantial and valuable good will therein;

(3)   The names of the characters and their likenesses, as applicable, and the title of the Products have acquired a secondary meaning as trademarks uniquely associated with merchandise authorized by Company;

(4)   All rights in any additional material, new versions, translations, rearrangements or other changes in the Products which may be created by or for Licensee (including without limitation Localizations and Localized Company Products), (collectively, "New Materials") shall be and shall remain the exclusive property of Company from creation; and

(5)   Any copyrights, trademarks and design patents heretofore obtained by Company or in connection with the characters and title of the Products are good and valid.

3.)   <u>Inspections: Records and Reporting</u>.

(a)   <u>Reports</u>. Licensee shall provide to Company written reports for every one-quarter period, or when requested by Company, showing Licensee's shipments of the Products by name and address of Dealers and End Users, Product name, units and local currency volume, volume in U.S. Dollars, remaining inventories of Products, and any other information Company reasonably requests.

(b)   <u>Notification</u>. Licensee shall notify Company in writing of any claim or proceeding involving the Products within seven (7) days after Licensee learns of such claim or proceeding. Licensee shall also immediately report to Company all claimed or suspected product defects. Licensee shall also notify Company in writing not more than seven (7) days after any change in the control of Licensee or any transfer of a majority share of Licensee's voting control or a transfer of substantially all its assets.

(c)   <u>Records</u>. Licensee shall maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to the reproduction and distribution of the Products. For the purpose of verifying compliance by the Licensee with the provisions of this Agreement, Licensee agrees that Company and its representatives shall be permitted full access to, and shall be permitted to make copies of

or abstracts from, the books and records of Licensee relating to inventory levels, manufacturing, sales, and distribution of the Products. Upon 2 weeks prior written notice Company shall be permitted to audit such books and records at reasonable intervals, no more than one audit shall be conducted in respect to one reporting period. Audit shall be conducted by independent and certified auditors retained by the Company at its own expense. If Company discovers an error which results in additional amounts being owed to Company in excess of five percent (5%) of the total amount being audited then Licensee shall reimburse Company for all reasonable costs of the examination, including travel and related expenses, in addition to paying Company the amount of the discrepancy plus interest on such amount calculated at ten percent (10%) per annum.

4.) <u>Ownership and Property Rights</u>. Licensee agrees that Company owns all right, title and interest in the Products in any form or medium except those elements specified in Section 5, and/or a Product Exhibit attached hereto (the "Third Party Elements") now or hereafter subject to this Agreement, and in all of Company's copyrights, patents, trade secrets, trademarks, service marks, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Products; and together with any and all inventions, know-how, technology, and trade secrets relating to the design, development, operation, distribution, use, or maintenance of the Company Products or the EULA. The use by Licensee of any of these proprietary rights is authorized only for the purposes and under the terms herein set forth, and upon termination of this Agreement for any reason, such authorization shall immediately cease. As part of this Agreement, and without additional compensation, Licensee acknowledges and agrees that any and all tangible and intangible property and work products, ideas, inventions, discoveries and improvements, and New Materials, whether or not patentable, which are conceived, developed, created, obtained, or first reduced to practice by Licensee for Company in connection with this Agreement or the Localization of Company Products, including, without limitation, all technical notes, schematics, software source and object code, prototypes, breadboards, computer models, artwork, sketches, designs, drawings, paintings, illustrations, computer-generated artwork, animations, video, film, artistic materials, photographs, literature, methods, processes, voice recordings, vocal performance, narrations, spoken word recordings and unique character voices (collectively referred to as the "Work Product") shall be considered "works made for hire" and therefore all right, title and interest therein (including, without limitation, patents and copyrights) shall vest exclusively in Company. To the extent that all or any part of such Work Product does not qualify as a "work made for hire" under applicable law, Licensee without further compensation therefore does hereby irrevocably transfer, sell and assign to Company all of Licensee's worldwide right, title, and interest, in and to the Work Product, including without limitation, all rights of copyright, patent, trade secret, trademark, service mark, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Work Product, together with any and all applications, registrations, renewal and extension rights, and rights to sue for any past, present, or future infringement of any of the foregoing. Licensee acknowledges and understands that artistic and moral rights include the right of an author: to be known as the author of a work; to prevent others from being named as the author of the works; to prevent others from falsely attributing to an author the authorship of a work which he/she has not in fact created; to prevent others from making deforming changes in an author's work; to withdraw a published work from distribution if it no longer represents the views of the author; and to prevent others from using the work or the author's name in such a way as to reflect on his/her professional standing. As required by applicable law, Licensee hereby expressly waives any and all artistic and moral rights associated

11.

with the Products and the Work Product. Licensee represents and warrants that: (i) it shall be the exclusive owner of all right, title, and interest in and to the Work Product and all proprietary rights associated with the Work Product; (ii) it has the right, power, and authority to make the transfer to Company of its interests in the Work Product as contemplated by this Section; and (iii) it has obtained written consents, assignments, and transfers from any and all third parties who participated in the development of the Work Product.

5.)    Third Party Elements.  Licensee agrees to use its best efforts to obtain all rights necessary with respect to the Third Party Elements so as to enable Company to exploit and distribute the Localized Company Product embodying such Third Party Elements after the expiration of the Distribution Term.  Company shall have the right to withhold its approval of any Localized Company Product for which Licensee is unable to obtain such rights on behalf of Company.  At the time Licensee provides the production samples described in Section 2(p)(3) of this Agreement, Licensee shall provide Company with a schedule of all Third Party Elements that are a part of the Localized Company Products and copies of all agreements relating to such Third Party Elements.

6.)    Advances, Royalties and Payment.

(a)    Advances and Royalty Amounts.  Licensee agrees to pay to Company the non-refundable (with exception of Clauses 2) (n); 11) (10) and 11) (11)), but recoupable Advances and Royalty payments set forth in Exhibit A.  Royalties payable to Company pursuant to this Agreement for distribution of Products through the retail or distribution channels shall be based on the number of units of the Products distributed by Licensee and shall only be subject to a deduction for Products previously sold by Licensee which are returned to Licensee by its customers.  Royalties payable to Company pursuant to this Agreement for distribution of Products through the OEM channel, or through bundling any of the Products with any other products shall be based on Net Receipts, which shall mean total sums invoiced by Licensee in connection with the sale or other distribution of the Products, less the amount of any actual returns of such Products to Licensee by its customers.  In the case of a bundle, the amount of invoiced sums attributable to any one product in the bundle shall be equal to the total invoiced sums divided by the total number of products in the bundle.  Net Receipts shall not be reduced by any other items including, but not limited to, any costs of manufacturing, marketing, advertising, or shipping the Products.  The royalty rate for new Products developed by Company and added to this Agreement shall be determined by Company as Company makes such new Products available to Licensee.

(b)    Royalty Payments.

Royalties shall be paid quarterly, no later than forty five (45) days after the end of the calendar quarter in which sales occurred Licensee  shall sent to the Company  a statement setting forth in reasonable detail the number of the Units of Products sold (for each Product) and amount due to the Company for corresponding Product during the reporting period as well as the total sum due to the Company. Within 5 days after the recipient of sales statements Company shall issue an Invoice computed on the basis of said sales statement and send it to the Licensee wia certified mail or other method mutually agreed between Parties Licensee shall make a payment of Royalties within 10 days after company's

12.

Invoice recipient.  Payment shall be sent via wire transfer of immediately available funds to the following account:

Account name: Constant Entertainment
Bank: Bank of America
Bank address: Los Gatos, CA
Routing Number: 121000358
Account number: 01425-03464
SWIFT code: BofAUS3N

(1)    All Advances, Royalties or other payments made to Company hereunder shall be made without deduction for any local, state, federal or foreign taxes or duties.  Licensee shall be responsible for the payment of any and all taxes, licenses, duties and fees of Licensee or Company in connection with the marketing, distribution, sale, possession, use or sublicensing of the Products (inclusive of value added taxes, but exclusive of taxes based on Company's net income).  Licensee hereby agrees to pay and to indemnify Company from all such duties, taxes and fees as may be imposed upon Company with respect to the marketing, distribution, sale, possession, use or sublicensing of the Products pursuant to this Agreement.  In the event Licensee is precluded by applicable law from making payments free of deductions, then Licensee shall pay to Company such additional amounts as necessary so that the actual amount received by Company shall be the same as though no such deduction had been made.  Notwithstanding the foregoing, Licensee may deduct the amount of any withholding income tax required by applicable governmental taxing authorities on amounts to be remitted to Company provided that Licensee shall remit such withheld payments to the applicable governmental authority and shall deliver documentation to Company in form and substance evidencing payment of said so as to enable Company to demonstrate its compliance with any such withholding requirement and obtain a foreign tax credit against its obligations under applicable United States tax laws.

7.)    <u>Licensee Determines Its Own Per Copy Prices</u>.  Licensee is free to determine unilaterally its own pricing of the Products to its Dealers and End Users, as applicable.  Although Company may publish suggested wholesale, retail, or Dealer prices, these are suggestions only and Licensee shall be entirely free to determine the actual prices at which the Products are sold to its Dealers and End Users, as applicable.

8.)    <u>Licensee's Warranties and Representations Regarding Treatment of Dealers</u>.  Licensee hereby warrants and represents to Company as follows:

(a)    <u>Dealer Pricing</u>.  Licensee shall inform each Dealer that it is free to determine unilaterally its own prices and that, although Company may publish lists showing suggested retail prices for Products, those are suggestions only.

(b)    <u>Non-Discrimination Among Dealers</u>.  In working with its Dealers, Licensee shall in all respects comply with all laws, regulations or statutes which regulate the resale of

13.

products to Dealers, including but not limited to those which govern discriminatory pricing.

9.)    Trademarks, Trade Names and Copyrights.

(a)    Trademark Use during Agreement.    During the term of this Agreement, Licensee is authorized by Company free of charge to use the trademarks and service marks Company uses for the Products (collectively, "the Marks") solely in connection with Licensee's advertisement, promotion and distribution of the Products. Licensee agrees that it shall cause to be affixed, conspicuously and legibly on the Products sold by it pursuant to this Agreement and on all advertising incorporating any part of the Company Products, appropriate copyright and trademark notices in the name of Company, which notices shall be in such form and have such content as may be prescribed by Company. Licensee further agrees to prominently feature the Marks on packaging and advertising of the Products. Licensee agrees not to alter, erase, deface, or overprint any such Marks on anything provided by Company without Company written consent. Licensee shall have the right to transfer its rights to use trademarks stated above to the companies (its sublicenses stated in Clause 9.) (h) of the present Agreement..

(b)    No Licensee Rights in Trademarks or Copyrights.    Licensee has paid no consideration for the use of Company's intellectual property, including without limitation, the Company's Marks; trade names; domain names; metatags; key words; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address); logos, character names and likenesses; plots; themes; and strategies (collectively, "the Intellectual Property"); and nothing contained in this Agreement shall give Licensee any interest in any of the Intellectual Property. Licensee acknowledges that Company owns and retains all proprietary rights in the Intellectual Property, and agrees that it shall not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect or dilute the Company's rights in the Intellectual Property (including, without limitation, any act, or assistance to any act, which may infringe or otherwise violate any of Company's rights in the Intellectual Property). Licensee shall not use any business name that incorporates or uses the Marks or any of the Intellectual Property. Licensee shall not register or attempt to register in any office or jurisdiction any rights in any trademark or service mark; trade name; domain name; metatag; key word; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address) which is the same as or similar to the Marks or any of the Intellectual Property.

(c)    No Continuing Right.    Upon expiration or termination of this Agreement, Licensee shall cease advertising and use of all Company Marks and Intellectual Property.

(d)    Obligation to Protect.    Licensee agrees to use reasonable efforts to protect Company's proprietary rights and to cooperate with Company's efforts to protect its proprietary rights.

(e)    Breach.    Licensee understands and agrees that Company will suffer irreparable harm in the event that Licensee fails to comply with any of its obligations pursuant to this Section 9 or Section 2 and that monetary damages in such event would be substantial and inadequate to compensate Company. Consequently, in such event Company shall be entitled, in addition to such monetary relief as may be recoverable by law, to such

temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by Licensee, without showing or proving any actual damages sustained by Company and without the necessity or requirement to Company of posting a bond or any other form of security therefor.

(f)　　Dealer or End-User Breaches.　Licensee shall promptly report to Company any breach of the EULA of which Licensee becomes aware.　Company shall have the right, but not the obligation, to pursue any and all relief available to remedy such breaches.

(g)　　Filing and Recording.　Upon request, Licensee agrees to assist Company in the filing, registration, or recording of Company's Marks and rights in Intellectual Property in the Territory, all costs to be paid by Company.

(h)　　Assignment.　Licensee is granted the right to sublicense all Licensee's rights granted to Licensee under this Agreement to **SWT Entertainment Limited**, reg#165602, having its registered office at 29A, Annis Komninis Street, P.C. 1061, Nicosia, Cyprus or another legal entity (Sublicensees), with right to further sublicense, subject to the following warranty. Licensee warrants that SWT Entertainment Limited or the third party shall have the right to sub-license the rights granted to: **OOO «Akella»**, a company incorporated and acting under the laws of the Russian Federation, having its principal place of business at: 12/1 Bolshaya Novodmitrovskaya str.,127015 Moscow, Russian Federation and **OOO «Akella»** shall have the rights to sublicense distribution, advertising and manufacturing rights to the following entity: **C.L.R."Multitrade"** with its principal place of business at Nemenskaya St.10, Kiev 01130.

(i)　　Sublicense's rights to the Product are restricted to the licensed Territory.

10.)　　Assignment.　The rights granted to Licensee hereunder are personal in nature and Licensee agrees that this Agreement shall not be assignable, nor may Licensee delegate its duties hereunder without, the prior written consent of Company.　Any attempted delegation or assignment without the required consent shall be void and of no effect.

11.)　　Duration and Termination of Agreement.

(a)　　Term.　Subject to prior termination in accordance with the provisions contained herein, the term of this Agreement shall commence as of the Effective Date and expire upon the expiration of the last-to-expire Distribution Term for Products distributed pursuant to an applicable Product Exhibit to this Agreement. Always provided that Licensee shall have the rights to distribute the remaining copies of the Product during the Sell-off Period Term as stated in the Exhibit A.

(b)　　Termination for Cause.　This Agreement may be terminated forthwith as set forth below, by one party giving written notice thereof to the other party, in accordance with Section 17(f) below, stating the effective date of termination, subject to Sections 11(c), 11(d), and 17(b) below.

(1)　　By Company if any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or against Licensee, or if Licensee shall make an assignment for the benefit of creditors; or

15.

(2)    Subject to Section 2(i) and Section 13(a) herein, by either party upon a material breach by the other party of any of the terms of this Agreement, or any other agreement in force between the parties hereto, which breach is not remedied by the breaching party to the non-breaching party's reasonable satisfaction within fifteen (15) days (or such shorter period of time as may be permitted under applicable law) of the breaching party's receipt of notice of such breach from the non-breaching party, in the event of a breach of Section 6 hereunder, and within thirty (30) days (or such shorter period of time as may be permitted under applicable law) for all other breaches; or

(3)    By Company, immediately, if Licensee is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a Licensee's common stock or the equivalent, shall be considered a substantial change in management or control hereunder); or

(4)    By Company, immediately, if Licensee sells:

   a.    any copies of the Products outside the Territory; or

   b.    any copies of the Products to any person or organization which Licensee has reason to believe may sell the Products outside the Territory; or

(5)    By Company, immediately, if Licensee distributes any Products or associated marketing material without first obtaining the approval(s) of Company required hereunder; or

(6)    By Company, the Distribution Term may be terminated as to any particular Product(s) for which Licensee has failed to produce a Localized Company Product acceptable to Company within three (3) months of the estimated publishing date; in the case of such termination, Company shall retain any Advances paid in respect of such Company Product; or

(7)    By Company, immediately, if Licensee commits any criminal or fraudulent act; or

(8)    By Company, immediately, if any product liability claim or the equivalent thereof is asserted against Company; or

(9)    By Company, immediately, if any infringement or other claim relating to the violation of proprietary rights is asserted against Company or Licensee in connection with this Agreement.

(10)    By Licensee, immediately if Company fails to provide Licensee with fails to provide Licensee with all the materials as set out in Clause 2 (n). In this case Company will refund the corresponding part of the Advance. Such Advances shall become due and immediately refundable to Licensee from

the thirty first (31st) day after the Latest Delivery Date. Any paid Advances in this Agreement remaining unreverted to Licensee after the Due Date as defined in above may involve, at Licensee's sole discretion, interest at a rate of 0.5,% (nought point five %) per month from the date such amount is due until the date of actual payment.

(11)    By Licensee, immediately if Company is in breach of the warranties made by the Company in this Agreement. In case of termination of the Agreement by Licensee for breach by Company, Licensee shall be entitled to a refund of unrecouped Advances paid by Licensee to Company and Company shall compensate to Licensee licensee's reasonable and documented costs and expenses for advertising and promotional campaigns of the Product in the Territory already carried out. Company and Licensee shall have an option, if mutually agreed, to replace the refunding of the unrecouped Advances from Company to Licensee with an Additional Sell-off period, which will continue until the above-mentioned unrecouped Advances, together with the costs and expenses for advertising and promotional campaigns, are recouped from the sales of the copies of the Company Products by the Licensee in the Territory.

(12)

(c)    <u>Effect of Termination</u>.  Upon termination of this Agreement:

(1)    Licensee shall cease using any Marks and Intellectual Property.

(2)    All Product masters, Localization materials, computer software in object and source code, marketing and promotional materials, and all other items or information of every kind provided to Licensee or in the possession of Licensee in connection with this Agreement shall remain the property of Company.  Within thirty (30) days after the termination of this Agreement, Licensee shall prepare all such items in its possession for shipment, as Company may direct, at Company's expense.  Licensee shall not make or retain any copies of any confidential or proprietary items or information which may have been entrusted to it.

(3)    Licensee shall provide Company with a written report detailing all inventory of the Products in its possession at the effective date of termination within ten (10) business days.  Company shall then have a period of ten (10) business days to elect to purchase any portion of unsold inventory at Licensee's actual cost of such goods.  Subject to Company's option to purchase Licensee's inventory, and unless this Agreement has been terminated by Company under Section 11(b), Licensee shall retain the right to sell off its remaining inventory of Products for a period of three (3) months following the expiration or termination of this Agreement, subject to Licensee's continuing obligation to make payment of Royalties for such sales.  However, if this Agreement has been terminated by Company under Section 11(b), Licensee shall have no sell-off rights whatsoever and any remaining inventory of the Products shall become the property of Company without any payment by Company to

17.

Licensee and shall be promptly delivered to Company at a destination designated by Company at Licensee's expense.

(d)     <u>Survival</u>. Company's rights to, and Licensee's obligations to pay Company all amounts due hereunder shall survive termination or expiration of this Agreement or any determination that this Agreement or any portion hereof or exhibit hereto is void or voidable excluding termination of the Agreement by Licensee under Clauses 2) (n;); 10) (10) and 10) (11).

(e)

12.)     <u>Relationship of the Parties</u>. Licensee's relationship with Company during the term of this Agreement will be that of an independent contractor. Licensee will not have, and shall not represent that it has, any power, right or authority to bind Company, or to assume or create any obligation or responsibility express or implied, on behalf of Company or in Company's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of Licensee and Company, nor as creating the relationships of employer/employee, franchisor/franchisee, joint ventures, or principal/agent between the parties. In all matters relating to this Agreement, neither Licensee nor its employees or agents are, or shall act as, employees of Company within the meaning or application of any obligations or liabilities to Company by reason of an employment relationship. Licensee shall reimburse Company for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon Company by virtue of any such law with respect to employees of Licensee in performance of this Agreement.

13.)     <u>Indemnification</u>.

(a)     <u>Licensees</u>. Licensee shall defend, indemnify and hold harmless Company, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) distribution by Licensee or its Dealers of the Products outside the Territory; (ii) breach of any or all obligations Licensee has undertaken to perform hereunder; (iii) breach of any representations and warranties or covenants Licensee has made hereunder; (iv) infringement or other violation of proprietary rights caused by any modification to the Products not authorized by Company, or otherwise caused by the Work Product; or (v) any third-party claim arising from Licensee's use of any materials added to or used in connection with the Products by Licensee, including, without limitation, the Work Product. Such indemnification obligation of Licensee shall be conditioned upon Company promptly notifying Licensee in a writing that sets forth with specificity the claim or action in which such indemnification obligation applies. Licensee shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Licensee does not timely undertake to defend Company from a claim or suit described above, Company shall have the right to undertake the defense itself and Licensee promises to promptly repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Licensee does not undertake the defense of Company as required hereunder, Company shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Licensee, which approval shall not be unreasonably withheld,

delayed, or conditioned.   In defending against such claim or action, Licensee may (i) contest; (ii) settle; (iii) procure for Company and its customers the right to continue using the Localized Company Products, as applicable; or (iv) modify or replace the Localized Company Products, as applicable, so that they no longer infringe; provided, however, Licensee shall not have authority to make any admission of liability on the part of Company, or to enter into any settlement that would result in the imposition of any obligations on Company, including, without limitation, any obligation to make payment of any amounts, without the prior written approval of Company.  Licensee acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(b)     Company.  Company  represents and warrants to Licensee that:

-Company owns or has rightfully acquired rights and proprietary interest in the Products and any and all other rights necessary to grant Licensee all rights and licenses granted to Licensee under this Agreement, and that the rights and licenses granted will not infringe or will not be in any way an infringement of any copyright, trademark, patent, trade secret, contractual right or other proprietary right of others.

- Company represents and warrants to Licensee that Company will not make any agreement that is in conflict with this Agreement during the Term of the Agreement.

- Company represents and warrants to Licensee that Company will perform all development tasks and services in a professional manner, in accordance with the highest industry standards and practices.

- Company represents and warrants to Licensee that the software engine, technology, source code and related development tools for the Products are or will be original to the developer and/or to Company, and/or exclusively owned or duly licensed by the developer and/or to Company, and that neither the software engine, technology, source code and related development tools are, nor will they be, in violation of the rights of any third Party. Company represents and warrants to Licensee that the execution and performance of this Agreement does not and will not violate or interfere with any other agreement.

Company shall defend, indemnify and hold harmless Licensee, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged:  (i) any third party claim arising from a breach of any copyright, trademark or patent rights with respect to the Company Products as delivered to Licensee; (ii) breach of any and all obligations Company has undertaken to perform hereunder; or (iii) breach of any representations and warranties or covenants Company has made hereunder.  Such indemnification obligation of Company shall be conditioned upon Licensee promptly notifying Company in a writing that sets forth with specificity the claim or action to which such indemnification obligation applies.  Company shall

19.

have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Company does not timely undertake to defend Licensee from a claim or suit described above, Licensee shall have the right to undertake the defense itself and Company promises to repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Company does not undertake the defense of Licensee as required hereunder, Licensee shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Company. In defending against such claim or action, Company may (i) contest; (ii) settle; (iii) procure for Licensee and its customers the right to continue using the Products, as applicable; or (iv) modify or replace the Products, as applicable, so that they no longer infringe. Company acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(c)    No Combination Claims. Notwithstanding Section 13(b), Company shall not be liable to Licensee for any claim arising from or based upon the combination, operation or use of any Product with equipment, data or programming not supplied by Company, or arising from any unauthorized alteration or modification of the Products.

14.)    Insurance. Licensee shall obtain and maintain in full force and effect during the term of this Agreement a policy or policies of comprehensive general liability insurance or similar commercial insurance providing for such coverage and amounts of coverage as customarily maintained in force and effect by other businesses engaged in activities comparable to those of Licensee. Company shall be designated as an additional insured on any such policy or policies; and no amendment, modification, or cancellation of such policy or policies may be made without providing at least thirty (30) days prior written notice to Company, which notice shall be given by both Licensee and the insurer. In the event that at any time such policy or policies are not in full force and effect or are otherwise amended, modified, or cancelled, Company have the right in its sole discretion and without notice to Licensee to immediately suspend its performance of any or all of its obligations under this Agreement. Upon the request of Company, Licensee shall provide Company with evidence satisfactory to Company in its discretion that the policy or policies of the required insurance are in full force and effect.

15.)    Disclaimer of Warranties; Limited Liability.

(a)    Disclaimer of Warranties. THE COMPANY PRODUCTS ARE PROVIDED "AS IS, WHERE IS, WITH ALL DEFECTS' AND WITHOUT WARRANTY OF ANY KIND WHATSOEVER. LICENSEE ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANY IMPLIED WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED.

(b)    Limitation of Liability. UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO Licensee ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER

TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY LICENSEE TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. LICENSEE acknowledges and agrees that (1) Licensee has no expectation and has received no assurances that its business relationship with Company will continue beyond the stated term of this Agreement or its earlier termination, and that Company has not made any promises with respect to Licensee's ability to recoup any investment by Licensee in the promotion of the Products by virtue of this Agreement; and (2) Licensee shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of the Products or in any goodwill created by its efforts hereunder. Under no circumstances shall Company's aggregate liability under this Agreement exceed the total amount of Royalties actually paid to Company by Licensee under this Agreement.

16.)    Confidentiality.  In the course of this Agreement, it is anticipated that the parties will learn confidential or proprietary information about each other. Each of the parties shall keep confidential this information and any other information which the applicable party may acquire with respect to the other's business, including without limitation, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until the applicable party consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of the applicable party. Except with respect to third parties who have an interest in the Products, neither party shall disclose to others, without the applicable party's consent, the subject of this relationship without first providing the other party with the opportunity to review and offer reasonable objection to the contemplated publication.  This undertaking to keep information confidential shall survive the termination of this Agreement.  It is understood, however, that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to the applicable party without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to the applicable party with respect to such information; (iii) is or becomes part of the public domain through no fault of the applicable party; (iv) is independently ascertainable or developed by the applicable party or its employees; (v) is required to be disclosed by administrative or judicial action provided that the applicable party immediately after receiving notice of such action notifies the applicable party of such action to give the applicable party the opportunity to seek a protective order or any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of the applicable party.  Upon the request of Company, Licensee shall require each of its employees performing services in connection with this Agreement to execute a confidentiality agreement containing terms and conditions consistent with this Section. Immediately upon the termination of this Agreement, Licensee shall return to Company all of Company's confidential information, together with any and all copies and tangible embodiments thereof, and any and all adaptations and related materials in all formats and mediums.

17.) <u>General</u>.

    (a)   <u>Waiver and Modification</u>. No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

(b)   <u>Survival</u>. The provisions of this Agreement which, by their terms, require performance after the termination of this Agreement, or have application to events that may occur after the termination of this Agreement, shall survive the termination of this Agreement.

(c)   <u>English Language</u>. Any and all notices, reports, correspondence, amendments, requests, responses, and other communications associated with this Agreement shall be in the English language, and the controlling version of this Agreement shall be in the English language.

(d)   <u>Section References</u>. Any and all section references in this Agreement shall refer to other sections contained in this Agreement.

(e)   <u>Currency</u>. Any and all fees, payments, compensation, consideration, and other amounts shall be expressed and payable in U.S. Dollars. For purposes of converting Royalties due to Constant from a currency that is not U.S. Dollars to U.S. Dollars the exchange rate used shall be the exchange rate as reported by Exchangerate.com for the business day immediately preceding the date of conversion.

(f)   <u>Notices</u>. Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and personally delivered, sent by confirmed facsimile transmission, sent by certified mail (or, as applicable, the foreign equivalent thereof if reasonably possible; but if not possible, then by first-class regular mail or the foreign equivalent thereof) or sent by express courier (by a nationally or internationally recognized courier) to the other party at its address set forth in this Agreement, or at such other address as the parties shall designate in writing by the aforementioned means of personal delivery, facsimile transmission, certified mail, or express courier.

(g)   <u>Assignment and Delegation</u>. Licensee shall not, without the prior written consent of Company, assign its rights or delegate its duties under this Agreement (with exception of Clause 9.) (h)), which consent shall not be unreasonably withheld, delayed, or conditioned. Company may assign its rights or delegate its duties under this Agreement without the consent of Licensee.

(h)   <u>Remedies</u>. Injunctive or other equitable relief shall be a remedy available to either party in the event of a breach of any provision of this Agreement by the other party, but such remedy shall not be the exclusive remedy available to the parties.

(i)   <u>Complete Execution</u>. This Agreement shall become effective only after it has been executed by Licensee and Company. This Agreement and any other instrument

which requires the signature of the parties may be signed in two (2) counterparts, each of which shall be deemed an original and which shall together constitute one Agreement or any other instrument which requires the signature of the parties.

(j)  Facsimile Signatures.  Signature pages delivered by facsimile transmission and bearing the signatures of the parties shall constitute execution of this Agreement or any other instrument which requires the signature of the parties.

(k)  Choice of Law, Jurisdiction.  This Agreement shall be governed by the laws of the State of California in the United States without reference to or use of any conflicts of laws provisions therein.  For the purpose of resolving conflicts related to or arising out of this Agreement, the parties expressly agree that venue shall be in the State of California in the United States only, and, in addition, the parties hereby consent to the jurisdiction of the federal and state courts in the State of California in the United States.  The parties specifically disclaim application of the United Nations Convention on Contracts for the International Sale of Goods, 1980.

(l)  Severability.  In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect.  In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(m)  Force Majeure.  Company shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond Company's control, including but not limited to acts of God, war, riot, acts of terrorism, the substantial failure of the internet, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(n)  Entire Agreement.  This Agreement, including all Schedules and Exhibits hereto, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes any prior or contemporaneous oral or written agreement.  Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each party and an executed copy has been delivered to the parties.  This Agreement may not be changed, modified, amended or supplemented except in a writing signed by all parties to this Agreement.  Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(o)  Benefits of Agreement.  The terms of this Agreement are intended solely for the benefit of the parties hereto.  They are not intended to confer upon any third party the status of a third-party beneficiary.  Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

**PAGE WITH SIGNATURES FOLLOWS**

IN WITNESS WHEREOF, the parties have entered into this Agreement effective as of the Effective Date.

CONSTANT ENTERTAINMENT LLP
By: PHILLIP HO
Its: MANAGING PARTNER

Date: 21. 12. 2006

3A ENTERTAINMENT INC
By: SERGEY LOSHKAREV
Its: PERSON EMPOWERED TO ACT

Date: 20. 12 - 2006

## EXHIBIT A

## PRODUCT EXHIBIT

**EFFECTIVE DATE:** December 20th, 2006

1.)    Products and Royalty Rates:

| # | COMPANY PRODUCT TITLE<br>All titles Win 2000/XP unless otherwise noted. | Royalty Rate per Unit | Distribution Term Limitation(s) |
|---|---|---|---|
| 1 | Microsoft Flight Simulator X | $ 2.00 US per unit sold | 2 (two) years from release date<br>Sell-Off period 6 (six) months |

2.)    OEM/Bundled Product. The royalty rate for Product distributed through the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

3.)    Distribution Term(s). Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the Agreement, the Distribution Term of the Products set forth in this Product Exhibit shall begin on the release date of the Product and continue for a period of two (2) years.

For the period of 6 (six) months (**Sell-Off period**) after the expiration of the Agreement Licensee shall have the right to distribute the remaining copies of the Company Product and its localized version (copies already reproduced but not yet distributed) to the public by sale or other transfer of ownership, or by rental, lease or lending.

4.)    Advance Payments. As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Agreement, Licensee shall pay Company the amount of One Hundred and Forty Five Thousand Dollars (US $145,000), due within 15 (fifteen) working days after execution of this Agreement by both parties.

5.)    The Third Party Elements shall be deemed to include the following: NONE.

6.)    Territory: Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.

CONSTANT ENTERTAINMENT LLP
By: PHILLIP HO
Its: MANAGING PARTNER

3A ENTERTAINMENT INC
By: SERGEY LOSHKAREV
Its: PERSON EMPOWERED TO ACT

25.

# EXHIBIT B APPROVAL REQUEST

Tracking
No.

☐ First submission.  We will assign a tracking number if this is first submission.
Always use this number when resubmitting this item.

## TO BE COMPLETED BY Licensee

Licensee                                Address

Licensee Contract                       Tel. No.                Fax No.

Item Submitted                          No. of Samples          Licensee Style No.

| Product | Packaging/Hang Tags/Labels/Manuals | Collateral/Advertising/Editorial |
|---|---|---|
| ☐ Preliminary Art/Concept | ☐ Preliminary Art/Concept | ☐ Preliminary Art/Concept |
| ☐ Color Comp./Hand Sample | ☐ Color Comp./Hand Sample | ☐ Color Comp./Hand Sample |
| ☐ Final Art | ☐ Final Art | ☐ Final Art |
| ☐ Mechanical | ☐ Mechanical | ☐ Mechanical |
| ☐ Prototype/Pre-Production Sample | ☐ Prototype/Pre-Production Sample | ☐ Prototype/Pre-Production Sample |
| ☐ Production Sample/Final Approval | ☐ Production Sample/Final Approval | ☐ Production Sample/Final Approval |

Comments

## DO NOT WRITE BELOW THIS LINE
## TO BE COMPLETED BY Company

Date Received   / /                              Date Returned to Licensee   / /

Action Taken on Submission:
☐ Approved As Is.  Proceed to:          ☐ Resubmit this stage with corrections          ☐ Not Approved - See
Comments                                                                                 Comments
                                         before proceeding to the next stage.
                                         See comments.

**Comments** (Company and Agent please initial and date after your comments.)

## ALL APPROVALS ARE SUBJECT TO PRODUCT BEING INCLUDED IN YOUR CONTRACT

Licensee Signature   Date  / /                   Agent Signature   Date  / /
**Proprietary Notices:**

26.

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** 07 June 2007 01:44
**To:** Alexander Kozhevnikov
**Cc:** 'Serguei An'; koudr@akella.com; arkhipov@akella.com; Alexey Badaev
**Subject:** RE: Distribution in Russia

Hey Alexander,

Thanks for your patience while I tracked down more information related to this situation.  Constant Entertainment has no rights to distribute any MS titles directly or indirectly.  As far as I can tell, we have never received monies from Constant Entertainment.  We have worked exclusively with Ubisoft for our back catalog of games for distribution in Russia and Ubisoft confirmed that they have not worked with Constant Entertainment either.   If they claim otherwise then please forward me the mail so I can take the matter up directly with them.

For all current and future titles, Alexey and I should be your main points of contact for granting any rights related to our games.

I will certainly be at E3.  It would be great to meet you there.  My schedule is very open so far.  When are you arriving, and what works for you?

Best regards,

**Jim Hawk**
425.705.4831 desk
206.251.7722 shoe

**From:** Alexander Kozhevnikov [mailto:akozhevnikov@akella.com]
**Sent:** Tuesday, June 05, 2007 7:37 AM
**To:** Jim Hawk
**Cc:** 'Serguei An'; koudr@akella.com; arkhipov@akella.com; Alexey Badaev
**Subject:** RE: Distribution in Russia

Dear Jim,

I am apologizing for all the hassle; it seems I have made a slight mistake with putting up the last question regarding licensing rights. We had contacted Phillip Ho as a representative of the Constant Entertainment LLP, thus we'd like to make additional enquiry whether Constant Entertainment LLP had any distribution rights for any of the titles mentioned previously. We will need this information for

requesting our advance back as they are confirming they hold the
rights for distribution of certain Microsoft's titles, including
Microsoft's Flight Simulator X and some of the back catalogue games,
and those rights are based on contract with Microsoft paid in full.


We would be also happy to meet you during E3 Business and Media
Summit if you are attending, we can fix the meeting at our booth or
wherever you suggest.



Best Regards,

Alexander Kozhevnikov
MD Akella Online

ICQ 266613531



---

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** Wednesday, May 30, 2007 12:54 AM
**To:** Alexander Kozhevnikov
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com; Alexey Badaev
**Subject:** RE: Distribution in Russia

I did some checking on my side.  We have not worked with Phil Ho so you should definitely contact him to get
your money back.  I am sorry that you are in this situation.

For all discussions going forward, I am looping in Alexey Badaev, our regional representative.  Any work related
to our games should go through both of us to ensure you are getting the appropriate rights.

Jim Hawk
425.705.4831 desk
206.251.7722 shoe

---

**From:** Alexander Kozhevnikov [mailto:akozhevnikov@akella.com]
**Sent:** Thursday, May 24, 2007 5:00 AM
**To:** Jim Hawk
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com
**Subject:** RE: Distribution in Russia


Dear Jim,

According to my knowledge, we have been approached by Mr. Phillip Ho with a proposal of future purchase of

several titles, including Gears of War, Halo 2, Alan Wake, Fable 2, Shadowrun, Kingdom Under Fire. We have also already paid advance for Flight Simulator X for a total of 140K USD. As we understand Microsoft didn't get any funds for that, is that correct?

If you are interested in our return proposal for aforementioned titles, we have come up with following:

Gears of War - 600K USD,
Halo 2 - 600K USD,
Alan Wake - 500K USD,
Fable 2 - 500K USD,
Kingdom Under Fire - 150K USD,
Shadowrun - 150K USD.

We have also submitted some marketing and PR plans for promoting those titles, I can forward to you some of the documents in case we can continue talking about the titles mentioned.


Best Regards,

Alexander Kozhevnikov
MD Akella Online

ICQ 266613531





---

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** Wednesday, May 23, 2007 8:48 PM
**To:** Alexander Kozhevnikov
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com; klapovsky@akella.com
**Subject:** RE: Distribution in Russia

Hey Alexander,

I can confirm that Mr. Philip Ho does not have any direct legitimate rights for distributing any of Microsoft's titles. We have used Ubisoft to help us republish internationally in the past and they may have used him. I am checking to see if they have ever used his services and will come back to you with an answer.

Has he represented any rights to you on any titles besides Flight Sim X?

**Jim Hawk**
425.705.4831 desk
206.251.7722 shoe

---

**From:** Alexander Kozhevnikov [mailto:akozhevnikov@akella.com]
**Sent:** Wednesday, May 23, 2007 7:28 AM
**To:** Jim Hawk
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com; klapovsky@akella.com

**Subject:** RE: Distribution in Russia

Dear Jim,

I am delighted to hear the matter has been resolved, we appreciate Microsoft's position about more actively handling distribution of own titles.

Regarding the current talks that we've had, from which some misunderstanding seems to have arisen, can you verify that Mr. Phillip Ho had legitimate rights for distributing some of the Microsoft's titles through us?

Best Regards,

Alexander Kozhevnikov
MD Akella Online

ICQ 266613531



---

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** Tuesday, May 22, 2007 9:42 AM
**To:** Alexander Kozhevnikov; klapovsky@akella.com; olgapak@akella.com
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com
**Subject:** RE: Distribution in Russia

Hi Alexander (and team),

Yes, thank you for your reply. The matter seems to be settled. I apologize for the confusion and appreciate everyone's prompt response to the situation.

Going forward, we are going to be taking a much more active role in the publishing/distribution of our titles in the region. If you are approached by anyone about any of our game titles, please let me know immediately so I can verify the legitimacy of their rights for you.

Thanks again for your thoughtful response.

Best regards,

**Jim Hawk**
425.705.4831 desk
206.251.7722 shoe

---

**From:** Alexander Kozhevnikov [mailto:akozhevnikov@akella.com]
**Sent:** Friday, May 18, 2007 12:38 AM
**To:** Jim Hawk; klapovsky@akella.com; olgapak@akella.com
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'; arkhipov@akella.com

**Subject:** RE: Distribution in Russia

Hi Jim,

Sorry for not answering earlier, completely forgot about that e-mail, I hope that the matter at hand will be resolved easily despite the lack of my response earlier.


Best Regards,

Alexander Kozhevnikov
MD Akella Online

ICQ 266613531




---

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** Thursday, May 17, 2007 7:28 PM
**To:** Alexander Kozhevnikov; klapovsky@akella.com; olgapak@akella.com
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'
**Subject:** RE: Distribution in Russia

Alexander,

Thank you for your prompt reply.  I look forward to hearing from your acquisition team.

Thanks again.

**Jim Hawk**
425.705.4831 desk
206.251.7722 shoe

---

**From:** Alexander Kozhevnikov [mailto:akozhevnikov@akella.com]
**Sent:** Thursday, May 17, 2007 3:14 AM
**To:** Jim Hawk; klapovsky@akella.com; olgapak@akella.com
**Cc:** 'Serguei An'; koudr@akella.com; 'Oleg Smirnoff'
**Subject:** RE: Distribution in Russia

Hi Jim,

Oleg is not in the office today, I'll remind him tomorrow. However, I suppose, this matter should be brought up with our acquisition team, and I have already notified them. I have only limited knowledge of the issue and I suppose we are only having talks about distributing some titles.


Best Regards,

Alexander Kozhevnikov
MD Akella Online

ICQ 266613531



---

**From:** Jim Hawk [mailto:jimhawk@microsoft.com]
**Sent:** Thursday, May 17, 2007 11:52 AM
**To:** Jim Hawk; akozhevnikov@akella.com; klapovsky@akella.com; olgapak@akella.com
**Subject:** RE: Distribution in Russia

Resending due to typo in Oleg's email address.

Jim Hawk
425.705.4831 desk
206.251.7722 shoe

---

**From:** Jim Hawk
**Sent:** Thursday, May 17, 2007 12:44 AM
**To:** 'akozhevnikov@akella.com'; 'blapovsky@akella.com'; 'olgapak@akella.com'
**Subject:** RE: Distribution in Russia

I never heard a response to my mail below, but I am still hearing rumors that you are planning to distribute Microsoft games in Russia. Is that correct? If so, I am surprisingly unaware of any details surrounding our business relationship and would appreciate any insight you can offer to help me better understand this situation.

Please respond.

Best regards,

Jim Hawk
425.705.4831 desk
206.251.7722 shoe

---

**From:** Jim Hawk
**Sent:** Friday, February 23, 2007 1:34 AM
**To:** 'akozhevnikov@akella.com'
**Subject:** Distribution in Russia

I sent this mail to Alexander but it kicked back and he gave me your contact info instead. Can you help with the below?

Hey Alexander,

I got your name from Frank Pape while briefing him on the status of a project. I was pleasantly surprised that he

not only knew your company but also had your name as a contact since I am in need of getting some sensitive issues resolved quickly.   Specifically, I am pinging you because I think I heard that your company is claiming to be distributing some Microsoft games in Russia.  Is that correct?

If so, I am unaware of our business relationship in that regard and would appreciate if you could help me understand how you earned such rights of distribution and  I would also appreciate if you could help me understand what games you believe you have the right to distribute.

Thank you for your immediate attention to this sensitive matter.

Sincerely,


**Jim Hawk**
Business Manager
jimhawk@microsoft.com

**Microsoft Game Studios**
www.microsoft.com/games/

425.705.4831 desk
206.251.7722 cell
425.708.5218 fax
WindsurfHR    Live



_____  Hmtnpl`vh☐  NOD32 2264 (20070514)  _____

]rn qnnayemhe opnbepemn @mrhbhpsqmni qhqrelni NOD32.
http://www.eset.com


_____  Hmtnpl`vh☐  NOD32 2264 (20070514)  _____

]rn qnnayemhe opnbepemn @mrhbhpsqmni qhqrelni NOD32.
http://www.eset.com


_____  Hmtnpl`vh☐  NOD32 2283 (20070521)  _____

]rn qnnayemhe opnbepemn @mrhbhpsqmni qhqrelni NOD32.
http://www.eset.com


_____  Hmtnpl`vh☐  NOD32 2287 (20070523)  _____

]rn qnnayemhe opnbepemn @mrhbhpsqmni qhqrelni NOD32.
http://www.eset.com


_____  Hmtnpl`vh☐  NOD32 2295 (20070529)  _____

]rn qnnayemhe opnbepemn @mrhbhpsqmni qhqrelni NOD32.
http://www.eset.com

## CONSTANT LICENSE AND DISTRIBUTION AGREEMENT

This License and Distribution Agreement (the "Agreement") is made and entered into this 1st day of February, 2006 (the "Effective Date"), by and between Constant Entertainment LLP, a limited-liability partnership organized under the laws of California, with its principal place of business at 445 Bryan Avenue, Sunnyvale, California 94086 ("Company") and 3A Entertainment Ltd. organized under the laws of British Virgin Islands with its principal offices at the Management Company Trust (B.V.I.) LTD., OMC Chambers, P.O. Box 3152, Road Town, Tortola, British Virgin Islands ("Distributor").

### PREMISES

Company publishes and distributes certain computer software products, including the products listed in Exhibit A hereto. Company desires to distribute its products in a world market; and Distributor has expressed an interest in localizing, and/or acting as an independent distributor of, certain Company products pursuant to the terms and conditions of this Agreement.

In consideration of the Premises, and of the mutual covenants and agreements hereinafter set forth, Company and Distributor agree as follows:

1.)     Definitions. Whenever used in this Agreement, the following terms shall have the following specified meanings;

(a)     "Company Products" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by Company and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto, but specifically excluding sequel products, along with any and all manuals, specifications, user guides and other documentation regarding such computer software programs. For the avoidance of doubt, other products may be subsequently added to this Agreement for by the mutual written agreement of the parties, in which event such products shall be deemed included in the Company Products and/or Localized Company Products.

(b)     "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which Distributor has the right to distribute the enumerated Products in the Territory.

(c)     "Territory" means only the countries listed in Exhibit A attached hereto, but only as their political borders exist on the date of this Agreement. The Territory excludes foreign countries' embassies, and foreign military and governmental installations, located within the territory.

(d)     "Localization" means the modification of Company Products to meet the needs of the non-English-speaking users in the Territory. This may include code changes, additions and alterations to the feature set, changes in the data or new art with the intent to provide more culturally acceptable Company Products in the Territory.



(e)    "Localized Company Products" means Company Products after Localization, together with the appropriate localized pre-approved collateral materials, contained in Company-approved localized packaging for Distributor's Territory.

(f)    "End-User" means an individual or entity which purchases Products for its own use, and not for redistribution.

(g)    "Dealer" means an entity which, as authorized hereunder, purchases Products and resells them to End-Users.

(h)    "EULA" means Company's standard form end-user license agreement, a copy of which is displayed on certain screens and as part of the installation of, all Company Products, as the same may be modified or amended from time to time.

(i)    "Prohibited Country" means a country to which export or re-export of any Products is prohibited by United States law without first obtaining the permissions of the United States Office of Export Administration or its successor.

(j)    "OEM" means original-equipment manufacturer, which is any natural person or legal entity which obtains a license from Company to use Products for the purpose of incorporating such Products, in whole or in part, either with or within computer hardware, software or other products for further distribution in conjunction with such products.

(k)    "Products" mean Company Products and/or Localized Company Products.

(l)    All references in this Agreement to the "sale" or "selling" of Products shall mean the sale of a license to use such Products. All references in this Agreement to the "purchase" of Products shall mean the purchase of a license to use such Products.

2.)    Appointment as Authorized Company Distributor.

(a)    Appointment. This Agreement is intended as a master agreement. If the parties wish to add other products to the scope of this Agreement, they may do so by executing one or more addenda in substantially the same form as Exhibit A attached hereto (each, a "Product Exhibit"), which shall thereupon be made a part of this Agreement and incorporated herein by reference. Any products so added shall be deemed included in the Products. As applicable any references to Exhibit A in this Agreement shall be deemed to include Exhibit A and any Product Exhibits subsequently executed by the parties. Subject to the terms and conditions of this Agreement, Company hereby appoints Distributor as an independent, exclusive distributor of the Products in the retail and distribution channels solely in the Territory, and Distributor hereby accepts such appointment. Such appointment specifically excludes the right to distribute the Products through the OEM channel, or through bundling any of the Products with any other products. If Distributor desires to distribute the Products through the OEM channel, or through bundling any of the Products with any other products Distributor may request such additional rights from Company on a case by case basis. Any such approval must

2.



be in writing by the Company. All rights not expressly granted to Distributor hereunder are reserved by Company.

(b)    <u>Nature of Distribution</u>.  The appointment of Distributor only grants to Distributor a non-transferable license to distribute Products to Distributor's customers in the Territory in accordance with this Agreement, and does not grant any right, title or interest in any of the Products, in whole or in part, to Distributor.

(c)    <u>Software License</u>.  Company grants to Distributor a non-transferable license in the Territory to (i) manufacture or have manufactured, market, distribute and sell only in the Territory the Products, and (ii) modify the Company Products, only as commercially necessary and as approved in writing in advance by Company, and to manufacture or have manufactured, market, distribute and sell only in the Territory such modified versions of the Company Products as Localized Company Products.

(d)    <u>On-line Sales</u>.  Company hereby grants Distributor the right to market and sell the Products through on-line services and the Internet only within the Territory.  Distributor is prohibited from distributing any Products via electronic means, including downloading. Company reserves the right to review Distributor's on-line materials regarding the Products, and may at any time require Distributor to modify or remove such materials. Distributor agrees to immediately comply with such notice.

(e)    <u>Company's Reserved Rights</u>.  In the event Company believes that further distribution of any Products in the Territory will expose Company to liability, Company may, without liability to Distributor, delete such Product from the list of Company Products contained in Exhibit A.  Distributor agrees to promptly refrain from any further distribution of the applicable Products following receipt of notice that such Product has been deleted from Exhibit A.  Additionally, Company reserves the right to modify Products during the term hereof in its sole discretion; and upon any such modification, the modified version of the Product shall be the only one authorized for distribution under this Agreement.

(f)    <u>Certain Obligations of Distributor</u>.  Distributor warrants and represents that it has, and will maintain, the capacity, facilities and personnel necessary to carry out its obligations pursuant to this Agreement, and in particular that:

    (1)    <u>Promotion Efforts</u>.  Distributor shall use its reasonable commercial efforts to market, sell and distribute the Products both vigorously and aggressively within the Territory in accordance with the terms of this Agreement.  Notwithstanding the foregoing, all promotional, advertising and/or other marketing items or the like which Distributor may desire to create must be pre-approved in writing by Company in the form attached hereto as Exhibit B.

    (2)    <u>Dealer Qualifications</u>  Distributor shall authorize and maintain only dealers, resellers, and distributors (collectively, the "Dealers") that have

3.



the financial capacity, facilities, technical capacity and desire to market and sell the Products competently.

(3) Distributor-Dealer Agreement. It is a material obligation of Distributor, prior to engaging in any transaction with a Dealer involving the Products, to enter, or have previously entered, into a written agreement with such Dealer which authorizes such Dealer to resell the Products, and which provides that as a material condition of such agreement such Dealer may resell the Products only within the Territory granted hereunder; and only in a manner consistent with the provisions of this Agreement (the "Dealer Agreement"). Distributor shall provide the Company with a copy of any such Dealer Agreement upon request. Distributor shall be responsible for the actions of all Dealers and their compliance with all of the terms and conditions of the Dealer Agreement.

(4) Inventory. Distributor shall maintain an inventory of Products sufficient to serve adequately the needs of Dealers and End-Users within a commercially reasonable time frame.

(5) Dealer Support. Distributor shall provide Dealers with training, technical support and other assistance appropriate in promoting the Products. Distributor shall transmit to Dealers all Company literature and other information that Company requests be transmitted to them.

(6) Distributor Personnel. Distributor shall train and maintain a sufficient number of capable technical and sales personnel at its expense; (1) to serve the needs of its Dealers or End-Users for the Products, service and support; and (2) otherwise to carry out the responsibilities of Distributor pursuant to this Agreement.

(7) Technical Expertise. Distributor and its staff shall be conversant with the technical language conventional to the Products and similar computer products in general.

(8) Distributor-Replicator/Duplicator Agreement. Distributor shall obtain Company's prior written approval before replicating any media used in the Company Products, and Company may withhold such consent in its sole discretion. Prior to engaging a replicator/duplicator to replicate/duplicate the Products as contemplated pursuant to Section 2 hereof, Distributor and such replicator/duplicator shall execute an agreement authorizing that entity to duplicate the Products. It is a material obligation of Distributor to contractually require the replicator/duplicator to refrain from replication that results in the production of gold-colored CD-ROMs.

(g) Distributor Covenants. Distributor covenants and agrees:

(1) To conduct business in a manner that reflects favorably on the goodwill and reputation of Company;

4.

(2)    To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Products that are inconsistent with the literature distributed by Company, including all warranties and disclaimers contained in Company literature;

(3)    To refrain from selling the Products to any Dealer that cannot agree to comply with obligations similar to those contained in this Section 2;

(4)    To distribute the Products only in machine-readable object code format;

(5)    To refrain from permitting the copying of Company Products onto any other media for purposes of redistribution to others whether for profit, promotion or otherwise, and not to use, copy, print or display any Company Products or permit any Dealer to use, copy, print or display any Company Products, in any manner except in direct connection with, and for the sole purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(6)    To refrain from renting or lending any Products, or the use, copying, printing or display of any Products, in any manner except in connection with, and for the purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(7)    Not to add to, delete or otherwise vary any of the terms and conditions of the EULA;

(8)    Not to distribute any Products under any trade names or trademarks other than those employed by Company with respect thereto without the prior written approval of Company; and

(9)    Distributor may deduct any withholding tax required by applicable governmental taxing authorities provided that Distributor shall remit such withheld payments to the applicable government authority, shall prepare and make all filings and tax returns in connection with such remittances, and shall deliver documentation to Company in form and substance evidencing payment of same so as to enable Company to obtain a foreign tax credit against its obligations under applicable United States tax laws.

(h)    Product Support.    Distributor shall provide a level of technical support for all Products equivalent in all material respects to that which Company provides its End Users for Company Products.

5.

(i)    <u>Compliance with Law</u>.  Distributor shall comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder, in any of its business with Dealers, and with respect to the Products.

(j)    <u>Compliance with U.S. Export Laws</u>.  Distributor acknowledges that Company's export of the Company Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data.  ("Direct Product" as used hereafter means the immediate product, including processes and services, derived from the use of Company Products.)  Distributor agrees, and shall cause each of its Dealers, employees, agents and representatives to agree, not to export or re-export any Products or Direct Products of Company Products to any Prohibited Country.  Distributor agrees to indemnify Company against any claim, demand, action, proceeding, investigation, loss, liability, cost or expense, including, without limitation attorney's fees, suffered or incurred by Company and arising out of or related to any breach (whether intentional or unintentional) by Distributor, its employees, agents, representatives or Dealers, of any of the warranties or covenants of this Section 2(j).

(k)    <u>Governmental Approval</u>.  If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to secure the right of remittance abroad of U.S. Dollars pursuant to Section 6 hereof, Distributor shall immediately take whatever steps may be necessary in this respect, and any charges incurred in connection therewith shall be paid by Distributor.  Distributor shall keep Company currently informed of its efforts in this connection.  Company shall be under no obligation to deliver Products to Distributor hereunder until Distributor has provided Company with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(l)    <u>Market Conditions</u>.  Distributor shall advise Company promptly concerning any material market information that comes to Distributor's attention regarding the Products, Company's market position or the continued competitiveness of the Products in the marketplace.

(m)    <u>Dealing with End-Users</u>.  Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of the Products from Distributor, Distributor shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the EULA.  A sample copy of the EULA shall be available from the Distributor for review by all prospective End-Users dealing with Distributor.  Should any End-User return to Distributor any unopened Products in the original sealed package in which it was distributed by Distributor, Distributor shall provide such End-User with a full refund of all sums paid by the End-User therefor.  In no event shall Company be required to provide any such refund to any End-User who has obtained the copy or copies in question from or through Distributor.

6.

(n)     Adaptation for Local Market.  Company and Distributor shall consult in good faith with respect to the localization of the Company Products and Distributor shall make such changes to Company Products, packaging and related marketing materials as Distributor and Company agree would be appropriate to adapt Company Products for use in the Territory.  Company shall submit to Distributor such materials as may be available to Company in order to assist in Distributor's Localization effort ("Localization Kit"). This might include, but is not limited to, scripts for speech files, and removable data storage media containing artwork.  Company will reasonably cooperate in Distributor's development of the Localized Company Products.  Distributor shall, at its sole cost and expense, be responsible for translating and manufacturing or having manufactured Company manuals, advertising and promotional materials into the language of the Territory if so requested by Company.  Upon receipt of the Localization Kit, Distributor shall submit, within two (2) weeks, an estimated publishing date for the localized version of the Company Product, which shall be no later than four (4) calendar months following receipt of the Localization Kit.    Failure to meet the publishing date deadline shall be considered a material breach and shall allow Company to terminate the Agreement upon thirty (30) days prior written notice.  During the completion of the Localization process, Distributor shall submit all localized materials to Company for approval.  Distributor must receive written approval from Company prior to any sale or demonstration of Localized Company Products.  If Distributor cannot achieve the quality or technical standards equivalent to those of the English version of the Company Product within forty-five (45) calendar days after Distributor's initial submission of the Localized Company Products to Company for approval, Company may terminate this Agreement upon seven (7) days prior notice.  Company has the exclusive right to sell Localized Company Products outside the Territory.

(o)     Packaging.  Except as provided in Section 2(n), Distributor shall distribute Products with all packaging, warranties, disclaimers and EULA intact as on Company Products prior to Localization, and shall instruct each of its Dealers as to the nature and terms of the EULA applicable to the Products.  Anything to the contrary notwithstanding, Distributor may not include any materials in or on the Product packaging which is not either (i) included in the U.S. version of the Company Product or (ii) pre-approved in writing by Company.  For the purpose of Localization, Distributor agrees to produce packaging and advertising or sales support material at the same high quality levels used by Company in the English version of the Company Products.  Distributor must receive written pre-approval from Company on all Distributor-produced marketing and sales materials, including, but not limited to, packaging and collateral material that reference the Products, prior to release of the materials.  Distributor shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the Localized Company Products within the Territory.

(p)     Quality: Samples.

    (1)     Distributor acknowledges that if the Products manufactured and sold by it hereunder were of inferior quality in design, material or workmanship, the substantial goodwill which Company has established and now possesses in the Products would be impaired.  Accordingly, Distributor agrees that the

7.

Products shall be of the highest standards and of such superior style, appearance and quality as shall be necessary and suited to their promotion, distribution, sale and exploitation to enhance the Products and the goodwill in the Products.

(2)    Company shall approve each stage of Localization of the Products from the conception to the production thereof. Distributor shall at each stage of Localization of the Products, before it manufactures, distributes, ships or sells any particular Products, furnish Company, free of cost, for its written approval, the Approval Request form attached hereto as Exhibit B with each of the following:

    a.    four (4) samples of preliminary art concept;

    b.    four (4) samples of color composite and/or one (1) hand sample;

    c.    four (4) samples of fine art;

    d.    one (1) pre-production sample; and

    e.    one (1) final sample/prototype for the Product together with its cartons and containers, tags, labels, wrapping material, advertising and promotional material for use in any media in connection with the Localized Company Product ("Packaging").

(3)    Distributor shall provide Company with six (6) production samples of the Products and all sales, marketing and advertising materials prepared by Distributor in connection with its distribution of the Products, free of cost, for Company's written approval or disapproval prior to distribution of the Products. The Third Party Elements defined in Section 5 of and/or any Product Exhibit to this Agreement shall accompany delivery of the foregoing. If Company does not indicate its approval or disapproval of such submissions within seven (7) business days from the date of actual receipt of the submission, Company shall be deemed to have disapproved the Products. If so disapproved, and without limiting Company's approval rights, upon receipt of a written request from Distributor, Company shall notify Distributor within twenty (20) business days after the request of the proposed modifications that would render such sample approved. The foregoing approval procedure may be repeated as necessary until the Products are finally approved. Once Products and collateral materials have been expressly approved, Distributor shall not depart therefrom in any material respect without first obtaining Company's written consent in accordance herewith or add any additional element(s), materials, or features without Company's prior written approval in each case. Upon the request of Company, Distributor agrees to furnish Company, at no charge, with additional samples of each Product and all sales, marketing and advertising materials which Company may deem reasonably necessary in

order to permit Company to ensure that the quality of the Products have been maintained and that no deviation and/or modification of Company approved Products has occurred. Company shall have the right in its sole discretion to withdraw its approval of samples if the quality of any Products ceases to be acceptable.

(4)     Duly authorized representatives of Company shall have the right, at any and all reasonable times, upon reasonable advance notice to Distributor, to inspect all facilities or premises maintained by Distributor, including, without limitation, the plants, factories, or other manufacturing or producing facilities of Distributor or third parties at which the Products and/or any components of Products are being manufactured or produced. Said representatives shall have the right to inspect and test any Products and/or all components thereof and to take any other action which in the opinion of Company is necessary or proper to assure Company that the nature and quality of the Products and/or all components thereof are in accordance with the requirements of this Agreement.

(5)     Distributor will diligently address all legitimate complaints brought to its attention regarding the Products. Distributor will advise Company promptly of any category of recurring complaint and of any complaint which Distributor reasonably believes might result in legal or administrative action against Distributor or Company.

(q)     Good Will and Protection. Distributor acknowledges that:

(1)     The Products, including without limitation, the characters, character names, trademarks, service marks, trade dress, logos and images associated with the Products are unique and original and Company is the exclusive owner thereof;

(2)     As the result of the exhibition and exploitation of the Products, Company has acquired a substantial and valuable good will therein;

(3)     The names of the characters and their likenesses, as applicable, and the title of the Products have acquired a secondary meaning as trademarks uniquely associated with merchandise authorized by Company;

(4)     All rights in any additional material, new versions, translations, rearrangements or other changes in the Products which may be created by or for Distributor (including without limitation Localizations and Localized Company Products), (collectively, "New Materials") shall be and shall remain the exclusive property of Company from creation; and

(5)     Any copyrights, trademarks and design patents heretofore obtained by Company or in connection with the characters and title of the Products are good and valid.

9.



3.)    <u>Inspections: Records and Reporting</u>.

(a)    <u>Reports</u>. Distributor shall provide to Company written reports for every one-quarter period, or when requested by Company, showing Distributor's shipments of the Products by name and address of Dealers and End Users, Product name, units and local currency volume, volume in U.S. Dollars, remaining inventories of Products, and any other information Company reasonably requests.

(b)    <u>Notification</u>. Distributor shall notify Company in writing of any claim or proceeding involving the Products within seven (7) days after Distributor learns of such claim or proceeding. Distributor shall also immediately report to Company all claimed or suspected product defects. Distributor shall also notify Company in writing not more than seven (7) days after any change in the control of Distributor or any transfer of a majority share of Distributor's voting control or a transfer of substantially all its assets.

(c)    <u>Records</u>. Distributor shall maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to the reproduction and distribution of the Products. For the purpose of verifying compliance by the Distributor with the provisions of this Agreement, Distributor agrees that Company and its representatives shall be permitted full access to, and shall be permitted to make copies of or abstracts from, the books and records of Distributor relating to inventory levels, manufacturing, sales, and distribution of the Products. Company shall be permitted to audit such books and records at reasonable intervals. If Company discovers an error which results in additional amounts being owed to Company in excess of five percent (5%) of the total amount being audited then Distributor shall reimburse Company for all reasonable costs of the examination, including travel and related expenses, in addition to paying Company the amount of the discrepancy plus interest on such amount calculated at ten percent (10%) per annum.

4.)    <u>Ownership and Property Rights</u>. Distributor agrees that Company owns all right, title and interest in the Products in any form or medium except those elements specified in Section 5, and/or a Product Exhibit attached hereto (the "Third Party Elements") now or hereafter subject to this Agreement, and in all of Company's copyrights, patents, trade secrets, trademarks, service marks, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Products; and together with any and all inventions, know-how, technology, and trade secrets relating to the design, development, operation, distribution, use, or maintenance of the Company Products or the EULA. The use by Distributor of any of these proprietary rights is authorized only for the purposes and under the terms herein set forth, and upon termination of this Agreement for any reason, such authorization shall immediately cease. As part of this Agreement, and without additional compensation, Distributor acknowledges and agrees that any and all tangible and intangible property and work products, ideas, inventions, discoveries and improvements, and New Materials, whether or not patentable, which are conceived, developed, created, obtained, or first reduced to practice by Distributor for Company in connection with this Agreement or the Localization of Company Products, including, without limitation, all technical notes, schematics, software source and object code, prototypes, breadboards, computer models, artwork, sketches, designs, drawings, paintings, illustrations, computer-generated artwork,

10.



animations, video, film, artistic materials, photographs, literature, methods, processes, voice recordings, vocal performance, narrations, spoken word recordings and unique character voices (collectively referred to as the "Work Product") shall be considered "works made for hire" and therefore all right, title and interest therein (including, without limitation, patents and copyrights) shall vest exclusively in Company. To the extent that all or any part of such Work Product does not qualify as a "work made for hire" under applicable law, Distributor without further compensation therefore does hereby irrevocably transfer, sell and assign to Company all of Distributor's worldwide right, title, and interest, in and to the Work Product, including without limitation, all rights of copyright, patent, trade secret, trademark, service mark, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Work Product, together with any and all applications, registrations, renewal and extension rights, and rights to sue for any past, present, or future infringement of any of the foregoing. Distributor acknowledges and understands that artistic and moral rights include the right of an author: to be known as the author of a work; to prevent others from being named as the author of the works; to prevent others from falsely attributing to an author the authorship of a work which he/she has not in fact created; to prevent others from making deforming changes in an author's work; to withdraw a published work from distribution if it no longer represents the views of the author; and to prevent others from using the work or the author's name in such a way as to reflect on his/her professional standing. As required by applicable law, Distributor hereby expressly waives any and all artistic and moral rights associated with the Products and the Work Product. Distributor represents and warrants that: (i) it shall be the exclusive owner of all right, title, and interest in and to the Work Product and all proprietary rights associated with the Work Product; (ii) it has the right, power, and authority to make the transfer to Company of its interests in the Work Product as contemplated by this Section; and (iii) it has obtained written consents, assignments, and transfers from any and all third parties who participated in the development of the Work Product.

5.) Third Party Elements. Distributor agrees to use its best efforts to obtain all rights necessary with respect to the Third Party Elements so as to enable Company to exploit and distribute the Localized Company Product embodying such Third Party Elements after the expiration of the Distribution Term. Company shall have the right to withhold its approval of any Localized Company Product for which Distributor is unable to obtain such rights on behalf of Company. At the time Distributor provides the production samples described in Section 2(p)(3) of this Agreement, Distributor shall provide Company with a schedule of all Third Party Elements that are a part of the Localized Company Products and copies of all agreements relating to such Third Party Elements.

6.) Advances, Royalties and Payment.

(a) Advances and Royalty Amounts. Distributor agrees to pay to Company the non-refundable, but recoupable Advances and Royalty payments set forth in Exhibit A. Royalties payable to Company pursuant to this Agreement for distribution of Products through the retail or distribution channels shall be based on the number of units of the Products distributed by Distributor and shall only be subject to a deduction for Products previously sold by Distributor which are returned to Distributor by its customers. Royalties payable to Company pursuant to this Agreement for distribution of Products through the OEM channel, or through bundling any of the Products with any other

11.

products shall be based on Net Receipts, which shall mean total sums invoiced by Distributor in connection with the sale or other distribution of the Products, less the amount of any actual returns of such Products to Distributor by its customers. In the case of a bundle, the amount of invoiced sums attributable to any one product in the bundle shall be equal to the total invoiced sums divided by the total number of products in the bundle. Net Receipts shall not be reduced by any other items including, but not limited to, any costs of manufacturing, marketing, advertising, or shipping the Products. The royalty rate for new Products developed by Company and added to this Agreement shall be determined by Company as Company makes such new Products available to Distributor.

(b)     Royalty Payments.

(1)     Royalties shall be paid quarterly, no later than thirty (30) days after the end of the calendar quarter in which sales occurred and shall be accompanied by a statement setting forth in reasonable detail the basis for the Royalty computation and payment. Payment shall be sent via wire transfer of immediately available funds to the following account:

Account name: Constant Entertainment
Bank: Bank of America
Bank address: Los Gatos, CA
Routing Number: 121000358
Account number: 01425-03464
SWIFT code: BofAUS3N

(2)     All Advances, Royalties or other payments made to Company hereunder shall be made without deduction for any local, state, federal or foreign taxes or duties. Distributor shall be responsible for the payment of any and all taxes, licenses, duties and fees of Distributor or Company in connection with the marketing, distribution, sale, possession, use or sublicensing of the Products (inclusive of value added taxes, but exclusive of taxes based on Company's net income). Distributor hereby agrees to pay and to indemnify Company from all such duties, taxes and fees as may be imposed upon Company with respect to the marketing, distribution, sale, possession, use or sublicensing of the Products pursuant to this Agreement. In the event Distributor is precluded by applicable law from making payments free of deductions, then Distributor shall pay to Company such additional amounts as necessary so that the actual amount received by Company shall be the same as though no such deduction had been made. Notwithstanding the foregoing, Distributor may deduct the amount of any withholding income tax required by applicable governmental taxing authorities on amounts to be remitted to Company provided that Distributor shall remit such withheld payments to the applicable governmental authority and shall deliver documentation to Company in form and substance evidencing payment of said so as to enable Company to demonstrate its compliance with any such withholding



requirement and obtain a foreign tax credit against its obligations under applicable United States tax laws.

7.)    <u>Distributor Determines Its Own Per Copy Prices</u>.  Distributor is free to determine unilaterally its own pricing of the Products to its Dealers and End Users, as applicable.  Although Company may publish suggested wholesale, retail, or Dealer prices, these are suggestions only and Distributor shall be entirely free to determine the actual prices at which the Products are sold to its Dealers and End Users, as applicable.

8.)    <u>Distributor's Warranties and Representations Regarding Treatment of Dealers</u>. Distributor hereby warrants and represents to Company as follows:

(a)    <u>Dealer Pricing</u>.  Distributor shall inform each Dealer that it is free to determine unilaterally its own prices and that, although Company may publish lists showing suggested retail prices for Products, those are suggestions only.

(b)    <u>Non-Discrimination Among Dealers</u>.  In working with its Dealers, Distributor shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Dealers, including but not limited to those which govern discriminatory pricing.

9.)    <u>Trademarks, Trade Names and Copyrights</u>.

(a)    <u>Trademark Use during Agreement</u>.  During the term of this Agreement, Distributor is authorized by Company to use the trademarks and service marks Company uses for the Products (collectively, "the Marks") solely in connection with Distributor's advertisement, promotion and distribution of the Products.  Distributor agrees that it shall cause to be affixed, conspicuously and legibly on the Products sold by it pursuant to this Agreement and on all advertising incorporating any part of the Company Products, appropriate copyright and trademark notices in the name of Company, which notices shall be in such form and have such content as may be prescribed by Company. Distributor further agrees to prominently feature the Marks on packaging and advertising of the Products.  Distributor agrees not to alter, erase, deface, or overprint any such Marks on anything provided by Company.

(b)    <u>No Distributor Rights in Trademarks or Copyrights</u>.  Distributor has paid no consideration for the use of Company's intellectual property, including without limitation, the Company's Marks; trade names; domain names; metatags; key words; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address); logos, character names and likenesses; plots; themes; and strategies (collectively, "the Intellectual Property"); and nothing contained in this Agreement shall give Distributor any interest in any of the Intellectual Property. Distributor acknowledges that Company owns and retains all proprietary rights in the Intellectual Property, and agrees that it shall not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect or dilute the Company's rights in the Intellectual Property (including, without limitation, any act, or assistance to any act, which may infringe or otherwise violate any of

13.



Company's rights in the Intellectual Property).  Distributor shall not use any business name that incorporates or uses the Marks or any of the Intellectual Property.  Distributor shall not register or attempt to register in any office or jurisdiction any rights in any trademark or service mark; trade name; domain name; metatag; key word; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address) which is the same as or similar to the Marks or any of the Intellectual Property.

(c)    No Continuing Right.  Upon expiration or termination of this Agreement, Distributor shall cease advertising and use of all Company Marks and Intellectual Property.

(d)    Obligation to Protect.  Distributor agrees to use reasonable efforts to protect Company's proprietary rights and to cooperate with Company's efforts to protect its proprietary rights.

(e)    Breach.  Distributor understands and agrees that Company will suffer irreparable harm in the event that Distributor fails to comply with any of its obligations pursuant to this Section 9 or Section 2 and that monetary damages in such event would be substantial and inadequate to compensate Company.  Consequently, in such event Company shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by Distributor, without showing or proving any actual damages sustained by Company and without the necessity or requirement to Company of posting a bond or any other form of security therefor.

(f)    Dealer or End-User Breaches.  Distributor shall promptly report to Company any breach of the EULA of which Distributor becomes aware.  Company shall have the right, but not the obligation, to pursue any and all relief available to remedy such breaches.

(g)    Filing and Recording.  Upon request, Distributor agrees to assist Company in the filing, registration, or recording of Company's Marks and rights in Intellectual Property in the Territory, all costs to be paid by Company.

10.)    Assignment.  The rights granted to Distributor hereunder are personal in nature and Distributor agrees that this Agreement shall not be assignable, nor may Distributor delegate its duties hereunder without, the prior written consent of Company.  Any attempted delegation or assignment without the required consent shall be void and of no effect.

11.)    Duration and Termination of Agreement.

(a)    Term.  Subject to prior termination in accordance with the provisions contained herein, the term of this Agreement shall commence as of the Effective Date and expire upon the expiration of the last-to-expire Distribution Term for Products distributed pursuant to an applicable Product Exhibit to this Agreement.

(b)    Termination for Cause.  This Agreement may be terminated forthwith as set forth below, by one party giving written notice thereof to the other party, in accordance with

Section 17(f) below, stating the effective date of termination, subject to Sections 11(c), 11(d), and 17(b) below.

(1)    By Company if any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or against Distributor, or if Distributor shall make an assignment for the benefit of creditors; or

(2)    Subject to Section 2(i) and Section 13(a) herein, by either party upon a material breach by the other party of any of the terms of this Agreement, or any other agreement in force between the parties hereto, which breach is not remedied by the breaching party to the non-breaching party's reasonable satisfaction within fifteen (15) days (or such shorter period of time as may be permitted under applicable law) of the breaching party's receipt of notice of such breach from the non-breaching party, in the event of a breach of Section 6 hereunder, and within thirty (30) days (or such shorter period of time as may be permitted under applicable law) for all other breaches; or

(3)    By Company, immediately, if Distributor is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a Distributor's common stock or the equivalent, shall be considered a substantial change in management or control hereunder); or

(4)    By Company, immediately, if Distributor sells:

    a.    any copies of the Products outside the Territory; or

    b.    any copies of the Products to any person or organization which Distributor has reason to believe may sell the Products outside the Territory; or

(5)    By Company, immediately, if Distributor distributes any Products or associated marketing material without first obtaining the approval(s) of Company required hereunder; or

(6)    By Company, the Distribution Term may be terminated as to any particular Product(s) for which Distributor has failed to produce a Localized Company Product acceptable to Company within three (3) months of the estimated publishing date; in the case of such termination, Company shall retain any Advances paid in respect of such Company Product; or

(7)    By Company, immediately, if Distributor commits any criminal or fraudulent act; or

15.



(8)    By Company, immediately, if any product liability claim or the equivalent thereof is asserted against Company; or

(9)    By Company, immediately, if any infringement or other claim relating to the violation of proprietary rights is asserted against Company or Distributor in connection with this Agreement.

(c)    <u>Effect of Termination</u>. Upon termination of this Agreement:

(1)    Distributor shall cease using any Marks and Intellectual Property.

(2)    All Product masters, Localization materials, computer software in object and source code, marketing and promotional materials, and all other items or information of every kind provided to Distributor or in the possession of Distributor in connection with this Agreement shall remain the property of Company.  Within thirty (30) days after the termination of this Agreement, Distributor shall prepare all such items in its possession for shipment, as Company may direct, at Company's expense.  Distributor shall not make or retain any copies of any confidential or proprietary items or information which may have been entrusted to it.

(3)    Distributor shall provide Company with a written report detailing all inventory of the Products in its possession at the effective date of termination within ten (10) business days.  Company shall then have a period of ten (10) business days to elect to purchase any portion of unsold inventory at Distributor's actual cost of such goods.  Subject to Company's option to purchase Distributor's inventory, and unless this Agreement has been terminated by Company under Section 11(b), Distributor shall retain the right to sell off its remaining inventory of Products for a period of three (3) months following the expiration or termination of this Agreement, subject to Distributor's continuing obligation to make payment of Royalties for such sales.  However, if this Agreement has been terminated by Company under Section 11(b), Distributor shall have no sell-off rights whatsoever and any remaining inventory of the Products shall become the property of Company without any payment by Company to Distributor and shall be promptly delivered to Company at a destination designated by Company at Distributor's expense.

(d)    <u>Survival</u>. Company's rights to, and Distributor's obligations to pay Company all amounts due hereunder shall survive termination or expiration of this Agreement or any determination that this Agreement or any portion hereof or exhibit hereto is void or voidable.

12.)    <u>Relationship of the Parties</u>. Distributor's relationship with Company during the term of this Agreement will be that of an independent contractor.  Distributor will not have, and shall not represent that it has, any power, right or authority to bind Company, or to assume or

16.

create any obligation or responsibility express or implied, on behalf of Company or in Company's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of Distributor and Company, nor as creating the relationships of employer/employee, franchisor/franchisee, joint ventures, or principal/agent between the parties. In all matters relating to this Agreement, neither Distributor nor its employees or agents are, or shall act as, employees of Company within the meaning or application of any obligations or liabilities to Company by reason of an employment relationship. Distributor shall reimburse Company for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon Company by virtue of any such law with respect to employees of Distributor in performance of this Agreement.

13.)    Indemnification.

(a)    Distributors. Distributor shall defend, indemnify and hold harmless Company, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) distribution by Distributor or its Dealers of the Products outside the Territory; (ii) breach of any or all obligations Distributor has undertaken to perform hereunder; (iii) breach of any representations and warranties or covenants Distributor has made hereunder; (iv) infringement or other violation of proprietary rights caused by any modification to the Products not authorized by Company, or otherwise caused by the Work Product; or (v) any third-party claim arising from Distributor's use of any materials added to or used in connection with the Products by Distributor, including, without limitation, the Work Product. Such indemnification obligation of Distributor shall be conditioned upon Company promptly notifying Distributor in a writing that sets forth with specificity the claim or action in which such indemnification obligation applies. Distributor shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Distributor does not timely undertake to defend Company from a claim or suit described above, Company shall have the right to undertake the defense itself and Distributor promises to promptly repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Distributor does not undertake the defense of Company as required hereunder, Company shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Distributor, which approval shall not be unreasonably withheld, delayed, or conditioned. In defending against such claim or action, Distributor may (i) contest; (ii) settle; (iii) procure for Company and its customers the right to continue using the Localized Company Products, as applicable; or (iv) modify or replace the Localized Company Products, as applicable, so that they no longer infringe; provided, however, Distributor shall not have authority to make any admission of liability on the part of Company, or to enter into any settlement that would result in the imposition of any obligations on Company, including, without limitation, any obligation to make payment of any amounts, without the prior written approval of Company. Distributor acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(b)    Company.  Company shall defend, indemnify and hold harmless Distributor, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged:  (i) any third party claim arising from a breach of any copyright, trademark or patent rights with respect to the Company Products as delivered to Distributor; (ii) breach of any and all obligations Company has undertaken to perform hereunder; or (iii) breach of any representations and warranties or covenants Company has made hereunder.  Such indemnification obligation of Company shall be conditioned upon Distributor promptly notifying Company in a writing that sets forth with specificity the claim or action to which such indemnification obligation applies.  Company shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom.  In the event Company does not timely undertake to defend Distributor from a claim or suit described above, Distributor shall have the right to undertake the defense itself and Company promises to repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome.  Except in the event that Company does not undertake the defense of Distributor as required hereunder, Distributor shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Company.    In defending against such claim or action, Company may (i) contest; (ii) settle; (iii) procure for Distributor and its customers the right to continue using the Products, as applicable; or (iv) modify or replace the Products, as applicable, so that they no longer infringe.  Company acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(c)    No Combination Claims.  Notwithstanding Section 13(b), Company shall not be liable to Distributor for any claim arising from or based upon the combination, operation or use of any Product with equipment, data or programming not supplied by Company, or arising from any unauthorized alteration or modification of the Products.

14.)    Insurance.  Distributor shall obtain and maintain in full force and effect during the term of this Agreement a policy or policies of comprehensive general liability insurance or similar commercial insurance providing for such coverage and amounts of coverage as customarily maintained in force and effect by other businesses engaged in activities comparable to those of Distributor.  Company shall be designated as an additional insured on any such policy or policies; and no amendment, modification, or cancellation of such policy or policies may be made without providing at least thirty (30) days prior written notice to Company, which notice shall be given by both Distributor and the insurer.  In the event that at any time such policy or policies are not in full force and effect or are otherwise amended, modified, or cancelled, Company have the right in its sole discretion and without notice to Distributor to immediately suspend its performance of any or all of its obligations under this Agreement.  Upon the request of Company, Distributor shall provide Company with evidence satisfactory to Company in its discretion that the policy or policies of the required insurance are in full force and effect.

18.

15.)    Disclaimer of Warranties; Limited Liability.

(a)    Disclaimer of Warranties.  THE COMPANY PRODUCTS ARE PROVIDED "AS IS, WHERE IS, WITH ALL DEFECTS' AND WITHOUT WARRANTY OF ANY KIND WHATSOEVER.    DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.    ANY IMPLIED WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED.

(b)    Limitation of Liability.  UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO DISTRIBUTOR ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY DISTRIBUTOR TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  Distributor acknowledges and agrees that (1) Distributor has no expectation and has received no assurances that its business relationship with Company will continue beyond the stated term of this Agreement or its earlier termination, and that Company has not made any promises with respect to Distributor's ability to recoup any investment by Distributor in the promotion of the Products by virtue of this Agreement; and (2) Distributor shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of the Products or in any goodwill created by its efforts hereunder.  Under no circumstances shall Company's aggregate liability under this Agreement exceed the total amount of Royalties actually paid to Company by Distributor under this Agreement.

16.)    Confidentiality.  In the course of this Agreement, it is anticipated that the parties will learn confidential or proprietary information about each other.  Each of the parties shall keep confidential this information and any other information which the applicable party may acquire with respect to the other's business, including without limitation, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until the applicable party consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of the applicable party. Except with respect to third parties who have an interest in the Products, neither party shall disclose to others, without the applicable party's consent, the subject of this relationship without first providing the other party with the opportunity to review and offer reasonable objection to the contemplated publication.  This undertaking to keep information confidential shall survive the termination of this Agreement.  It is understood, however, that the restrictions listed above shall not apply to any portion of confidential information which:  (i) was previously known to the

applicable party without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to the applicable party with respect to such information; (iii) is or becomes part of the public domain through no fault of the applicable party; (iv) is independently ascertainable or developed by the applicable party or its employees; (v) is required to be disclosed by administrative or judicial action provided that the applicable party immediately after receiving notice of such action notifies the applicable party of such action to give the applicable party the opportunity to seek a protective order or any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of the applicable party. Upon the request of Company, Distributor shall require each of its employees performing services in connection with this Agreement to execute a confidentiality agreement containing terms and conditions consistent with this Section. Immediately upon the termination of this Agreement, Distributor shall return to Company all of Company's confidential information, together with any and all copies and tangible embodiments thereof, and any and all adaptations and related materials in all formats and mediums.

17.)    General.

(a)    Waiver and Modification.  No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted.  Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof.  None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

(b)    Survival.  The provisions of this Agreement which, by their terms, require performance after the termination of this Agreement, or have application to events that may occur after the termination of this Agreement, shall survive the termination of this Agreement.

(c)    English Language.  Any and all notices, reports, correspondence, amendments, requests, responses, and other communications associated with this Agreement shall be in the English language, and the controlling version of this Agreement shall be in the English language.

(d)    Section References.  Any and all section references in this Agreement shall refer to other sections contained in this Agreement.

(e)    Currency.  Any and all fees, payments, compensation, consideration, and other amounts shall be expressed and payable in U.S. Dollars.  For purposes of converting Royalties due to Constant from a currency that is not U.S. Dollars to U.S. Dollars the exchange rate used shall be the exchange rate as reported by Exchangerate.com for the business day immediately preceding the date of conversion.

(f)    Notices.  Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and personally delivered, sent by confirmed facsimile

20.



transmission, sent by certified mail (or, as applicable, the foreign equivalent thereof if reasonably possible; but if not possible, then by first-class regular mail or the foreign equivalent thereof) or sent by express courier (by a nationally or internationally recognized courier) to the other party at its address set forth in this Agreement, or at such other address as the parties shall designate in writing by the aforementioned means of personal delivery, facsimile transmission, certified mail, or express courier.

(g)    Assignment and Delegation.   Distributor shall not, without the prior written consent of Company, assign its rights or delegate its duties under this Agreement, which consent shall not be unreasonably withheld, delayed, or conditioned.   Company may assign its rights or delegate its duties under this Agreement without the consent of Distributor.

(h)    Remedies.   Injunctive or other equitable relief shall be a remedy available to either party in the event of a breach of any provision of this Agreement by the other party, but such remedy shall not be the exclusive remedy available to the parties.

(i)    Complete Execution.   This Agreement shall become effective only after it has been executed by Distributor and Company.   This Agreement and any other instrument which requires the signature of the parties may be signed in two (2) counterparts, each of which shall be deemed an original and which shall together constitute one Agreement or any other instrument which requires the signature of the parties.

(j)    Facsimile Signatures.   Signature pages delivered by facsimile transmission and bearing the signatures of the parties shall constitute execution of this Agreement or any other instrument which requires the signature of the parties.

(k)    Choice of Law, Jurisdiction.   This Agreement shall be governed by the laws of the State of California in the United States without reference to or use of any conflicts of laws provisions therein.   For the purpose of resolving conflicts related to or arising out of this Agreement, the parties expressly agree that venue shall be in the State of California in the United States only, and, in addition, the parties hereby consent to the jurisdiction of the federal and state courts in the State of California in the United States.   The parties specifically disclaim application of the United Nations Convention on Contracts for the International Sale of Goods, 1980.

(l)    Severability.   In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect.   In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(m)    Force Majeure.   Company shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond Company's control, including but not limited to acts of God, war, riot, acts of terrorism, the substantial failure of the internet,

21.

embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(n)    Entire Agreement. This Agreement, including all Schedules and Exhibits hereto, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes any prior or contemporaneous oral or written agreement. Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each party and an executed copy has been delivered to the parties. This Agreement may not be changed, modified, amended or supplemented except in a writing signed by all parties to this Agreement. Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(o)    Benefits of Agreement. The terms of this Agreement are intended solely for the benefit of the parties hereto. They are not intended to confer upon any third party the status of a third-party beneficiary. Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement effective as of the Effective Date.

CONSTANT ENTERTAINMENT LLP       3A ENTERTAINMENT LTD
By: PHILLIP HO                               By: SERGEY LOSHKAREV
Its: MANAGING PARTNER                Its: PERSON EMPOWERED TO ACT

Date: 2/22/06                               Date: 10.02.2006

22.

**EXHIBIT A**

**PRODUCT EXHIBIT**

**EFFECTIVE DATE: February 1, 2006**

1.)     Products and Royalty Rates:

| # | COMPANY PRODUCT TITLE<br>All titles Win 2000/XP unless otherwise noted. | Royalty Rate per Unit | Distribution Term Limitation(s) |
|---|---|---|---|
| 1 | 200+ Great Games for PDA (**for PDA**) | $0.70 | None |
| 2 | Midnight Outlaw: Illegal Street Drag | $0.70 | No Manufacture after 1 Dec. 2007; No Distribution after 29 Feb. 2008 |
| 3 | Midnight Outlaw: Nitro Edition | $0.70 | No Manufacture after 1 Dec. 2007; No Distribution after 29 Feb. 2008 |
| 4 | Navy Seals 2 | $0.70 | No Manufacture after 15 Aug. 2007; No Distribution after 11 Feb. 2008 |
| 5 | Prison Tycoon | $0.70 | None |
| 6 | Super Stunt Spectacular | $0.70 | None |
| 7 | Tabloid Tycoon | $0.70 | None |
| 8 | Ultimate Pinball Extreme | $0.70 | None |
| 9 | Ultimate Puzzles 1000 | $0.70 | None |
| 10 | Ultimate Solitaire 750 | $0.70 | None |
| 11 | World Poker Championship | $0.70 | None |
| 12 | Your Complete Landscape & Garden Design | $0.70 | None |
| 13 | Your Custom Home | $0.70 | None |

2.)     Sublicense/OEM/Bundled Product.  The royalty rate for Product distributed through sublicensing, the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

3.)     Distribution Term(s).  Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the Agreement, the Distribution Term of the Products set forth in this Product Exhibit shall begin on the Effective Date of this Product Exhibit and continue for a period of two (2) years.

4.)     Advance Payments.  As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Agreement, Distributor shall pay Company the amount of Seventy Three Thousand Dollars (US $73,000), due upon execution of this Product Exhibit by both parties.

5.)     The Third Party Elements shall be deemed to include the following: NONE

6.)     Territory:  Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.



## EXHIBIT B APPROVAL REQUEST

Tracking
No.

☐  First submission. We will assign a tracking number if this is first submission.
   Always use this number when resubmitting this item.

### TO BE COMPLETED BY Distributor

Distributor                              Address

Distributor Contract                     Tel. No.                    Fax No.

Item Submitted                           No. of Samples              Distributor Style No.

| Product | Packaging/Hang Tags/Labels/Manuals | Collateral/Advertising/Editorial |
|---|---|---|
| ☐ Preliminary Art/Concept | ☐ Preliminary Art/Concept | ☐ Preliminary Art/Concept |
| ☐ Color Comp./Hand Sample | ☐ Color Comp./Hand Sample | ☐ Color Comp./Hand Sample |
| ☐ Final Art | ☐ Final Art | ☐ Final Art |
| ☐ Mechanical | ☐ Mechanical | ☐ Mechanical |
| ☐ Prototype/Pre-Production Sample | ☐ Prototype/Pre-Production Sample | ☐ Prototype/Pre-Production Sample |
| ☐ Production Sample/Final Approval | ☐ Production Sample/Final Approval | ☐ Production Sample/Final Approval |

Comments

---

### DO NOT WRITE BELOW THIS LINE
### TO BE COMPLETED BY Company

Date Received    / /                     Date Returned to Distributor    / /

Action Taken on Submission:
☐  Approved As Is.  Proceed to:          ☐  Resubmit this stage with corrections          ☐  Not Approved - See
Comments                                    before proceeding to the next stage.
                                            See comments.

Comments (Company and Agent please initial and date after your comments.)

### ALL APPROVALS ARE SUBJECT TO PRODUCT BEING INCLUDED IN YOUR CONTRACT

Distributor Signature  Date  / /          Agent Signature  Date  / /
**Proprietary Notices:**

24.

## CONSTANT LICENSE AND DISTRIBUTION AGREEMENT

This License and Distribution Agreement (the "Agreement") is made and entered into this 12th day of September, 2006 (the "Effective Date"), by and between Constant Entertainment LLP, a limited-liability partnership organized under the laws of California, with its principal place of business at 445 Bryan Avenue, Sunnyvale, California 94086 ("Company") and 3A Entertainment Ltd. organized under the laws of British Virgin Islands with its principal offices at the Management Company Trust (B.V.I.) LTD., OMC Chambers, P.O. Box 3152, Road Town, Tortola, British Virgin Islands ("Distributor").

### PREMISES

Company publishes and distributes certain computer software products, including the products listed in Exhibit A hereto. Company desires to distribute its products in a world market; and Distributor has expressed an interest in localizing, and/or acting as an independent distributor of, certain Company products pursuant to the terms and conditions of this Agreement.

In consideration of the Premises, and of the mutual covenants and agreements hereinafter set forth, Company and Distributor agree as follows:

1.)  Definitions.  Whenever used in this Agreement, the following terms shall have the following specified meanings;

(a)  "Company Products" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by Company and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto, but specifically excluding sequel products, along with any and all manuals, specifications, user guides and other documentation regarding such computer software programs. For the avoidance of doubt, other products may be subsequently added to this Agreement for by the mutual written agreement of the parties, in which event such products shall be deemed included in the Company Products and/or Localized Company Products.

(b)  "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which Distributor has the right to distribute the enumerated Products in the Territory.

(c)  "Territory" means only the countries listed in Exhibit A attached hereto, but only as their political borders exist on the date of this Agreement. The Territory excludes foreign countries' embassies, and foreign military and governmental installations, located within the territory.

(d)  "Localization" means the modification of Company Products to meet the needs of the non-English-speaking users in the Territory. This may include code changes, additions and alterations to the feature set, changes in the data or new art with the intent to provide more culturally acceptable Company Products in the Territory.



(e)    "Localized Company Products" means Company Products after Localization, together with the appropriate localized pre-approved collateral materials, contained in Company-approved localized packaging for Distributor's Territory.

(f)    "End-User" means an individual or entity which purchases Products for its own use, and not for redistribution.

(g)    "Dealer" means an entity which, as authorized hereunder, purchases Products and resells them to End-Users.

(h)    "EULA" means Company's standard form end-user license agreement, a copy of which is displayed on certain screens and as part of the installation of, all Company Products, as the same may be modified or amended from time to time.

(i)    "Prohibited Country" means a country to which export or re-export of any Products is prohibited by United States law without first obtaining the permissions of the United States Office of Export Administration or its successor.

(j)    "OEM" means original-equipment manufacturer, which is any natural person or legal entity which obtains a license from Company to use Products for the purpose of incorporating such Products, in whole or in part, either with or within computer hardware, software or other products for further distribution in conjunction with such products.

(k)    "Products" mean Company Products and/or Localized Company Products.

(l)    All references in this Agreement to the "sale" or "selling" of Products shall mean the sale of a license to use such Products. All references in this Agreement to the "purchase" of Products shall mean the purchase of a license to use such Products.

2.)    Appointment as Authorized Company Distributor.

(a)    Appointment. This Agreement is intended as a master agreement. If the parties wish to add other products to the scope of this Agreement, they may do so by executing one or more addenda in substantially the same form as Exhibit A attached hereto (each, a "Product Exhibit"), which shall thereupon be made a part of this Agreement and incorporated herein by reference. Any products so added shall be deemed included in the Products. As applicable any references to Exhibit A in this Agreement shall be deemed to include Exhibit A and any Product Exhibits subsequently executed by the parties. Subject to the terms and conditions of this Agreement, Company hereby appoints Distributor as an independent, exclusive distributor of the Products in the retail and distribution channels solely in the Territory, and Distributor hereby accepts such appointment. Such appointment specifically excludes the right to distribute the Products through the OEM channel, or through bundling any of the Products with any other products. If Distributor desires to distribute the Products through the OEM channel, or through bundling any of the Products with any other products Distributor may request such additional rights from Company on a case by case basis. Any such approval must

2.



be in writing by the Company. All rights not expressly granted to Distributor hereunder are reserved by Company.

(b)    Nature of Distribution. The appointment of Distributor only grants to Distributor a non-transferable license (with exception of Clause 9) to distribute Products to Distributor's customers in the Territory in accordance with this Agreement, and does not grant any right, title or interest in any of the Products, in whole or in part, to Distributor.

(c)    Software License. Company grants to Distributor a non-transferable license (with exception of Clause 9) in the Territory to (i) manufacture or have manufactured, market, distribute and sell only in the Territory the Products, and (ii) modify the Company Products, only as commercially necessary and as approved in writing in advance by Company, and to manufacture or have manufactured, market, distribute and sell only in the Territory such modified versions of the Company Products as Localized Company Products.

(d)    On-line Sales. Company hereby grants Distributor the right to market and sell the Products through on-line services and the Internet only within the Territory. Distributor is prohibited from distributing any Products via electronic means, including downloading. Company reserves the right to review Distributor's on-line materials regarding the Products, and may at any time require Distributor to modify or remove such materials. Distributor agrees to immediately comply with such notice.

(e)    Company's Reserved Rights. In the event Company believes that further distribution of any Products in the Territory will expose Company to liability, Company may delete such Product from the list of Company Products contained in Exhibit A. Distributor agrees to promptly refrain from any further distribution of the applicable Products following receipt of notice that such Product has been deleted from Exhibit A. Additionally, Company reserves the right to modify Products during the term hereof in its sole discretion; and upon any such modification, the modified version of the Product shall be the only one authorized for distribution under this Agreement. In the case, that certain products are taken off the distribution list before the expiration of the distribution term, the Publisher shall refund the Distributor on prorate basis.

(f)    Certain Obligations of Distributor. Distributor warrants and represents that it has, and will maintain, the capacity, facilities and personnel necessary to carry out its obligations pursuant to this Agreement, and in particular that:

(1)    Promotion Efforts. Distributor shall use its reasonable commercial efforts to market, sell and distribute the Products both vigorously and aggressively within the Territory in accordance with the terms of this Agreement. Notwithstanding the foregoing, all promotional, advertising and/or other marketing items or the like which Distributor may desire to create must be pre-approved in writing by Company in the form attached hereto as Exhibit B.

3.



(2)    Dealer Qualifications    Distributor shall authorize and maintain only dealers, resellers, and distributors (collectively, the "Dealers") that have the financial capacity, facilities, technical capacity and desire to market and sell the Products competently.

(3)    Distributor-Dealer Agreement.    It is a material obligation of Distributor, prior to engaging in any transaction with a Dealer involving the Products, to enter, or have previously entered, into a written agreement with such Dealer which authorizes such Dealer to resell the Products, and which provides that as a material condition of such agreement such Dealer may resell the Products only within the Territory granted hereunder, and only in a manner consistent with the provisions of this Agreement (the "Dealer Agreement"). Distributor shall provide the Company with a copy of any such Dealer Agreement upon request. Distributor shall be responsible for the actions of all Dealers and their compliance with all of the terms and conditions of the Dealer Agreement.

(4)    Inventory.    Distributor shall maintain an inventory of Products sufficient to serve adequately the needs of Dealers and End-Users within a commercially reasonable time frame.

(5)    Dealer Support.    Distributor shall provide Dealers with training, technical support and other assistance appropriate in promoting the Products. Distributor shall transmit to Dealers all Company literature and other information that Company requests be transmitted to them.

(6)    Distributor Personnel.    Distributor shall train and maintain a sufficient number of capable technical and sales personnel at its expense; (1) to serve the needs of its Dealers or End-Users for the Products, service and support; and (2) otherwise to carry out the responsibilities of Distributor pursuant to this Agreement.

(7)    Technical Expertise.    Distributor and its staff shall be conversant with the technical language conventional to the Products and similar computer products in general.

(8)    Distributor-Replicator/Duplicator Agreement.    Distributor shall obtain Company's prior written approval before replicating any media used in the Company Products, and Company may withhold such consent in its sole discretion. Prior to engaging a replicator/duplicator to replicate/duplicate the Products as contemplated pursuant to Section 2 hereof, Distributor and such replicator/duplicator shall execute an agreement authorizing that entity to duplicate the Products. It is a material obligation of Distributor to contractually require the replicator/duplicator to refrain from replication that results in the production of gold-colored CD-ROMs.

(g)    Distributor Covenants.    Distributor covenants and agrees:

4.

(1)    To conduct business in a manner that reflects favorably on the goodwill and reputation of Company;

(2)    To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Products that are inconsistent with the literature distributed by Company, including all warranties and disclaimers contained in Company literature;

(3)    To refrain from selling the Products to any Dealer that cannot agree to comply with obligations similar to those contained in this Section 2;

(4)    To distribute the Products only in machine-readable object code format;

(5)    To refrain from permitting the copying of Company Products onto any other media for purposes of redistribution to others whether for profit, promotion or otherwise, and not to use, copy, print or display any Company Products or permit any Dealer to use, copy, print or display any Company Products, in any manner except in direct connection with, and for the sole purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(6)    To refrain from renting or lending any Products, or the use, copying, printing or display of any Products, in any manner except in connection with, and for the purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(7)    Not to add to, delete or otherwise vary any of the terms and conditions of the EULA;

(8)    Not to distribute any Products under any trade names or trademarks other than those employed by Company with respect thereto without the prior written approval of Company; and

(9)    Distributor may deduct any withholding tax required by applicable governmental taxing authorities provided that Distributor shall remit such withheld payments to the applicable government authority, shall prepare and make all filings and tax returns in connection with such remittances, and shall deliver documentation to Company in form and substance evidencing payment of same so as to enable Company to obtain a foreign tax credit against its obligations under applicable United States tax laws.

(h)    Product Support. Distributor shall provide a level of technical support for all Products equivalent in all material respects to that which Company provides its End Users for Company Products.

5.

(i)    Compliance with Law.  Distributor shall comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder, in any of its business with Dealers, and with respect to the Products.

(j)    Compliance with U.S. Export Laws.  Distributor acknowledges that Company's export of the Company Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data.   ("Direct Product" as used hereafter means the immediate product, including processes and services, derived from the use of Company Products.) Distributor agrees, and shall cause each of its Dealers, employees, agents and representatives to agree, not to export or re-export any Products or Direct Products of Company Products to any Prohibited Country.  Distributor agrees to indemnify Company against any claim, demand, action, proceeding, investigation, loss, liability, cost or expense, including, without limitation attorney's fees, suffered or incurred by Company and arising out of or related to any breach (whether intentional or unintentional) by Distributor, its employees, agents, representatives or Dealers, of any of the warranties or covenants of this Section 2(j).

(k)    Governmental Approval.  If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to secure the right of remittance abroad of U.S. Dollars pursuant to Section 6 hereof, Distributor shall immediately take whatever steps may be necessary in this respect, and any charges incurred in connection therewith shall be paid by Distributor.  Distributor shall keep Company currently informed of its efforts in this connection.  Company shall be under no obligation to deliver Products to Distributor hereunder until Distributor has provided Company with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(l)    Market Conditions.  Distributor shall advise Company promptly concerning any material market information that comes to Distributor's attention regarding the Products, Company's market position or the continued competitiveness of the Products in the marketplace.

(m)    Dealing with End-Users.  Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of the Products from Distributor, Distributor shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the EULA.  A sample copy of the EULA shall be available from the Distributor for review by all prospective End-Users dealing with Distributor.  Should any End-User return to Distributor any unopened Products in the original sealed package in which it was distributed by Distributor, Distributor shall provide such End-User with a full refund of all sums paid by the End-User therefor.  In no event shall Company be required to provide any such refund to any End-User who has obtained the copy or copies in question from or through Distributor.

6.



(n)    Adaptation for Local Market. Company and Distributor shall consult in good faith with respect to the localization of the Company Products and Distributor shall make such changes to Company Products, packaging and related marketing materials as Distributor and Company agree would be appropriate to adapt Company Products for use in the Territory. Company shall submit to Distributor such materials as may be available to Company in order to assist in Distributor's Localization effort ("Localization Kit"). This might include, but is not limited to, scripts for speech files, and removable data storage media containing artwork. Company will reasonably cooperate in Distributor's development of the Localized Company Products. The Company shall submit no later then 1 month after the signature of this agreement English unprotected masters or US commercial versions of the products and artworks (where available). If the Company does not submit the above materials by due date the Distributor shall have the right to terminate the agreement and receive the full refund the advances paid. Distributor shall, at its sole cost and expense, be responsible for translating and manufacturing or having manufactured Company manuals, advertising and promotional materials into the language of the Territory if so requested by Company. Upon receipt of the Localization Kit, Distributor shall submit, within two (2) weeks, an estimated publishing date for the localized version of the Company Product, which shall be no later than four (4) calendar months following receipt of the Localization Kit. Failure to meet the publishing date deadline shall be considered a material breach and shall allow Company to terminate the Agreement upon thirty (30) days prior written notice. During the completion of the Localization process, Distributor shall submit all localized materials to Company for approval. Distributor must receive written approval from Company prior to any sale or demonstration of Localized Company Products. If Distributor cannot achieve the quality or technical standards equivalent to those of the English version of the Company Product within forty-five (45) calendar days after Distributor's initial submission of the Localized Company Products to Company for approval, Company may terminate this Agreement upon seven (7) days prior notice. Company has the exclusive right to sell Localized Company Products outside the Territory.

(o)    Packaging. Except as provided in Section 2(n), Distributor shall distribute Products with all packaging, warranties, disclaimers and EULA intact as on Company Products prior to Localization, and shall instruct each of its Dealers as to the nature and terms of the EULA applicable to the Products. Anything to the contrary notwithstanding, Distributor may not include any materials in or on the Product packaging which is not either (i) included in the U.S. version of the Company Product or (ii) pre-approved in writing by Company. For the purpose of Localization, Distributor agrees to produce packaging and advertising or sales support material at the same high quality levels used by Company in the English version of the Company Products. Distributor must receive written pre-approval from Company on all Distributor-produced marketing and sales materials, including, but not limited to, packaging and collateral material that reference the Products, prior to release of the materials. Distributor shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the Localized Company Products within the Territory.

7.

(p)    Quality; Samples.

(1)    Distributor acknowledges that if the Products manufactured and sold by it hereunder were of inferior quality in design, material or workmanship, the substantial goodwill which Company has established and now possesses in the Products would be impaired. Accordingly, Distributor agrees that the Products shall be of the highest standards and of such superior style, appearance and quality as shall be necessary and suited to their promotion, distribution, sale and exploitation to enhance the Products and the goodwill in the Products.

(2)    Company shall approve each stage of Localization of the Products from the conception to the production thereof. Distributor shall at each stage of Localization of the Products, before it manufactures, distributes, ships or sells any particular Products, furnish Company, free of cost, for its written approval, the Approval Request form attached hereto as Exhibit B with each of the following:

   a.    four (4) samples of preliminary art concept;

   b.    four (4) samples of color composite and/or one (1) hand sample;

   c.    four (4) samples of fine art;

   d.    one (1) pre-production sample; and

   e.    one (1) final sample/prototype for the Product together with its cartons and containers, tags, labels, wrapping material, advertising and promotional material for use in any media in connection with the Localized Company Product ("Packaging").

(3)    Distributor shall provide Company with six (6) production samples of the Products and all sales, marketing and advertising materials prepared by Distributor in connection with its distribution of the Products, free of cost, for Company's written approval or disapproval prior to distribution of the Products. The Third Party Elements defined in Section 5 of and/or any Product Exhibit to this Agreement shall accompany delivery of the foregoing. If Company does not indicate its approval or disapproval of such submissions within seven (7) business days from the date of actual receipt of the submission, Company shall be deemed to have disapproved the Products. If so disapproved, and without limiting Company's approval rights, upon receipt of a written request from Distributor, Company shall notify Distributor within twenty (20) business days after the request of the proposed modifications that would render such sample approved. The foregoing approval procedure may be repeated as necessary until the Products are finally approved. Once Products and collateral materials have been expressly approved, Distributor shall not depart therefrom in any material respect without first obtaining Company's written consent in

8.




accordance herewith or add any additional element(s), materials, or features without Company's prior written approval in each case. Upon the request of Company, Distributor agrees to furnish Company, at no charge, with additional samples of each Product and all sales, marketing and advertising materials which Company may deem reasonably necessary in order to permit Company to ensure that the quality of the Products have been maintained and that no deviation and/or modification of Company approved Products has occurred. Company shall have the right in its sole discretion to withdraw its approval of samples if the quality of any Products ceases to be acceptable.

(4)     Duly authorized representatives of Company shall have the right, at any and all reasonable times, upon reasonable advance notice to Distributor, to inspect all facilities or premises maintained by Distributor, including, without limitation, the plants, factories, or other manufacturing or producing facilities of Distributor or third parties at which the Products and/or any components of Products are being manufactured or produced. Said representatives shall have the right to inspect and test any Products and/or all components thereof and to take any other action which in the opinion of Company is necessary or proper to assure Company that the nature and quality of the Products and/or all components thereof are in accordance with the requirements of this Agreement.

(5)     Distributor will diligently address all legitimate complaints brought to its attention regarding the Products. Distributor will advise Company promptly of any category of recurring complaint and of any complaint which Distributor reasonably believes might result in legal or administrative action against Distributor or Company.

(q)     Good Will and Protection. Distributor acknowledges that:

(1)     The Products, including without limitation, the characters, character names, trademarks, service marks, trade dress, logos and images associated with the Products are unique and original and Company is the exclusive owner thereof;

(2)     As the result of the exhibition and exploitation of the Products, Company has acquired a substantial and valuable good will therein;

(3)     The names of the characters and their likenesses, as applicable, and the title of the Products have acquired a secondary meaning as trademarks uniquely associated with merchandise authorized by Company;

(4)     All rights in any additional material, new versions, translations, rearrangements or other changes in the Products which may be created by or for Distributor (including without limitation Localizations and



Localized Company Products), (collectively, "New Materials") shall be and shall remain the exclusive property of Company from creation; and

(5)    Any copyrights, trademarks and design patents heretofore obtained by Company or in connection with the characters and title of the Products are good and valid.

3.)    Inspections; Records and Reporting.

(a)    Reports.  Distributor shall provide to Company written reports for every one-quarter period, or when requested by Company, showing Distributor's shipments of the Products by name and address of Dealers and End Users, Product name, units and local currency volume, volume in U.S. Dollars, remaining inventories of Products, and any other information Company reasonably requests.

(b)    Notification.  Distributor shall notify Company in writing of any claim or proceeding involving the Products within seven (7) days after Distributor learns of such claim or proceeding.  Distributor shall also immediately report to Company all claimed or suspected product defects.  Distributor shall also notify Company in writing not more than seven (7) days after any change in the control of Distributor or any transfer of a majority share of Distributor's voting control or a transfer of substantially all its assets.

(c)    Records.  Distributor shall maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to the reproduction and distribution of the Products.  For the purpose of verifying compliance by the Distributor with the provisions of this Agreement, Distributor agrees that Company and its representatives shall be permitted full access to, and shall be permitted to make copies of or abstracts from, the books and records of Distributor relating to inventory levels, manufacturing, sales, and distribution of the Products.  Company shall be permitted to audit such books and records at reasonable intervals.  If Company discovers an error which results in additional amounts being owed to Company in excess of five percent (5%) of the total amount being audited then Distributor shall reimburse Company for all reasonable costs of the examination, including travel and related expenses, in addition to paying Company the amount of the discrepancy plus interest on such amount calculated at ten percent (10%) per annum.

4.)    Ownership and Property Rights.  Distributor agrees that Company owns all right, title and interest in the Products in any form or medium except those elements specified in Section 5, and/or a Product Exhibit attached hereto (the "Third Party Elements") now or hereafter subject to this Agreement, and in all of Company's copyrights, patents, trade secrets, trademarks, service marks, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Products; and together with any and all inventions, know-how, technology, and trade secrets relating to the design, development, operation, distribution, use, or maintenance of the Company Products or the EULA.  The use by Distributor of any of these proprietary rights is authorized only for the purposes and under the terms herein set forth, and upon termination of this Agreement for any reason, such authorization shall immediately cease.  As part of this

10.

Agreement, and without additional compensation, Distributor acknowledges and agrees that any and all tangible and intangible property and work products, ideas, inventions, discoveries and improvements, and New Materials, whether or not patentable, which are conceived, developed, created, obtained, or first reduced to practice by Distributor for Company in connection with this Agreement or the Localization of Company Products, including, without limitation, all technical notes, schematics, software source and object code, prototypes, breadboards, computer models, artwork, sketches, designs, drawings, paintings, illustrations, computer-generated artwork, animations, video, film, artistic materials, photographs, literature, methods, processes, voice recordings, vocal performance, narrations, spoken word recordings and unique character voices (collectively referred to as the "Work Product") shall be considered "works made for hire" and therefore all right, title and interest therein (including, without limitation, patents and copyrights) shall vest exclusively in Company. To the extent that all or any part of such Work Product does not qualify as a "work made for hire" under applicable law, Distributor without further compensation therefore does hereby irrevocably transfer, sell and assign to Company all of Distributor's worldwide right, title, and interest, in and to the Work Product, including without limitation, all rights of copyright, patent, trade secret, trademark, service mark, trade dress, artistic and moral rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the Work Product, together with any and all applications, registrations, renewal and extension rights, and rights to sue for any past, present, or future infringement of any of the foregoing. Distributor acknowledges and understands that artistic and moral rights include the right of an author: to be known as the author of a work; to prevent others from being named as the author of the works; to prevent others from falsely attributing to an author the authorship of a work which he/she has not in fact created; to prevent others from making deforming changes in an author's work; to withdraw a published work from distribution if it no longer represents the views of the author; and to prevent others from using the work or the author's name in such a way as to reflect on his/her professional standing. As required by applicable law, Distributor hereby expressly waives any and all artistic and moral rights associated with the Products and the Work Product. Distributor represents and warrants that: (i) it shall be the exclusive owner of all right, title, and interest in and to the Work Product and all proprietary rights associated with the Work Product; (ii) it has the right, power, and authority to make the transfer to Company of its interests in the Work Product as contemplated by this Section; and (iii) it has obtained written consents, assignments, and transfers from any and all third parties who participated in the development of the Work Product.

5.)    Third Party Elements. Distributor agrees to use its best efforts to obtain all rights necessary with respect to the Third Party Elements so as to enable Company to exploit and distribute the Localized Company Product embodying such Third Party Elements after the expiration of the Distribution Term. Company shall have the right to withhold its approval of any Localized Company Product for which Distributor is unable to obtain such rights on behalf of Company. At the time Distributor provides the production samples described in Section 2(p)(3) of this Agreement, Distributor shall provide Company with a schedule of all Third Party Elements that are a part of the Localized Company Products and copies of all agreements relating to such Third Party Elements.

11.

6.)    Advances, Royalties and Payment.

(a)    Advances and Royalty Amounts. Distributor agrees to pay to Company the non-refundable, but recoupable Advances and Royalty payments set forth in Exhibit A. Royalties payable to Company pursuant to this Agreement for distribution of Products through the retail or distribution channels shall be based on the number of units of the Products distributed by Distributor and shall only be subject to a deduction for Products previously sold by Distributor which are returned to Distributor by its customers. Royalties payable to Company pursuant to this Agreement for distribution of Products through the OEM channel, or through bundling any of the Products with any other products shall be based on Net Receipts, which shall mean total sums invoiced by Distributor in connection with the sale or other distribution of the Products, less the amount of any actual returns of such Products to Distributor by its customers. In the case of a bundle, the amount of invoiced sums attributable to any one product in the bundle shall be equal to the total invoiced sums divided by the total number of products in the bundle. Net Receipts shall not be reduced by any other items including, but not limited to, any costs of manufacturing, marketing, advertising, or shipping the Products. The royalty rate for new Products developed by Company and added to this Agreement shall be determined by Company as Company makes such new Products available to Distributor.

(b)    Royalty Payments.

(1)    Royalties shall be paid quarterly, no later than thirty (30) days after the end of the calendar quarter in which sales occurred and shall be accompanied by a statement setting forth in reasonable detail the basis for the Royalty computation and payment. Payment shall be sent via wire transfer of immediately available funds to the following account:

Account name: Constant Entertainment
Bank: Bank of America
Bank address: Los Gatos, CA
Routing Number: 121000358
Account number: 01425-03464
SWIFT code: BofAUS3N

(2)    All Advances, Royalties or other payments made to Company hereunder shall be made without deduction for any local, state, federal or foreign taxes or duties. Distributor shall be responsible for the payment of any and all taxes, licenses, duties and fees of Distributor or Company in connection with the marketing, distribution, sale, possession, use or sublicensing of the Products (inclusive of value added taxes, but exclusive of taxes based on Company's net income). Distributor hereby agrees to pay and to indemnify Company from all such duties, taxes and fees as may be imposed upon Company with respect to the marketing, distribution, sale, possession, use or sublicensing of the Products pursuant to this Agreement. In the event Distributor is precluded by applicable law from

12.



making payments free of deductions, then Distributor shall pay to Company such additional amounts as necessary so that the actual amount received by Company shall be the same as though no such deduction had been made. Notwithstanding the foregoing, Distributor may deduct the amount of any withholding income tax required by applicable governmental taxing authorities on amounts to be remitted to Company provided that Distributor shall remit such withheld payments to the applicable governmental authority and shall deliver documentation to Company in form and substance evidencing payment of said so as to enable Company to demonstrate its compliance with any such withholding requirement and obtain a foreign tax credit against its obligations under applicable United States tax laws.

7.)    <u>Distributor Determines Its Own Per Copy Prices</u>. Distributor is free to determine unilaterally its own pricing of the Products to its Dealers and End Users, as applicable. Although Company may publish suggested wholesale, retail, or Dealer prices, these are suggestions only and Distributor shall be entirely free to determine the actual prices at which the Products are sold to its Dealers and End Users, as applicable.

8.)    <u>Distributor's Warranties and Representations Regarding Treatment of Dealers</u>. Distributor hereby warrants and represents to Company as follows:

(a)    <u>Dealer Pricing</u>. Distributor shall inform each Dealer that it is free to determine unilaterally its own prices and that, although Company may publish lists showing suggested retail prices for Products, those are suggestions only.

(b)    <u>Non-Discrimination Among Dealers</u>. In working with its Dealers, Distributor shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Dealers, including but not limited to those which govern discriminatory pricing.

9.)    <u>Trademarks, Trade Names and Copyrights</u>.

(a)    <u>Trademark Use during Agreement</u>. During the term of this Agreement, Distributor is authorized by Company to use the trademarks and service marks Company uses for the Products (collectively, "the Marks") solely in connection with Distributor's advertisement, promotion and distribution of the Products. Distributor agrees that it shall cause to be affixed, conspicuously and legibly on the Products sold by it pursuant to this Agreement and on all advertising incorporating any part of the Company Products, appropriate copyright and trademark notices in the name of Company, which notices shall be in such form and have such content as may be prescribed by Company. Distributor further agrees to prominently feature the Marks on packaging and advertising of the Products. Distributor agrees not to alter, erase, deface, or overprint any such Marks on anything provided by Company.

(b)    <u>No Distributor Rights in Trademarks or Copyrights</u>. Distributor has paid no consideration for the use of Company's intellectual property, including without

13.



limitation, the Company's Marks; trade names; domain names; metatags; key words; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address); logos, character names and likenesses; plots; themes; and strategies (collectively, "the Intellectual Property"); and nothing contained in this Agreement shall give Distributor any interest in any of the Intellectual Property. Distributor acknowledges that Company owns and retains all proprietary rights in the Intellectual Property, and agrees that it shall not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect or dilute the Company's rights in the Intellectual Property (including, without limitation, any act, or assistance to any act, which may infringe or otherwise violate any of Company's rights in the Intellectual Property). Distributor shall not use any business name that incorporates or uses the Marks or any of the Intellectual Property. Distributor shall not register or attempt to register in any office or jurisdiction any rights in any trademark or service mark; trade name; domain name; metatag; key word; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address) which is the same as or similar to the Marks or any of the Intellectual Property.

(c)    No Continuing Right.    Upon expiration or termination of this Agreement, Distributor shall cease advertising and use of all Company Marks and Intellectual Property.

(d)    Obligation to Protect.    Distributor agrees to use reasonable efforts to protect Company's proprietary rights and to cooperate with Company's efforts to protect its proprietary rights.

(e)    Breach.    Distributor understands and agrees that Company will suffer irreparable harm in the event that Distributor fails to comply with any of its obligations pursuant to this Section 9 or Section 2 and that monetary damages in such event would be substantial and inadequate to compensate Company. Consequently, in such event Company shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by Distributor, without showing or proving any actual damages sustained by Company and without the necessity or requirement to Company of posting a bond or any other form of security therefor.

(f)    Dealer or End-User Breaches.    Distributor shall promptly report to Company any breach of the EULA of which Distributor becomes aware. Company shall have the right, but not the obligation, to pursue any and all relief available to remedy such breaches.

(g)    Filing and Recording.    Upon request, Distributor agrees to assist Company in the filing, registration, or recording of Company's Marks and rights in Intellectual Property in the Territory, all costs to be paid by Company.

(h)    Assignment.    Licensee is granted the right to sublicense all Licensee's rights granted to Licensee under this Agreement to **SWT Entertainment Limited**, reg#165602, having its registered office at 29A, Annis Komninis Street, P.C. 1061, Nicosia, Cyprus or

14.



another legal entity (Sublicensees), with right to further sublicense, subject to the following warranty. Licensee warrants that SWT Entertainment Limited or the third party shall have the right to sub-license the rights granted to: **OOO «Akela»**, a company incorporated and acting under the laws of the Russian Federation, having its principal place of business at: 12/1 Bolshaya Novodmitrovskaya str.,127015 Moscow, Russian Federation and **OOO «Akela»** shall have the rights to sublicense distribution, advertising and manufacturing rights to the following entity: **C.L.R."Multitrade"** with its principal place of business at Nemenskaya St.10, Kiev 01130.

(i)     Sublicense's rights to the Product are restricted to the licensed Territory.

10.)    _Assignment._  The rights granted to Distributor hereunder are personal in nature and Distributor agrees that this Agreement shall not be assignable, nor may Distributor delegate its duties hereunder without, the prior written consent of Company.  Any attempted delegation or assignment without the required consent shall be void and of no effect.

11.)    _Duration and Termination of Agreement._

(a)     _Term._  Subject to prior termination in accordance with the provisions contained herein, the term of this Agreement shall commence as of the Effective Date and expire upon the expiration of the last-to-expire Distribution Term for Products distributed pursuant to an applicable Product Exhibit to this Agreement.

(b)     _Termination for Cause._  This Agreement may be terminated forthwith as set forth below, by one party giving written notice thereof to the other party, in accordance with Section 17(f) below, stating the effective date of termination, subject to Sections 11(c), 11(d), and 17(b) below.

(1)     By Company if any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or against Distributor, or if Distributor shall make an assignment for the benefit of creditors; or

(2)     Subject to Section 2(i) and Section 13(a) herein, by either party upon a material breach by the other party of any of the terms of this Agreement, or any other agreement in force between the parties hereto, which breach is not remedied by the breaching party to the non-breaching party's reasonable satisfaction within fifteen (15) days (or such shorter period of time as may be permitted under applicable law) of the breaching party's receipt of notice of such breach from the non-breaching party, in the event of a breach of Section 6 hereunder, and within thirty (30) days (or such shorter period of time as may be permitted under applicable law) for all other breaches; or

(3)     By Company, immediately, if Distributor is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a Distributor's common stock or the equivalent,

15.

shall be considered a substantial change in management or control hereunder); or

(4) By Company, immediately, if Distributor sells:

    a.    any copies of the Products outside the Territory; or

    b.    any copies of the Products to any person or organization which Distributor has reason to believe may sell the Products outside the Territory; or

(5) By Company, immediately, if Distributor distributes any Products or associated marketing material without first obtaining the approval(s) of Company required hereunder; or

(6) By Company, the Distribution Term may be terminated as to any particular Product(s) for which Distributor has failed to produce a Localized Company Product acceptable to Company within three (3) months of the estimated publishing date; in the case of such termination, Company shall retain any Advances paid in respect of such Company Product; or

(7) By Company, immediately, if Distributor commits any criminal or fraudulent act; or

(8) By Company, immediately, if any product liability claim or the equivalent thereof is asserted against Company; or

(9) By Company, immediately, if any infringement or other claim relating to the violation of proprietary rights is asserted against Company or Distributor in connection with this Agreement.

(c)    Effect of Termination. Upon termination of this Agreement:

(1) Distributor shall cease using any Marks and Intellectual Property.

(2) All Product masters, Localization materials, computer software in object and source code, marketing and promotional materials, and all other items or information of every kind provided to Distributor or in the possession of Distributor in connection with this Agreement shall remain the property of Company. Within thirty (30) days after the termination of this Agreement, Distributor shall prepare all such items in its possession for shipment, as Company may direct, at Company's expense. Distributor shall not make or retain any copies of any confidential or proprietary items or information which may have been entrusted to it.

(3) Distributor shall provide Company with a written report detailing all inventory of the Products in its possession at the effective date of

16.

termination within ten (10) business days. Company shall then have a period of ten (10) business days to elect to purchase any portion of unsold inventory at Distributor's actual cost of such goods. Subject to Company's option to purchase Distributor's inventory, and unless this Agreement has been terminated by Company under Section 11(b), Distributor shall retain the right to sell off its remaining inventory of Products for a period of three (3) months following the expiration or termination of this Agreement, subject to Distributor's continuing obligation to make payment of Royalties for such sales. However, if this Agreement has been terminated by Company under Section 11(b), Distributor shall have no sell-off rights whatsoever and any remaining inventory of the Products shall become the property of Company without any payment by Company to Distributor and shall be promptly delivered to Company at a destination designated by Company at Distributor's expense.

(d)    Survival. Company's rights to, and Distributor's obligations to pay Company all amounts due hereunder shall survive termination or expiration of this Agreement or any determination that this Agreement or any portion hereof or exhibit hereto is void or voidable.

12.)    Relationship of the Parties. Distributor's relationship with Company during the term of this Agreement will be that of an independent contractor. Distributor will not have, and shall not represent that it has, any power, right or authority to bind Company, or to assume or create any obligation or responsibility express or implied, on behalf of Company or in Company's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of Distributor and Company, nor as creating the relationships of employer/employee, franchisor/franchisee, joint ventures, or principal/agent between the parties. In all matters relating to this Agreement, neither Distributor nor its employees or agents are, or shall act as, employees of Company within the meaning or application of any obligations or liabilities to Company by reason of an employment relationship. Distributor shall reimburse Company for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon Company by virtue of any such law with respect to employees of Distributor in performance of this Agreement.

13.)    Indemnification.

(a)    Distributors. Distributor shall defend, indemnify and hold harmless Company, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) distribution by Distributor or its Dealers of the Products outside the Territory; (ii) breach of any or all obligations Distributor has undertaken to perform hereunder; (iii) breach of any representations and warranties or covenants Distributor has made hereunder; (iv) infringement or other violation of proprietary rights caused by any modification to the Products not authorized by Company, or otherwise caused by the Work Product; or (v) any third-party claim arising

17.

from Distributor's use of any materials added to or used in connection with the Products by Distributor, including, without limitation, the Work Product. Such indemnification obligation of Distributor shall be conditioned upon Company promptly notifying Distributor in a writing that sets forth with specificity the claim or action in which such indemnification obligation applies. Distributor shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Distributor does not timely undertake to defend Company from a claim or suit described above, Company shall have the right to undertake the defense itself and Distributor promises to promptly repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Distributor does not undertake the defense of Company as required hereunder, Company shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Distributor, which approval shall not be unreasonably withheld, delayed, or conditioned. In defending against such claim or action, Distributor may (i) contest; (ii) settle; (iii) procure for Company and its customers the right to continue using the Localized Company Products, as applicable; or (iv) modify or replace the Localized Company Products, as applicable, so that they no longer infringe; provided, however, Distributor shall not have authority to make any admission of liability on the part of Company, or to enter into any settlement that would result in the imposition of any obligations on Company, including, without limitation, any obligation to make payment of any amounts, without the prior written approval of Company. Distributor acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(b)    Company. Company shall defend, indemnify and hold harmless Distributor, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) any third party claim arising from a breach of any copyright, trademark or patent rights with respect to the Company Products as delivered to Distributor; (ii) breach of any and all obligations Company has undertaken to perform hereunder; or (iii) breach of any representations and warranties or covenants Company has made hereunder. Such indemnification obligation of Company shall be conditioned upon Distributor promptly notifying Company in a writing that sets forth with specificity the claim or action to which such indemnification obligation applies. Company shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Company does not timely undertake to defend Distributor from a claim or suit described above, Distributor shall have the right to undertake the defense itself and Company promises to repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Company does not undertake the defense of Distributor as required hereunder, Distributor shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Company. In defending against such claim or action, Company may (i) contest; (ii) settle; (iii) procure for Distributor and its customers the right to continue using the Products, as applicable; or (iv) modify or replace the Products, as applicable, so that they no longer infringe.

18.

Company acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(c)     No Combination Claims.  Notwithstanding Section 13(b), Company shall not be liable to Distributor for any claim arising from or based upon the combination, operation or use of any Product with equipment, data or programming not supplied by Company, or arising from any unauthorized alteration or modification of the Products.

14.)     Insurance.  Distributor shall obtain and maintain in full force and effect during the term of this Agreement a policy or policies of comprehensive general liability insurance or similar commercial insurance providing for such coverage and amounts of coverage as customarily maintained in force and effect by other businesses engaged in activities comparable to those of Distributor.  Company shall be designated as an additional insured on any such policy or policies; and no amendment, modification, or cancellation of such policy or policies may be made without providing at least thirty (30) days prior written notice to Company, which notice shall be given by both Distributor and the insurer.  In the event that at any time such policy or policies are not in full force and effect or are otherwise amended, modified, or cancelled, Company have the right in its sole discretion and without notice to Distributor to immediately suspend its performance of any or all of its obligations under this Agreement.  Upon the request of Company, Distributor shall provide Company with evidence satisfactory to Company in its discretion that the policy or policies of the required insurance are in full force and effect.

15.)     Disclaimer of Warranties; Limited Liability.

(a)     Disclaimer of Warranties.  THE COMPANY PRODUCTS ARE PROVIDED "AS IS, WHERE IS, WITH ALL DEFECTS' AND WITHOUT WARRANTY OF ANY KIND WHATSOEVER.  DISTRIBUTOR ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  ANY IMPLIED WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED.

(b)     Limitation of Liability.  UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO DISTRIBUTOR ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY DISTRIBUTOR TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  Distributor acknowledges and agrees that (1) Distributor has no expectation and has received no assurances that its

19.



business relationship with Company will continue beyond the stated term of this Agreement or its earlier termination, and that Company has not made any promises with respect to Distributor's ability to recoup any investment by Distributor in the promotion of the Products by virtue of this Agreement; and (2) Distributor shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of the Products or in any goodwill created by its efforts hereunder. Under no circumstances shall Company's aggregate liability under this Agreement exceed the total amount of Royalties actually paid to Company by Distributor under this Agreement.

16.) Confidentiality. In the course of this Agreement, it is anticipated that the parties will learn confidential or proprietary information about each other. Each of the parties shall keep confidential this information and any other information which the applicable party may acquire with respect to the other's business, including without limitation, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until the applicable party consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of the applicable party. Except with respect to third parties who have an interest in the Products, neither party shall disclose to others, without the applicable party's consent, the subject of this relationship without first providing the other party with the opportunity to review and offer reasonable objection to the contemplated publication. This undertaking to keep information confidential shall survive the termination of this Agreement. It is understood, however, that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to the applicable party without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to the applicable party with respect to such information; (iii) is or becomes part of the public domain through no fault of the applicable party; (iv) is independently ascertainable or developed by the applicable party or its employees; (v) is required to be disclosed by administrative or judicial action provided that the applicable party immediately after receiving notice of such action notifies the applicable party of such action to give the applicable party the opportunity to seek a protective order or any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of the applicable party. Upon the request of Company, Distributor shall require each of its employees performing services in connection with this Agreement to execute a confidentiality agreement containing terms and conditions consistent with this Section. Immediately upon the termination of this Agreement, Distributor shall return to Company all of Company's confidential information, together with any and all copies and tangible embodiments thereof, and any and all adaptations and related materials in all formats and mediums.

17.) General.

(a) Waiver and Modification. No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

20.



(b)    Survival.    The provisions of this Agreement which, by their terms, require performance after the termination of this Agreement, or have application to events that may occur after the termination of this Agreement, shall survive the termination of this Agreement.

(c)    English Language.    Any and all notices, reports, correspondence, amendments, requests, responses, and other communications associated with this Agreement shall be in the English language, and the controlling version of this Agreement shall be in the English language.

(d)    Section References.    Any and all section references in this Agreement shall refer to other sections contained in this Agreement.

(e)    Currency.    Any and all fees, payments, compensation, consideration, and other amounts shall be expressed and payable in U.S. Dollars.    For purposes of converting Royalties due to Constant from a currency that is not U.S. Dollars to U.S. Dollars the exchange rate used shall be the exchange rate as reported by Exchangerate.com for the business day immediately preceding the date of conversion.

(f)    Notices.    Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and personally delivered, sent by confirmed facsimile transmission, sent by certified mail (or, as applicable, the foreign equivalent thereof if reasonably possible; but if not possible, then by first-class regular mail or the foreign equivalent thereof) or sent by express courier (by a nationally or internationally recognized courier) to the other party at its address set forth in this Agreement, or at such other address as the parties shall designate in writing by the aforementioned means of personal delivery, facsimile transmission, certified mail, or express courier.

(g)    Assignment and Delegation.    Distributor shall not, without the prior written consent of Company, assign its rights or delegate its duties under this Agreement, which consent shall not be unreasonably withheld, delayed, or conditioned.    Company may assign its rights or delegate its duties under this Agreement without the consent of Distributor.

(h)    Remedies.    Injunctive or other equitable relief shall be a remedy available to either party in the event of a breach of any provision of this Agreement by the other party, but such remedy shall not be the exclusive remedy available to the parties.

(i)    Complete Execution.    This Agreement shall become effective only after it has been executed by Distributor and Company.    This Agreement and any other instrument which requires the signature of the parties may be signed in two (2) counterparts, each of which shall be deemed an original and which shall together constitute one Agreement or any other instrument which requires the signature of the parties.

(j)    Facsimile Signatures.    Signature pages delivered by facsimile transmission and bearing the signatures of the parties shall constitute execution of this Agreement or any other instrument which requires the signature of the parties.

21.

(k)    Choice of Law, Jurisdiction. This Agreement shall be governed by the laws of the State of California in the United States without reference to or use of any conflicts of laws provisions therein. For the purpose of resolving conflicts related to or arising out of this Agreement, the parties expressly agree that venue shall be in the State of California in the United States only, and, in addition, the parties hereby consent to the jurisdiction of the federal and state courts in the State of California in the United States. The parties specifically disclaim application of the United Nations Convention on Contracts for the International Sale of Goods, 1980.

(l)    Severability. In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect. In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(m)    Force Majeure. Company shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond Company's control, including but not limited to acts of God, war, riot, acts of terrorism, the substantial failure of the internet, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(n)    Entire Agreement. This Agreement, including all Schedules and Exhibits hereto, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes any prior or contemporaneous oral or written agreement. Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each party and an executed copy has been delivered to the parties. This Agreement may not be changed, modified, amended or supplemented except in a writing signed by all parties to this Agreement. Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(o)    Benefits of Agreement. The terms of this Agreement are intended solely for the benefit of the parties hereto. They are not intended to confer upon any third party the status of a third-party beneficiary. Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement effective as of the Effective Date.

CONSTANT ENTERTAINMENT LLP          3A ENTERTAINMENT INC
By: PHILLIP HO                                            By: SERGEY LOSHKAREV
Its: MANAGING PARTNER                          Its: PERSON EMPOWERED TO ACT

Date: September 27, 2006          Date: 20  09  2006

22.

# EXHIBIT A

## PRODUCT EXHIBIT

### EFFECTIVE DATE: September 12, 2006

1.)    Products and Royalty Rates:

| # | COMPANY PRODUCT TITLE<br>All titles Win 2000/XP unless otherwise noted. | Royalty Rate per Unit | Distribution Term Limitation(s) |
|---|---|---|---|
| 1 | Chris Moneymaker's World Poker | $0.70 | No Manufacture after 30-Sept, 2007<br>No Distribution after 29-Mar., 2008 |
| 2 | Construction/Destruction | $0.70 | No Manufacture after 16-Jan., 2008<br>No Distribution after 16-May., 2008 |
| 3 | Dogs Playing Poker | $0.70 | No Manufacture after 7-Jul., 2007<br>No Distribution after 21-Nov., 2007 |
| 4 | Hunting Unlimited 3 | $0.70 | None |
| 5 | WWII Desert Rats | $0.70 | None |
| 6 | Laser Arena | $0.70 | None |

2.)    Sublicense/OEM/Bundled Product.  The royalty rate for Product distributed through sublicensing, the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

3.)    Distribution Term(s).  Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the Agreement, the Distribution Term for the each Product set forth in this Product Exhibit shall begin on the release date of the mentioned Product in the Territory, and shall continue further for a period of two (2) years from the Release Date of corresponding Product.

4.)    Advance Payments.  As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Agreement, Distributor shall pay Company the amount of Twenty Seven Thousand Dollars (US $27,000), due upon execution of this Product Exhibit by both parties.

5.)    The Third Party Elements shall be deemed to include the following: NONE

6.)    Territory:  Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.

## EXHIBIT B APPROVAL REQUEST

Tracking
No.

☐ First submission. We will assign a tracking number if this is first submission.
Always use this number when resubmitting this item.

### TO BE COMPLETED BY Distributor

Distributor                                    Address

Distributor Contract                    Tel. No.                          Fax No.

Item Submitted                          No. of Samples           Distributor Style No.

**Product**
☐  Preliminary Art/Concept
☐  Color Comp./Hand Sample
☐  Final Art
☐  Mechanical
☐  Prototype/Pre-Production Sample
☐  Production Sample/Final
Approval
Comments

**Packaging/Hang
Tags/Labels/Manuals**
☐  Preliminary Art/Concept
☐  Color Comp./Hand Sample
☐  Final Art
☐  Mechanical
☐  Prototype/Pre-Production Sample
☐  Production Sample/Final Approval

**Collateral/Advertising/Editorial**
☐  Preliminary Art/Concept
☐  Color Comp./Hand Sample
☐  Final Art
☐  Mechanical
☐  Prototype/Pre-Production Sample
☐  Production Sample/Final Approval

### DO NOT WRITE BELOW THIS LINE
### TO BE COMPLETED BY Company

Date Received   /  /                              Date Returned to Distributor    /  /

Action Taken on Submission:
☐  Approved As Is. Proceed to:        ☐  Resubmit this stage with corrections        ☐  Not Approved - See
Comments
                                                              before proceeding to the next stage.
                                                              See comments.

**Comments** (Company and Agent please initial and date after your comments.)

### ALL APPROVALS ARE SUBJECT TO PRODUCT BEING INCLUDED IN YOUR CONTRACT

Distributor Signature   Date  /  /                    Agent Signature   Date  /  /
**Proprietary Notices:**

CON   ANT LICENSE AND DISTRIBUTIC   .GREEMENT

This License and Distribution Agreement (the "Agreement") is made and entered into this 13th day of November, 2006 (the "Effective Date"), by and between Constant Entertainment LLP, a limited-liability partnership organized under the laws of California, with its principal place of business at 445 Bryan Avenue, Sunnyvale, California 94086 ("Company") and 3A Entertainment Ltd. organized under the laws of British Virgin Islands with its principal offices at the Office Management Company Trust (B.V.I.) LTD., OMC Chambers, P.O. Box 3152, Road Town, Tortola, British Virgin Islands ("Licensee").

## PREMISES

Company publishes and distributes certain computer software products, including the products listed in Exhibit A hereto.  Company desires to distribute its products in a world market; and Licensee desire to obtain manufacturing, distribution, advertising rights as well as right to localize (modify)  certain Company products stated in Exhibit A pursuant to the terms and conditions of this Agreement.

In consideration of the Premises, and of the mutual covenants and agreements hereinafter set forth, Company and Licensee agree as follows:

1.)

Definitions.  Whenever used in this Agreement, the following terms shall have the following specified meanings;

(a)    "Company Products" means computer software programs (including programs intended for demonstration or tutorial purposes) produced and/or distributed by Company and identified in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, and any and all improvements, corrections, modifications, updates, enhancements and new releases related thereto, but specifically excluding sequel products, along with any and all manuals, specifications, user guides and other documentation regarding such computer software programs.  For the avoidance of doubt, other products may be subsequently added to this Agreement for by the mutual written agreement of the parties, in which event such products shall be deemed included in the Company Products and/or Localized Company Products.

(b)    "Distribution Term" means the time period set forth in the attached Exhibit A, as Exhibit A may be modified or amended from time to time, during which Licensee has the right to distribute the enumerated Products in the Territory.

(c)    "Gold Master" means a non-copy protected and non-encrypted final copy of the Product in the English language that is free of all bugs, is recorded in executable form together with any necessary supporting software and data, fully implements all features and functions, has been approved by Licensee.

(d)    "Territory" means only the countries listed in Exhibit A attached hereto, but only as their political borders exist on the date of this Agreement.  The Territory excludes



foreign countries, embassies, and foreign military and governmental installations, located within the territory.

(e)     "Localization" means the modification of Company Products to meet the needs of the non-English-speaking users in the Territory. This may include but not limited to: code changes, translation of in-game texts and voices, additions and alterations to the feature set, changes in the data or new art with the intent to provide more culturally acceptable Company Products in the Territory.

(f)     "Localized Company Products" means Company Products after Localization, together with the appropriate localized pre-approved collateral materials, contained in Company-approved localized packaging for Licensee's Territory.

(g)     «License» means an express, exclusive, transferable as stated herein, terminable license to the Product to perform in relation to the Product the acts specified in this Agreement.

(h)     "Localization Materials" means copies of the text and audio portions of the Products, including, without limitation, text which appears in graphics and audio which is included in video sequences (if any).

(i)     "End-User" means an individual or entity which purchases Products for its own use, and not for redistribution.

(j)     "Dealer" means an entity which, as authorized hereunder, purchases Products and resells them to End-Users.

(k)     "EULA" means Company's standard form end-user license agreement, a copy of which is displayed on certain screens and as part of the installation of, all Company Products, as the same may be modified or amended from time to time.

(l)     "Prohibited Country" means a country to which export or re-export of any Products is prohibited by United States law without first obtaining the permissions of the United States Office of Export Administration or its successor.

(m)     "OEM" means original-equipment manufacturer, which is any natural person or legal entity which obtains a license from Company to use Products for the purpose of incorporating such Products, in whole or in part, either with or within computer hardware, software or other products for further distribution in conjunction with such products.

(n)     "Products" mean Company Products and/or Localized Company Products.

(o)     All references in this Agreement to the "sale" or "selling" of Products shall mean the sale of a license to use such Products. All references in this Agreement to the "purchase" of Products shall mean the purchase of a license to use such Products.

2.

2.)
**Grant of rights** .

(a)    This Agreement is intended as a master agreement. If the parties wish to add other products to the scope of this Agreement, they may do so by executing one or more addenda in substantially the same form as Exhibit A attached hereto (each, a "Product Exhibit"), which shall thereupon be made a part of this Agreement and incorporated herein by reference. Any products so added shall be deemed included in the Products. As applicable any references to Exhibit A in this Agreement shall be deemed to include Exhibit A and any Product Exhibits subsequently executed by the parties. Subject to the terms and conditions of this Agreement, Company hereby grants to the  Licensee exclusive license to sell/distribute the Products  through  retail and distribution channels solely in the Territory and during the terms of the Agreement, and Licensee hereby accepts such grant of rights. It is expressly understood between parties that such grant of rights specifically excludes the right to distribute the Products through the OEM channel, or through bundling any of the Products with any other products.  If Licensee desires to distribute the Products through the OEM channel, or through bundling any of the Products with any other products Licensee may request such additional rights from Company on a case by case basis.  Any such approval must be in writing by the Company.   All rights not expressly granted to Licensee hereunder are reserved by Company.

(b)    <u>Nature of Distribution</u>.  Company grants to Licensee a non-transferable (with exception of Clause 9.) (h)) exclusive license to distribute/sell Products to Licensee's customers in the Territory in accordance with this Agreement, and does not grant any right, title or interest in any of the Products, in whole or in part, to Licensee.

(c)    <u>Software License</u>.   Company grants to Licensee a non-transferable (with exception of Clause 9.) (h)) exclusive license in the Territory to (i) manufacture or have manufactured, market, distribute and sell only in the Territory the Products, and (ii) modify (localize) the Company Products, only as commercially necessary and as approved in writing in advance by Company, and to manufacture or have manufactured, market, distribute and sell only in the Territory such modified versions of the Company Products as Localized Company Products.

(d)    <u>On-line Sales</u>.  Company hereby grants Licensee the right to market and sell the Products through on-line services and the Internet only within the Territory.  Licensee is prohibited from distributing any Products via electronic means, including downloading. Company reserves the right to review Licensee's on-line materials regarding the Products, and may at any time require Licensee to modify or remove such materials. Licensee agrees to immediately comply with such notice.

(e)    <u>Company's Reserved Rights</u>.   In the event Company believes that further distribution of any Products in the Territory will expose Company to liability, Company may, without liability to Licensee, delete such Product from the list of Company Products contained in Exhibit A.  Licensee agrees to promptly refrain from any further distribution of the applicable Products following receipt of notice that such Product has been deleted

3.

from Exhibit A. ditionally, Company reserves the right modify Products during the term hereof in its sole discretion; and upon any such modification, the modified version of the Product shall be the only one authorized for distribution under this Agreement. In the case, that certain products are taken off the distribution list before the expiration of the distribution term, the Publisher shall refund the Distributor on prorate basis.

(f)     Certain Obligations of Licensee. Licensee warrants and represents that it has, and will maintain, the capacity, facilities and personnel necessary to carry out its obligations pursuant to this Agreement, and in particular that:

(1)     Promotion Efforts. Licensee shall use its reasonable commercial efforts to market, sell and distribute the Products both vigorously and aggressively within the Territory in accordance with the terms of this Agreement. Notwithstanding the foregoing, all promotional, advertising and/or other marketing items or the like which Licensee may desire to create must be pre-approved in writing by Company in the form attached hereto as Exhibit B.

(2)     Dealer Qualifications Licensee shall authorize and maintain only dealers, resellers, and distributors (collectively, the "Dealers") that have the financial capacity, facilities, technical capacity and desire to market and sell the Products competently.

(3)     Licensee-Dealer Agreement. It is a material obligation of Licensee, prior to engaging in any transaction with a Dealer involving the Products, to enter, or have previously entered, into a written agreement with such Dealer which authorizes such Dealer to resell the Products, and which provides that as a material condition of such agreement such Dealer may resell the Products only within the Territory granted hereunder; and only in a manner consistent with the provisions of this Agreement (the "Dealer Agreement"). Licensee shall provide the Company with a copy of any such Dealer Agreement upon request. Licensee shall be responsible for the actions of all Dealers and their compliance with all of the terms and conditions of the Dealer Agreement.

(4)     Inventory. Licensee shall maintain an inventory of Products sufficient to serve adequately the needs of Dealers and End-Users within a commercially reasonable time frame.

(5)     Dealer Support. Licensee shall provide Dealers with training, technical support and other assistance appropriate in promoting the Products. Licensee shall transmit to Dealers all Company literature and other information that Company requests be transmitted to them.

(6)     Licensee Personnel. Licensee shall train and maintain a sufficient number of capable technical and sales personnel at its expense; (1) to serve the needs of its Dealers or End-Users for the Products, service and support;

4.



(2) otherwise to carry out the responsibilities of Licensee pursuant to this Agreement.

(7) <u>Technical Expertise</u>. Licensee and its staff shall be conversant with the technical language conventional to the Products and similar computer products in general.

(8) <u>Licensee-Replicator/Duplicator Agreement</u>. Licensee shall obtain Company's prior written approval before replicating any media used in the Company Products, and Company may withhold such consent in its sole discretion. Prior to engaging a replicator/duplicator to replicate/duplicate the Products as contemplated pursuant to Section 2 hereof, Licensee and such replicator/duplicator shall execute an agreement authorizing that entity to duplicate the Products. It is a material obligation of Licensee to contractually require the replicator/duplicator to refrain from replication that results in the production of gold-colored CD-ROMs.

(g) <u>Licensee Covenants</u>. Licensee covenants and agrees:

(1) To conduct business in a manner that reflects favorably on the goodwill and reputation of Company;

(2) To avoid deceptive, misleading or unethical trade practices, including but not limited to making representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Products that are inconsistent with the literature distributed by Company, including all warranties and disclaimers contained in Company literature;

(3) To refrain from selling the Products to any Dealer that cannot agree to comply with obligations similar to those contained in this Section 2;

(4) To distribute the Products only in machine-readable object code format;

(5) To refrain from permitting the copying of Company Products onto any other media for purposes of redistribution to others whether for profit, promotion or otherwise, and not to use, copy, print or display any Company Products or permit any Dealer to use, copy, print or display any Company Products, in any manner except in direct connection with, and for the sole purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

(6) To refrain from renting or lending any Products, or the use, copying, printing or display of any Products, in any manner except in connection with, and for the purpose of replicating/duplicating the Products, and marketing and selling copies of the Products to others in accordance with this Agreement;

5.



(7)    to add to, delete or otherwise vary a    the terms and conditions of the EULA;

(8)    Not to distribute any Products under any trade names or trademarks other than those employed by Company with respect thereto without the prior written approval of Company; and

(9)    Licensee may deduct any withholding tax required by applicable governmental taxing authorities provided that Licensee shall remit such withheld payments to the applicable government authority, shall prepare and make all filings and tax returns in connection with such remittances, and shall deliver documentation to Company in form and substance evidencing payment of same so as to enable Company to obtain a foreign tax credit against its obligations under applicable United States tax laws.

(h)    <u>Product Support</u>.  Licensee shall provide a level of technical support for all Products equivalent in all material respects to that which Company provides its End Users for Company Products.

(i)    <u>Compliance with Law</u>.  Licensee shall comply with applicable international, national, state, regional and local laws and regulations in performing its duties hereunder, in any of its business with Dealers, and with respect to the Products.

(j)    <u>Compliance with U.S. Export Laws</u>.  Licensee acknowledges that Company's export of the Company Products may be subject to compliance with the Export Administration Act Regulations of the Department of Commerce of the United States, as amended, and other export controls of the United States ("Export Laws"), which restrict the export and re-export of software media, technical data, and direct products of technical data.  ("Direct Product" as used hereafter means the immediate product, including processes and services, derived from the use of Company Products.)  Licensee agrees, and shall cause each of its Dealers, employees, agents and representatives to agree, not to export or re-export any Products or Direct Products of Company Products to any Prohibited Country.  Licensee agrees to indemnify Company against any claim, demand, action, proceeding, investigation, loss, liability, cost or expense, including, without limitation attorney's fees, suffered or incurred by Company and arising out of or related to any breach (whether intentional or unintentional) by Licensee, its employees, agents, representatives or Dealers, of any of the warranties or covenants of this Section 2(j).

(k)    <u>Governmental Approval</u>.  If any approval with respect to this Agreement, or the registration thereof, shall be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the Territory, or with respect to compliance with exchange regulations or other requirements so as to secure the right of remittance abroad of U.S. Dollars pursuant to Section 6 hereof, Licensee shall immediately take whatever steps may be necessary in this respect, and any charges incurred in connection therewith shall be paid by Licensee.  Licensee shall keep Company currently informed of its efforts in this connection.  Company shall be under no

6.

obligation to d      r Products to Licensee hereunder     Licensee has provided Company with satisfactory evidence that such approval or registration is not required or that it has been obtained.

(l)    Market Conditions.   Licensee shall advise Company promptly concerning any material market information that comes to Licensee's attention regarding the Products, Company's market position or the continued competitiveness of the Products in the marketplace.

(m)    Dealing with End-Users.   Prior to accepting any fee or other charge from any End-User interested in acquiring a copy or copies of the Products from Licensee, Licensee shall inform the End-User that acquisition of such copy is subject to the terms and conditions of the EULA.  A sample copy of the EULA shall be available from the Licensee for review by all prospective End-Users dealing with Licensee.  Should any End-User return to Licensee any unopened Products in the original sealed package in which it was distributed by Licensee, Licensee shall provide such End-User with a full refund of all sums paid by the End-User therefor.  In no event shall Company be required to provide any such refund to any End-User who has obtained the copy or copies in question from or through Licensee.

(n)    Adaptation for Local Market.   Company and Licensee shall consult in good faith with respect to the localization of the Company Products and Licensee shall make such changes to Company Products, packaging and related marketing materials as Licensee and Company agree would be appropriate to adapt Company Products for use in the Territory.   Company shall submit to Licensee all necessary localization and layout materials, this might include, but is not limited to: scripts for speech files, and removable data storage media containing artwork screenshots, artworks for advertising, printed materials, manuals, packages and CD-tray cards of the Products together with Localization Kit and English Gold Master(s) of the Products ("materials").  Company shall submit to the Licensee any and all of the above-mentioned materials no later than one month after the signature of the present Agreement (Later Delivery Date).

- Licensee shall start acceptance testing after receipt of English Gold Master, Localization Kit and other Materials mentioned above. If the results of acceptance testing do not meet licensee's requirements, Company shall correct and modify all items free of charge as soon as reasonably possible, but at latest within three (3) weeks after informed by Licensee until there are no more material faults.

Company will reasonably cooperate in Licensee's development of the Localized Company Products.  Licensee shall, at its sole cost and expense, be responsible for translating and manufacturing or having manufactured Company manuals, advertising and promotional materials into the language of the Territory if so requested by Company.  Upon receipt of the finally accepted by licensee Localization Kit and English Gold Master of the Products, Licensee shall submit, within two (2) weeks, an estimated publishing date for the localized version of the Company Product, which shall be no later than four (4) calendar months following receipt of the approved Localization Kit and English Gold Master.   Failure to meet the publishing date deadline shall be considered a

7.



material breach and shall allow Company to terminate Agreement upon thirty (30) days prior written notice. During the completion of the Localization process, Licensee shall submit all localized materials to Company for approval. Licensee must receive written approval from Company prior to any sale or demonstration of Localized Company Products. If Licensee cannot achieve the quality or technical standards equivalent to those of the English version of the Company Product within forty-five (45) calendar days after Licensee's initial submission of the Localized Company Products to Company for approval, Company may terminate this Agreement upon seven (7) days prior notice. Company has the exclusive right to sell Localized Company Products outside the Territory.

(o)      Packaging. Except as provided in Section 2(n), Licensee shall distribute Products with all packaging, warranties, disclaimers and EULA intact as on Company Products prior to Localization, and shall instruct each of its Dealers as to the nature and terms of the EULA applicable to the Products. Anything to the contrary notwithstanding, Licensee may not include any materials in or on the Product packaging which is not either (i) included in the U.S. version of the Company Product or (ii) pre-approved in writing by Company. For the purpose of Localization, Licensee agrees to produce packaging and advertising or sales support material at the same high quality levels used by Company in the English version of the Company Products. Licensee must receive written pre-approval from Company, which shall no be unreasonable withheld, on all Licensee-produced marketing and sales materials, including, but not limited to, packaging and collateral material that reference the Products, prior to release of the materials. Licensee shall pay for shipping and production of the art media for the packaging, brochures or other collateral materials used to promote the Localized Company Products within the Territory.

(p)      Quality: Samples.

   (1)      Licensee acknowledges that if the Products manufactured and sold by it hereunder were of inferior quality in design, material or workmanship, the substantial goodwill which Company has established and now possesses in the Products would be impaired. Accordingly, Licensee agrees that the Products shall be of the highest standards and of such superior style, appearance and quality as shall be necessary and suited to their promotion, distribution, sale and exploitation to enhance the Products and the goodwill in the Products.

   (2)      Company shall approve each stage of Localization of the Products from the conception to the production thereof. Licensee shall at each stage of Localization of the Products, before it manufactures, distributes, ships or sells any particular Products, furnish Company, free of cost, for its written approval, the Approval Request form attached hereto as Exhibit B with each of the following:

      a.      four (4) samples of preliminary art concept;

8.

b.    four (4) samples of color composite    or one (1) hand sample;

c.    four (4) samples of fine art;

d.    one (1) pre-production sample; and

e.    one (1) final sample/prototype for the Product together with its cartons and containers, tags, labels, wrapping material, advertising and promotional material for use in any media in connection with the Localized Company Product ("Packaging").

(3)    Licensee shall provide Company with six (6) production samples of the Products and all sales, marketing and advertising materials prepared by Licensee in connection with its distribution of the Products, free of cost, for Company's written approval or disapproval prior to distribution of the Products. The Third Party Elements defined in Section 5 of and/or any Product Exhibit to this Agreement shall accompany delivery of the foregoing. If Company does not indicate its approval or disapproval of such submissions within seven (7) business days from the date of actual receipt of the submission, Company shall be deemed to have approved the Products. If so disapproved, and without limiting Company's approval rights, upon receipt of a written request from Licensee, Company shall notify Licensee within twenty (20) business days after the request of the proposed modifications that would render such sample approved. The foregoing approval procedure may be repeated as necessary until the Products are finally approved Once Products and collateral materials have been expressly approved, Licensee shall not depart therefrom in any material respect without first obtaining Company's written consent in accordance herewith or add any additional element(s), materials, or features without Company's prior written approval in each case. Upon the request of Company, Licensee agrees to furnish Company, at no charge, with additional samples of each Product and all sales, marketing and advertising materials which Company may deem reasonably necessary in order to permit Company to ensure that the quality of the Products have been maintained and that no deviation and/or modification of Company approved Products has occurred. Company shall have the right in its sole discretion to withdraw its approval of samples if the quality of any Products ceases to be acceptable.

(4)    Duly authorized representatives of Company shall have the right, at any and all reasonable times, upon reasonable advance notice to Licensee, to inspect all facilities or premises maintained by Licensee, including, without limitation, the plants, factories, or other manufacturing or producing facilities of Licensee or third parties at which the Products and/or any components of Products are being manufactured or produced. Said representatives shall have the right to inspect and test any Products and/or all components thereof and to take any other action which in the

9.

,ion of Company is necessary or pro    o assure Company that the nature and quality of the Products and/or all components thereof are in accordance with the requirements of this Agreement.

(5)    Licensee will diligently address all legitimate complaints brought to its attention regarding the Products. Licensee will advise Company promptly of any category of recurring complaint and of any complaint which Licensee reasonably believes might result in legal or administrative action against Licensee or Company.

(q)    Good Will and Protection.  Licensee acknowledges that:

(1)    The Products, including without limitation, the characters, character names, trademarks, service marks, trade dress, logos and images associated with the Products are unique and original and Company is the exclusive owner thereof;

(2)    As the result of the exhibition and exploitation of the Products, Company has acquired a substantial and valuable good will therein;

(3)    The names of the characters and their likenesses, as applicable, and the title of the Products have acquired a secondary meaning as trademarks uniquely associated with merchandise authorized by Company;

(4)    All rights in any additional material, new versions, translations, rearrangements or other changes in the Products which may be created by or for Licensee (including without limitation Localizations and Localized Company Products), (collectively, "New Materials") shall be and shall remain the exclusive property of Company from creation; and

(5)    Any copyrights, trademarks and design patents heretofore obtained by Company or in connection with the characters and title of the Products are good and valid.

3.)
Inspections:  Records and Reporting.

(a)    Reports.  Licensee shall provide to Company written reports for every one-quarter period, or when requested by Company, showing Licensee's shipments of the Products by name and address of Dealers and End Users, Product name, units and local currency volume, volume in U.S. Dollars, remaining inventories of Products, and any other information Company reasonably requests.

(b)    Notification.  Licensee shall notify Company in writing of any claim or proceeding involving the Products within seven (7) days after Licensee learns of such claim or proceeding.  Licensee shall also immediately report to Company all claimed or suspected product defects.  Licensee shall also notify Company in writing not more than

seven (7) days a   any change in the control of Licensee   y transfer of a majority
share of Licensee's voting control or a transfer of substantially all its assets.

(c)   <u>Records</u>. Licensee shall maintain, for at least two (2) years after termination of
this Agreement, its records, contracts and accounts relating to the reproduction and
distribution of the Products. For the purpose of verifying compliance by the Licensee
with the provisions of this Agreement, Licensee agrees that Company and its
representatives shall be permitted full access to, and shall be permitted to make copies of
or abstracts from, the books and records of Licensee relating to inventory levels,
manufacturing, sales, and distribution of the Products. Upon 2 weeks prior written notice
Company shall be permitted to audit such books and records at reasonable intervals, no
more than one audit shall be conducted in respect to one reporting period. Audit shall be
conducted by independent and certified auditors retained by the Company at its own
expense. If Company discovers an error which results in additional amounts being owed
to Company in excess of five percent (5%) of the total amount being audited then
Licensee shall reimburse Company for all reasonable costs of the examination, including
travel and related expenses, in addition to paying Company the amount of the
discrepancy plus interest on such amount calculated at ten percent (10%) per annum.

4.)
<u>wnership and Property Rights</u>. Licensee agrees that Company owns all right, title and interest in the
Products in any form or medium except those elements specified in Section 5, and/or a Product Exhibit
attached hereto (the "Third Party Elements") now or hereafter subject to this Agreement, and in all of
Company's copyrights, patents, trade secrets, trademarks, service marks, trade dress, artistic and moral
rights, mask rights, character rights, publicity rights, and any and all other proprietary rights of any kind
whatsoever relating to the Products; and together with any and all inventions, know-how, technology, and
trade secrets relating to the design, development, operation, distribution, use, or maintenance of the
Company Products or the EULA. The use by Licensee of any of these proprietary rights is authorized
only for the purposes and under the terms herein set forth, and upon termination of this Agreement for
any reason, such authorization shall immediately cease. As part of this Agreement, and without
additional compensation, Licensee acknowledges and agrees that any and all tangible and intangible
property and work products, ideas, inventions, discoveries and improvements, and New Materials,
whether or not patentable, which are conceived, developed, created, obtained, or first reduced to practice
by Licensee for Company in connection with this Agreement or the Localization of Company Products,
including, without limitation, all technical notes, schematics, software source and object code,
prototypes, breadboards, computer models, artwork, sketches, designs, drawings, paintings, illustrations,
computer-generated artwork, animations, video, film, artistic materials, photographs, literature, methods,
processes, voice recordings, vocal performance, narrations, spoken word recordings and unique
character voices (collectively referred to as the "Work Product") shall be considered "works made for
hire" and therefore all right, title and interest therein (including, without limitation, patents and
copyrights) shall vest exclusively in Company. To the extent that all or any part of such Work Product
does not qualify as a "work made for hire" under applicable law, Licensee without further compensation
therefore does hereby irrevocably transfer, sell and assign to Company all of Licensee's worldwide
right, title, and interest, in and to the Work Product, including without limitation, all rights of copyright,
patent, trade secret, trademark, service mark, trade dress, artistic and moral rights, mask rights, character
rights, publicity rights, and any and all other proprietary rights of any kind whatsoever relating to the
Work Product, together with any and all applications, registrations, renewal and extension rights, and

11.

rights to sue for any past, present, or future infringement of any the foregoing. Licensee acknowledges and understands that artistic and moral rights include the right of an author: to be known as the author of a work; to prevent others from being named as the author of the works; to prevent others from falsely attributing to an author the authorship of a work which he/she has not in fact created; to prevent others from making deforming changes in an author's work; to withdraw a published work from distribution if it no longer represents the views of the author; and to prevent others from using the work or the author's name in such a way as to reflect on his/her professional standing. As required by applicable law, Licensee hereby expressly waives any and all artistic and moral rights associated with the Products and the Work Product. Licensee represents and warrants that: (i) it shall be the exclusive owner of all right, title, and interest in and to the Work Product and all proprietary rights associated with the Work Product; (ii) it has the right, power, and authority to make the transfer to Company of its interests in the Work Product as contemplated by this Section; and (iii) it has obtained written consents, assignments, and transfers from any and all third parties who participated in the development of the Work Product.

5.)

hird Party Elements. Licensee agrees to use its best efforts to obtain all rights necessary with respect to the Third Party Elements so as to enable Company to exploit and distribute the Localized Company Product embodying such Third Party Elements after the expiration of the Distribution Term. Company shall have the right to withhold its approval of any Localized Company Product for which Licensee is unable to obtain such rights on behalf of Company. At the time Licensee provides the production samples described in Section 2(p)(3) of this Agreement, Licensee shall provide Company with a schedule of all Third Party Elements that are a part of the Localized Company Products and copies of all agreements relating to such Third Party Elements.

6.)

dvances, Royalties and Payment.

    (a)    Advances and Royalty Amounts. Licensee agrees to pay to Company the non-refundable (with exception of Clauses 2) e); 10) (10) and 10) (11) ), but recoupable against Royalty Advances and Royalty payments set forth in Exhibit A. Royalties payable to Company pursuant to this Agreement for distribution of Products through the retail or distribution channels shall be based on the number of units of the Products sold/distributed by Licensee and shall only be subject to a deduction for Products previously sold by Licensee which are returned to Licensee by its customers. Royalties payable to Company pursuant to this Agreement for distribution of Products through the OEM channel, or through bundling any of the Products with any other products shall be based on Net Receipts, which shall mean total sums invoiced by Licensee in connection with the sale or other distribution of the Products, less the amount of any actual returns of such Products to Licensee by its customers. In the case of a bundle, the amount of invoiced sums attributable to any one product in the bundle shall be equal to the total invoiced sums divided by the total number of products in the bundle. Net Receipts shall not be reduced by any other items including, but not limited to, any costs of manufacturing, marketing, advertising, or shipping the Products. The royalty rate for new Products developed by Company and added to this Agreement shall be determined by Company as Company makes such new Products available to Licensee.

12.



(b)  Royalty F    ents.

(1)  Royalties shall be paid quarterly, no later than forty five (45) days after the end of the calendar quarter in which sales occurred Licensee shall shall sent to the Company a a statement setting forth in reasonable detail the number of the Units of Products sold (for each Product) and amount due to the Company for corresponding Product during the reporting period as well as the total sum due to the Company. Within 5 days after the recipient of sales statements Company shall issue an Invoice computed on the basis of said sales statement and send it to the Licensee wia certified mail or other method mutually agreed between Parties Licensee shall make a payment of Royalties within 10 days after company's Invoice recipient. Payment shall be sent via wire transfer of immediately available funds to the following account:

Account name: Constant Entertainment
Bank: Bank of America
Bank address: Los Gatos, CA
Routing Number: 121000358
Account number: 01425-03464
SWIFT code: BofAUS3N

(2)  All Advances, Royalties or other payments made to Company hereunder shall be made without deduction for any local, state, federal or foreign taxes or duties. Licensee shall be responsible for the payment of any and all taxes, licenses, duties and fees of Licensee or Company in connection with the marketing, distribution, sale, possession, use or sublicensing of the Products (inclusive of value added taxes, but exclusive of taxes based on Company's net income). Licensee hereby agrees to pay and to indemnify Company from all such duties, taxes and fees as may be imposed upon Company with respect to the marketing, distribution, sale, possession, use or sublicensing of the Products pursuant to this Agreement. In the event Licensee is precluded by applicable law from making payments free of deductions, then Licensee shall pay to Company such additional amounts as necessary so that the actual amount received by Company shall be the same as though no such deduction had been made. Notwithstanding the foregoing, Licensee may deduct the amount of any withholding income tax required by applicable governmental taxing authorities on amounts to be remitted to Company provided that Licensee shall remit such withheld payments to the applicable governmental authority and shall deliver documentation to Company in form and substance evidencing payment of said so as to enable Company to demonstrate its compliance with any such withholding requirement and obtain a foreign tax credit against its obligations under applicable United States tax laws.

13.

7.) icensee **Determines Its Own Per Copy Prices.** Licensee is free to determine unilaterally its own pricing of the Products to its Dealers and End Users, as applicable. Although Company may publish suggested wholesale, retail, or Dealer prices, these are suggestions only and Licensee shall be entirely free to determine the actual prices at which the Products are sold to its Dealers and End Users, as applicable.

8.) icensee's **Warranties and Representations Regarding Treatment of Dealers.** Licensee hereby warrants and represents to Company as follows:

(a)    **Dealer Pricing.** Licensee shall inform each Dealer that it is free to determine unilaterally its own prices and that, although Company may publish lists showing suggested retail prices for Products, those are suggestions only.

(b)    **Non-Discrimination Among Dealers.** In working with its Dealers, Licensee shall in all respects comply with all laws, regulations or statutes which regulate the resale of products to Dealers, including but not limited to those which govern discriminatory pricing.

9.) rademarks, **Trade Names and Copyrights.**

**To be provided further by Company**

(a)    **Trademark Use during Agreement.** During the term of this Agreement, Licensee is authorized by Company free of charge to use the trademarks and service marks Company uses for the Products (collectively, "the Marks") solely in connection with Licensee's advertisement, promotion and distribution of the Products. Licensee agrees that it shall cause to be affixed, conspicuously and legibly on the Products sold by it pursuant to this Agreement and on all advertising incorporating any part of the Company Products, appropriate copyright and trademark notices in the name of Company, which notices shall be in such form and have such content as may be prescribed by Company. Licensee further agrees to prominently feature the Marks on packaging and advertising of the Products. Licensee agrees not to alter, erase, deface, or overprint any such Marks on anything provided by Company without Company written consent. Licensee shall have the right to transfer its rights to use trademarks stated above to the companies (its sublicenses stated in Clause 9.) (h) of the present Agreement.

(b)    **No Licensee Rights in Trademarks or Copyrights.** Licensee has paid no consideration for the use of Company's intellectual property, including without limitation, the Company's Marks; trade names; domain names; metatags; key words; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address); logos, character names and likenesses; plots; themes; and strategies (collectively, "the Intellectual Property"); and nothing contained in this Agreement shall give Licensee any interest in any of the Intellectual Property. Licensee acknowledges that Company owns and retains all proprietary rights in the Intellectual Property, and agrees that it shall not at any time during or after this Agreement assert or

14.

claim any inte... in or do anything that may adversely ...ct or dilute the Company's rights in the Intellectual Property (including, without lim....tion, any act, or assistance to any act, which may infringe or otherwise violate any of Company's rights in the Intellectual Property). Licensee shall not use any business name that incorporates or uses the Marks or any of the Intellectual Property. Licensee shall not register or attempt to register in any office or jurisdiction any rights in any trademark or service mark; trade name; domain name; metatag; key word; trade dress, or other designation of source, origin, identity, or address (whether a physical address or an electronic address) which is the same as or similar to the Marks or any of the Intellectual Property.

(c)    No Continuing Right.    Upon expiration or termination of this Agreement, Licensee shall cease advertising and use of all Company Marks and Intellectual Property.

(d)    Obligation to Protect.    Licensee agrees to use reasonable efforts to protect Company's proprietary rights and to cooperate with Company's efforts to protect its proprietary rights.

(e)    Breach.    Licensee understands and agrees that Company will suffer irreparable harm in the event that Licensee fails to comply with any of its obligations pursuant to this Section 9 or Section 2 and that monetary damages in such event would be substantial and inadequate to compensate Company.    Consequently, in such event Company shall be entitled, in addition to such monetary relief as may be recoverable by law, to such temporary, preliminary and/or permanent injunctive relief as may be necessary to restrain any continuing or further breach by Licensee, without showing or proving any actual damages sustained by Company and without the necessity or requirement to Company of posting a bond or any other form of security therefor.

(f)    Dealer or End-User Breaches.    Licensee shall promptly report to Company any breach of the EULA of which Licensee becomes aware.    Company shall have the right, but not the obligation, to pursue any and all relief available to remedy such breaches.

(g)    Filing and Recording.    Upon request, Licensee agrees to assist Company in the filing, registration, or recording of Company's Marks and rights in Intellectual Property in the Territory, all costs to be paid by Company.

(h)    Assignment.    Licensee is granted the right to sublicense all Licensee's rights granted to Licensee under this Agreement to **SWT Entertainment Limited**, reg#165602, having its registered office at 29A, Annis Komninis Street, P.C. 1061, Nicosia, Cyprus or another legal entity (Sublicensees), with right to further sublicense, subject to the following warranty. Licensee warrants that SWT Entertainment Limited or the third party shall have the right to sub-license the rights granted to: **OOO «Akella»**, a company incorporated and acting under the laws of the Russian Federation, having its principal place of business at: 12/1 Bolshaya Novodmitrovskaya str.,127015 Moscow, Russian Federation and/or **C.L.R.** **"Multitrade"** with its principal place of business at Nemenskaya St.10, Kiev 01130.

(i)    Sublicense's rights to the Product are restricted to the licensed Territory.

15.



10.) Duration and Termination of Agreement.

(a)   Term.  Subject to prior termination in accordance with the provisions contained herein, the term of this Agreement shall commence as of the Effective Date and expire upon the expiration of the last-to-expire Distribution Term (and/or Sell-off Period Term as stated in the Exhibit A)  for Products distributed pursuant to an applicable Product Exhibit to this Agreement.

(b)   Termination for Cause.  This Agreement may be terminated forthwith as set forth below, by one party giving written notice thereof to the other party, in accordance with Section 17(f) below, stating the effective date of termination, subject to Sections 11(c), 11(d), and 17(b) below.

(1)   By Company if any proceeding in bankruptcy or in reorganization or for the appointment of a receiver or trustee or any other proceeding under any law for the relief of debtors shall be instituted by or against Licensee, or if Licensee shall make an assignment for the benefit of creditors; or

(2)   Subject to Section 2(i) and Section 13(a) herein, by either party upon a material breach by the other party of any of the terms of this Agreement, or any other agreement in force between the parties hereto, which breach is not remedied by the breaching party to the non-breaching party's reasonable satisfaction within fifteen (15) days (or such shorter period of time as may be permitted under applicable law) of the breaching party's receipt of notice of such breach from the non-breaching party, in the event of a breach of Section 6 hereunder, and within thirty (30) days (or such shorter period of time as may be permitted under applicable law) for all other breaches; or

(3)   By Company, immediately, if Licensee is merged, consolidated, sells all or substantially all of its assets or implements or experiences any substantial change in management or control (the transfer of twenty-five percent (25%) or more of a Licensee's common stock or the equivalent, shall be considered a substantial change in management or control hereunder); or

(4)   By Company, immediately, if Licensee sells:

a.   any copies of the Products outside the Territory; or

b.   any copies of the Products to any person or organization which Licensee has reason to believe may sell the Products outside the Territory; or

(5)   By Company, immediately, if Licensee distributes any Products or associated marketing material without first obtaining the approval(s) of Company required hereunder; or

16.



(6)  By Company, the Distribution Term n  be terminated as to any particular Product(s) for which Licensee has failed to produce a Localized Company Product acceptable to Company within three (3) months of the estimated publishing date; in the case of such termination, Company shall retain any Advances paid in respect of such Company Product; or

(7)  By Company, immediately, if Licensee commits any criminal or fraudulent act; or

(8)  By Company, immediately, if any product liability claim or the equivalent thereof is asserted against Company; or

(9)  By Company, immediately, if any infringement or other claim relating to the violation of proprietary rights is asserted against Company or Licensee in connection with this Agreement.

(10)  By Licensee, immediately if Company fails to provide Licensee with fails to provide Licensee with all the materials as set out in Clause 2 (n). In this case Company will refund the corresponding part of the Advance. Such Advances shall become due and immediately refundable to Licensee from the thirty first (31st) day after the Latest Delivery Date. Any paid Advances in this Agreement remaining unreverted to Licensee after the Due Date as defined in above may involve, at Licensee's sole discretion, interest at a rate of 0.5,% (nought point five %) per month from the date such amount is due until the date of actual payment.

(11)  By Licensee, immediately if Company is in breach of the warranties made by the Company in this Agreement. In case of termination of the Agreement by Licensee for breach by Company, Licensee shall be entitled to a refund of unrecouped Advances paid by Licensee to Company and Company shall compensate to Licensee licensee's reasonable and documented costs and expenses for advertising and promotional campaigns of the Product in the Territory already carried out. Company and Licensee shall have an option, if mutually agreed, to replace the refunding of the unrecouped Advances from Company to Licensee with an Additional Sell-off period, which will continue until the above-mentioned unrecouped Advances, together with the costs and expenses for advertising and promotional campaigns, are recouped from the sales of the copies of the Company Products by the Licensee in the Territory.

(c)  <u>Effect of Termination</u>.  Upon termination of this Agreement:

(1)  Licensee shall cease using any Marks and Intellectual Property.

17.

(2)    Product masters, Localization material, computer software in object and source code, marketing and promotional materials, and all other items or information of every kind provided to Licensee or in the possession of Licensee in connection with this Agreement shall remain the property of Company. Within thirty (30) days after the termination of this Agreement, Licensee shall prepare all such items in its possession for shipment, as Company may direct, at Company's expense. Licensee shall not make or retain any copies of any confidential or proprietary items or information which may have been entrusted to it.

(3)    Licensee shall provide Company with a written report detailing all inventory of the Products in its possession at the effective date of termination within ten (10) business days. Company shall then have a period of ten (10) business days to elect to purchase any portion of unsold inventory at Licensee's actual cost of such goods. Subject to Company's option to purchase Licensee's inventory, and unless this Agreement has been terminated by Company under Section 11(b), Licensee shall retain the right to sell off its remaining inventory of Products for a period of three (3) months following the expiration or termination of this Agreement, subject to Licensee's continuing obligation to make payment of Royalties for such sales. However, if this Agreement has been terminated by Company under Section 11(b), Licensee shall have no sell-off rights whatsoever and any remaining inventory of the Products shall become the property of Company without any payment by Company to Licensee and shall be promptly delivered to Company at a destination designated by Company at Licensee's expense.

(d)    Survival. Company's rights to, and Licensee's obligations to pay Company all amounts due hereunder shall survive termination or expiration of this Agreement or any determination that this Agreement or any portion hereof or exhibit hereto is void or voidable, excluding termination of the Agreement by Licensee under Clauses 10) (b) (10) and 10) (b) (11).

11.)

Relationship of the Parties. Licensee's relationship with Company during the term of this Agreement will be that of an independent contractor. Licensee will not have, and shall not represent that it has, any power, right or authority to bind Company, or to assume or create any obligation or responsibility express or implied, on behalf of Company or in Company's name, except as herein expressly provided. Nothing stated in this Agreement shall be construed as making partners of Licensee and Company, nor as creating the relationships of employer/employee, franchisor/franchisee, joint ventures, or principal/agent between the parties. In all matters relating to this Agreement, neither Licensee nor its employees or agents are, or shall act as, employees of Company within the meaning or application of any obligations or liabilities to Company by reason of an employment relationship. Licensee shall reimburse Company for and hold it harmless from any liabilities or obligations imposed or attempted to be imposed upon Company by virtue of any such law with respect to employees of Licensee in performance of this Agreement.

18.

12.)
Indemnification.

(a)    Licensees.  Licensee shall defend, indemnify and hold harmless Company, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) distribution by Licensee or its Dealers of the Products outside the Territory; (ii) breach of any or all obligations Licensee has undertaken to perform hereunder; (iii) breach of any representations and warranties or covenants Licensee has made hereunder; (iv) infringement or other violation of proprietary rights caused by any modification to the Products not authorized by Company, or otherwise caused by the Work Product; or (v) any third-party claim arising from Licensee's use of any materials added to or used in connection with the Products by Licensee, including, without limitation, the Work Product.    Such indemnification obligation of Licensee shall be conditioned upon Company promptly notifying Licensee in a writing that sets forth with specificity the claim or action in which such indemnification obligation applies.  Licensee shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom.  In the event Licensee does not timely undertake to defend Company from a claim or suit described above, Company shall have the right to undertake the defense itself and Licensee promises to promptly repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome.  Except in the event that Licensee does not undertake the defense of Company as required hereunder, Company shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Licensee, which approval shall not be unreasonably withheld, delayed, or conditioned.   In defending against such claim or action, Licensee may (i) contest; (ii) settle; (iii) procure for Company and its customers the right to continue using the Localized Company Products, as applicable; or (iv) modify or replace the Localized Company Products, as applicable, so that they no longer infringe; provided, however, Licensee shall not have authority to make any admission of liability on the part of Company, or to enter into any settlement that would result in the imposition of any obligations on Company, including, without limitation, any obligation to make payment of any amounts, without the prior written approval of Company.  Licensee acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(b)    Company.  Company  represents and warrants to Licensee that:

-Company owns or has rightfully acquired rights and proprietary interest in the Products and any and all other rights necessary to grant Licensee all rights and licenses granted to Licensee under this Agreement, and that the rights and licenses granted will not infringe or will not be in any way an infringement of any copyright, trademark, patent, trade secret, contractual right or other proprietary right of others.

19.



- Company represents and warrants to Licensee that Company will not make any agreement that is in conflict with this Agreement during the Term of the Agreement.

- Company represents and warrants to Licensee that Company will perform all development tasks and services in a professional manner, in accordance with the highest industry standards and practices.

- Company represents and warrants to Licensee that the software engine, technology, source code and related development tools for the Products are or will be original to the developer and/or to Company, and/or exclusively owned or duly licensed by the developer and/or to Company, and that neither the software engine, technology, source code and related development tools are, nor will they be, in violation of the rights of any third Party. Company represents and warrants to Licensee that the execution and performance of this Agreement does not and will not violate or interfere with any other agreement.

- Company shall defend, indemnify and hold harmless Licensee, its parent, subsidiaries, affiliated companies and partners and their respective officers, directors, employees and agents from and against any and all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from any claims or actions arising out of or relating to actual or alleged: (i) any third party claim arising from a breach of any copyright, trademark or patent rights with respect to the Company Products as delivered to Licensee; (ii) breach of any and all obligations Company has undertaken to perform hereunder; or (iii) breach of any representations and warranties or covenants Company has made hereunder. Such indemnification obligation of Company shall be conditioned upon Licensee promptly notifying Company in a writing that sets forth with specificity the claim or action to which such indemnification obligation applies. Company shall have the right to control the defense of each such claim and any lawsuit or proceeding arising therefrom. In the event Company does not timely undertake to defend Licensee from a claim or suit described above, Licensee shall have the right to undertake the defense itself and Company promises to repay all liabilities, damages, costs and fees (including reasonable attorney's fees) resulting from such defense regardless of the outcome. Except in the event that Company does not undertake the defense of Licensee as required hereunder, Licensee shall not settle any such claim or lawsuit or proceeding arising therefrom without the prior written approval of Company. In defending against such claim or action, Company may (i) contest; (ii) settle; (iii) procure for Licensee and its customers the right to continue using the Products, as applicable; or (iv) modify or replace the Products, as applicable, so that they no longer infringe. Company acknowledges that the warranties and representations herein shall survive the termination of this Agreement.

(c)    No Combination Claims. Notwithstanding Section 13(b), Company shall not be liable to Licensee for any claim arising from or based upon the combination, operation or use of any Product with equipment, data or programming not supplied by Company, or arising from any unauthorized alteration or modification of the Products.



13.)
Insurance.  Licensee shall obtain and maintain in full force and effect during the term of this Agreement a policy or policies of comprehensive general liability insurance or similar commercial insurance providing for such coverage and amounts of coverage as customarily maintained in force and effect by other businesses engaged in activities comparable to those of Licensee.  Company shall be designated as an additional insured on any such policy or policies; and no amendment, modification, or cancellation of such policy or policies may be made without providing at least thirty (30) days prior written notice to Company, which notice shall be given by both Licensee and the insurer.  In the event that at any time such policy or policies are not in full force and effect or are otherwise amended, modified, or cancelled, Company have the right in its sole discretion and without notice to Licensee to immediately suspend its performance of any or all of its obligations under this Agreement.  Upon the request of Company, Licensee shall provide Company with evidence satisfactory to Company in its discretion that the policy or policies of the required insurance are in full force and effect.

14.)
Disclaimer of Warranties; Limited Liability.

(a)    Disclaimer of Warranties.  THE COMPANY PRODUCTS ARE PROVIDED "AS IS, WHERE IS, WITH ALL DEFECTS' AND WITHOUT WARRANTY OF ANY KIND WHATSOEVER.  LICENSEE ACKNOWLEDGES THAT NO WARRANTIES WITH REGARD TO THE PRODUCTS, WHETHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE, ARE CREATED BY THIS AGREEMENT AND COMPANY HEREBY DISCLAIMS AND EXCLUDES ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  ANY IMPLIED WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312(3) OF THE UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED.

(b)    Limitation of Liability.  UNDER NO CIRCUMSTANCES SHALL COMPANY BE LIABLE TO Licensee ON ACCOUNT OF ANY CLAIM (WHETHER BASED UPON PRINCIPLES OF CONTRACT, WARRANTY, NEGLIGENCE OR OTHER TORT, BREACH OF ANY STATUTORY DUTY, PRINCIPLES OF INDEMNITY, THE FAILURE OF ANY LIMITED REMEDY TO ACHIEVE ITS ESSENTIAL PURPOSE, OR OTHERWISE) FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS, OR FOR ANY DAMAGES OR SUMS PAID BY LICENSEE TO THIRD PARTIES, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  LICENSEE acknowledges and agrees that (1) Licensee has no expectation and has received no assurances that its business relationship with Company will continue beyond the stated term of this Agreement or its earlier termination, and that Company has not made any promises with respect to Licensee's ability to recoup any investment by Licensee in the promotion of the Products by virtue of this Agreement; and (2) Licensee shall not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of the Products or in any goodwill created by its efforts hereunder.  Under no circumstances

21.

shall Company's aggregate liability under this Agreement exceed the total amount of Royalties and Advance actually paid to Company by Licensee under this Agreement.

15.)

**Confidentiality.** In the course of this Agreement, it is anticipated that the parties will learn confidential or proprietary information about each other. Each of the parties shall keep confidential this information and any other information which the applicable party may acquire with respect to the other's business, including without limitation, information developed and relating to new products, customers, pricing, know-how, processes, and practices, unless and until the applicable party consents to disclosure, or unless such knowledge and information otherwise becomes generally available to the public through no fault of the applicable party. Except with respect to third parties who have an interest in the Products, neither party shall disclose to others, without the applicable party's consent, the subject of this relationship without first providing the other party with the opportunity to review and offer reasonable objection to the contemplated publication. This undertaking to keep information confidential shall survive the termination of this Agreement. It is understood, however, that the restrictions listed above shall not apply to any portion of confidential information which: (i) was previously known to the applicable party without obligations of confidentiality; (ii) is obtained after the Effective Date of this Agreement from a third party which is lawfully in possession of such information and not in violation of any contractual or legal obligation to the applicable party with respect to such information; (iii) is or becomes part of the public domain through no fault of the applicable party; (iv) is independently ascertainable or developed by the applicable party or its employees; (v) is required to be disclosed by administrative or judicial action provided that the applicable party immediately after receiving notice of such action notifies the applicable party of such action to give the applicable party the opportunity to seek a protective order or any other legal remedies to maintain such confidential information in confidence; or (vi) is approved for release by written authorization of the applicable party. Upon the request of Company, Licensee shall require each of its employees performing services in connection with this Agreement to execute a confidentiality agreement containing terms and conditions consistent with this Section. Immediately upon the termination of this Agreement, Licensee shall return to Company all of Company's confidential information, together with any and all copies and tangible embodiments thereof, and any and all adaptations and related materials in all formats and mediums.

16.)

**General.**

   (a) <u>Waiver and Modification</u>. No waiver or modification of the Agreement shall be effective unless in writing and signed by the party against whom such waiver or modification is asserted. Waiver by either party in any instance of any breach of any term or condition of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other term or condition hereof. None of the terms or conditions of this Agreement shall be deemed to have been waived by course of dealing or trade usage.

   (b) <u>Survival</u>. The provisions of this Agreement which, by their terms, require performance after the termination of this Agreement, or have application to events that may occur after the termination of this Agreement, shall survive the termination of this Agreement.

22.



(c)    Englis.    .nguage.  Any and all notices, repor    >rrespondence, amendments, requests, responses, and other communications associated with this Agreement shall be in the English language, and the controlling version of this Agreement shall be in the English language.

(d)    Section References.  Any and all section references in this Agreement shall refer to other sections contained in this Agreement.

(e)    Currency.  Any and all fees, payments, compensation, consideration, and other amounts shall be expressed and payable in U.S. Dollars.  For purposes of converting Royalties due to Constant from a currency that is not U.S. Dollars to U.S. Dollars the exchange rate used shall be the exchange rate as reported by Exchangerate.com for the business day immediately preceding the date of conversion.

(f)    Notices.  Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and personally delivered, sent by confirmed facsimile transmission, sent by certified mail (or, as applicable, the foreign equivalent thereof if reasonably possible; but if not possible, then by first-class regular mail or the foreign equivalent thereof) or sent by express courier (by a nationally or internationally recognized courier) to the other party at its address set forth in this Agreement, or at such other address as the parties shall designate in writing by the aforementioned means of personal delivery, facsimile transmission, certified mail, or express courier.

(g)    Assignment and Delegation.  Licensee shall not, without the prior written consent of Company, assign its rights or delegate its duties under this Agreement (with exception of Clause 9.) (h)), which consent shall not be unreasonably withheld, delayed, or conditioned.  Company may assign its rights or delegate its duties under this Agreement without the consent of Licensee.

(h)    Remedies.  Injunctive or other equitable relief shall be a remedy available to either party in the event of a breach of any provision of this Agreement by the other party, but such remedy shall not be the exclusive remedy available to the parties.

(i)    Complete Execution.  This Agreement shall become effective only after it has been executed by Licensee and Company.  This Agreement and any other instrument which requires the signature of the parties may be signed in two (2) counterparts, each of which shall be deemed an original and which shall together constitute one Agreement or any other instrument which requires the signature of the parties.

(j)    Facsimile Signatures.  Signature pages delivered by facsimile transmission and bearing the signatures of the parties shall constitute execution of this Agreement or any other instrument which requires the signature of the parties.

(k)    Choice of Law, Jurisdiction.  This Agreement shall be governed by the laws of the State of California in the United States without reference to or use of any conflicts of laws provisions therein.  For the purpose of resolving conflicts related to or arising out of this Agreement, the parties expressly agree that venue shall be in the State of California in the United States only, and, in addition, the parties hereby consent to the jurisdiction of

23.

the federal and the courts in the State of California in United States. The parties specifically disclaim application of the United Nations Convention on Contracts for the International Sale of Goods, 1980.

(l)      Severability.  In the event that any provision of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision shall be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect.  In the event the infirmed provision causes the contract to fail of its essential purpose, then the entire Agreement shall fail and become void.

(m)      Force Majeure.  Company shall not be responsible for any failure to perform due to unforeseen circumstances or cause beyond Company's control, including but not limited to acts of God, war, riot, acts of terrorism, the substantial failure of the internet, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, or shortages of transportation facilities, fuel, energy, labor or materials.

(n)      Entire Agreement.  This Agreement, including all Schedules and Exhibits hereto, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes any prior or contemporaneous oral or written agreement.  Nothing herein contained shall be binding upon the parties until this Agreement has been executed by each party and an executed copy has been delivered to the parties.  This Agreement may not be changed, modified, amended or supplemented except in a writing signed by all parties to this Agreement.  Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

(o)      Benefits of Agreement.  The terms of this Agreement are intended solely for the benefit of the parties hereto.  They are not intended to confer upon any third party the status of a third-party beneficiary.  Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement effective as of the Effective Date.

CONSTANT ENTERTAINMENT LLP          3A ENTERTAINMENT INC
By: PHILLIP HO                                     By: SERGEY LOSHKAREV
Its: MANAGING PARTNER                       Its: PERSON EMPOWERED TO ACT

Date: 12. 03. 2006                                Date: 22. 11. 2006

24.

**EXHIBIT A**

## PRODUCT EXHIBIT

### EFFECTIVE DATE: November 13, 2006

1.)
Products and Royalty Rates:

| # | COMPANY PRODUCT TITLE<br><br>All titles Win 2000/XP unless otherwise noted. | Royalty Rate per Unit | Distribution Term Limitation(s) |
|---|---|---|---|
| 1 | 18 Wheels of America: Hauling | $0.75 | |
| 2 | Prison Tycoon 2 | $0.75 | |
| 3 | Sprint Cars | $0.75 | |

2.)
Sublicense/OEM/Bundled Product. The royalty rate for Product distributed through sublicensing, the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

3.)
Distribution Term(s). Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the Agreement, the Distribution Term of the Products set forth in this Product Exhibit shall begin on the actual Release Date of Products on per-Product basis and continue for a period of two (2) years, provided, however, upon expiration of the Agreement Licensee may, for six (6) months, deplete its then-existing stock after the date of expiration/termination on per-Product basis.

4.)
Advance Payments. As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Agreement, Licensee shall pay Company the amount of Seventy Two Thousand US Dollars (US $72,000), which shall be paid as follows:

- US $ 72,000 (seventy seven thousand Us dollar) within 15 fifteen working days after execution of this Product Exhibit by both parties.

5.)
No regular royalties shall be paid on the Product until all cumulative advances made under the Agreement, have been earned down and recouped by Licensee (amount guaranteed by the advance payments is 96,000 units of the Product).

25.





6.) The Third Party El    its shall be deemed to include the foll    g: NONE.

7.) Territory:   Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.

26.

**EXHIBIT B APPROVAL REQUEST**

Tracking
No.

☐ First submission. We will assign a tracking number if this is first submission.
Always use this number when resubmitting this item.

**TO BE COMPLETED BY Licensee**

Licensee                           Address

Licensee Contract                  Tel. No.              Fax No.

Item Submitted                     No. of Samples        Licensee Style No.

Product                            Packaging/Hang              Collateral/Advertising/Editorial
☐ Preliminary Art/Concept         Tags/Labels/Manuals          ☐ Preliminary Art/Concept
☐ Color Comp./Hand Sample         ☐ Preliminary Art/Concept    ☐ Color Comp./Hand Sample
☐ Final Art                       ☐ Color Comp./Hand Sample    ☐ Final Art
☐ Mechanical                      ☐ Final Art                  ☐ Mechanical
☐ Prototype/Pre-Production Sample ☐ Mechanical                 ☐ Prototype/Pre-Production Sample
☐ Production Sample/Final         ☐ Prototype/Pre-Production Sample  ☐ Production Sample/Final Approval
Approval                          ☐ Production Sample/Final Approval
Comments

---

**DO NOT WRITE BELOW THIS LINE**

**TO BE COMPLETED BY Company**

Date Received    / /                        Date Returned to Licensee    / /
Action Taken on Submission:
☐ Approved As Is. Proceed to:      ☐ Resubmit this stage with corrections    ☐ Not Approved - See
Comments
                                   before proceeding to the next stage.
                                   See comments.

**Comments** (Company and Agent please initial and date after your comments.)

**ALL APPROVALS ARE SUBJECT TO PRODUCT BEING INCLUDED IN YOUR CONTRACT**

Licensee Signature   Date / /              Agent Signature   Date / /
**Proprietary Notices:**

27.

be changed, modified, amended or supplemented except in a writing signed by all parties to this Agreement. Each of the parties acknowledges and agrees that the other has not made any representations, warranties or agreements of any kind, except as may be expressly set forth herein.

n. Benefits of Agreement. The terms of this Agreement are intended solely for the benefit of the parties hereto. They are not intended to confer upon any third party the status of a third-party beneficiary. Except as otherwise provided for by this Agreement, the terms hereto shall inure to the benefit of, and be binding upon, the respective successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Agreement effective as of the Effective Date.

CONSTANT ENTERTAINMENT LLP
By: PHILLIP HO
Its: MANAGING PARTNER

Date: 3 . 30 . 07

3A ENTERTAINMENT INC
By: SERGEY LOSHKAREV
Its: PERSON EMPOWERED TO ACT

Date: _____

25.

## EXHIBIT A

## PRODUCT EXHIBIT

### EFFECTIVE DATE: March 26, 2007

1.)
Products and Royalty Rates:

100+ Volume 2
18 Wheels of Steel Convoy
18 Wheels of Steel: Across America
18 Wheels of Steel: Pedal to the Metal
202 Game Collection
303 Game Collection
505 Great Games
Coffee House Chaos
Cribbage Quest
Crisis Team Ambulance Driver
Crystalize 2: Quest for the Jewel Crown
Crystalize!
Domino Lounge (SlingDot)
Ewe Turn   (SlingDot)
F.R.O.G.
Fetch!
First Line of Defense: Border Patrol
Hunting Unlimited 4
I was An Atomic Mutant
Ice Caps/Army The Spider
King's Collection-Classic Card Games
Las Vegas Casino: Pleaers Collection
Let's Ride: Corral Club
Let's Ride: Silver Buckle Stables
Living Underwater Worlds
MahJongg Ascension
Millennium Gold
Monster Truck Rumble
MX vs. ATV Unleashed
Pop Pop Pop
Quick Conversation Spanish
Ride! Midway Tycoon
Sea Scene: Living Underwater Worlds
Super Aneurysm
Texas Hold 'Em: High Stakes Poker
Ultimate Gamepak
Ultimate Mahjongg 20
Prsion Tycoon 3
Border Patrol
Ride! Carnival Tycoon

26.

3) Sublicense/OEM/Bundled Product.   The royalty rate for Product distributed through sublicensing, the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

4) Distribution Term(s).   Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the Agreement, the Distribution Term of the Products set forth in this Product Exhibit shall begin on the actual Release Date of Products on per-Product basis and continue for a period of two (2) years, provided, however, upon expiration of the Agreement Licensee may, for six (6) months, deplete its then-existing stock after the date of expiration/termination on per-Product basis.

5) Advance Payments.   As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Agreement, Licensee shall pay Company the amount of One Hundred Seventy Thousand US Dollars (US $170,000), which shall be paid as follows: 100% upon signing

6.) The Third Party Elements shall be deemed to include the following: NONE

7.) Territory:   Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.

8) Royalty Rate shall be $0.75 per unit sold cross collateralized across all products.

27.

**From:** Sherry Heller [mailto:sherry@valusoft.com]
**Sent:** 31 October 2007 10:30
**To:** Serguei An
**Subject:** Russian titles through Akeela

Hello Sergei -- we continue to hear nothing from Constant Entertainment and are in the process of filing legal breach against his company and the assets. As part of the agreement he signed it will mean a drawback of all product in the Russian market.

I'm still unsure what products have been shipped into Russia. I didn't receive a list from you.

I am attaching the legal agreement between Constant and ValuSoft with a list of the only titles that are authorized in this agreement. If there are any others, you are publishing that aren't on this list, we need to know about them.

THQ Europe came back from Russia last week saying that Akeela was publishing a handful of titles through Constant that are not part of the agreement. I'm assuming there is some confusion over different revisions of titles.

I would like you to clarify what you have published and when so that we can determine how to move forward and protect what you have already publilshed.

If you could review this list and highlight which titles have been published and please let me know if there are others on this list that you have published which are not included.

If you need to call me I'm around most of the morning (CST) and will be out this afternoon.

Thanks and I'm sorry for the unfortunate circumstances surrounding Constant Entertainment. Have you heard from Philip at all?

**Sherry A. Heller**
International Licensing Manager
ValuSoft, *a division of THQ*
Office: 281-379-6774
Cell:   713-907-2910
Corp:  952-442-7000

**AMENDMENT NO. 2**

to the

**ValuSoft License and Distribution Agreement**

This Amendment No. 2 (the "Amendment") made as of the 11th day of April, 2007 (the "Amendment Effective Date"), by and between Constant Entertainment, LLP, a California limited-liability partnership with its principal place of business at 445 Bryan Avenue, Sunnyvale, CA 94086 ("Distributor") and ValuSoft, ("ValuSoft") a division of THQ Inc., a Delaware corporation, doing business at 3650 Chestnut Street North, Suite #101A, Chaska, MN 55318.

WHEREAS ValuSoft and Distributor have entered into a License and Distribution Agreement dated February 1, 2006 whereby ValuSoft has granted Distributor the right and license to distribute certain Company Products; and

WHEREAS ValuSoft and Distributor have entered into an Amendment to the Agreement dated July 21, 2006 ("Amendment No. 1") whereby ValuSoft has granted Distributor the right and license to distribute certain additional Company Products; and

WHEREAS, Distributor wishes to amend the Agreement to acquire the right and license to distribute certain additional products of ValuSoft, and ValuSoft has agreed to grant such right and license to Distributor on the terms and conditions set forth below.

NOW THEREFORE, in consideration of the mutual promises, covenants and obligations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Except as specifically amended in the Amendment, all other terms and conditions of the Agreement shall continue in full force and effect and govern this Amendment as if repeated herein in full, and the parties hereby expressly ratify and affirm the same. Unless specified otherwise within this Amendment, all capitalized terms used in this Amendment shall have the same meanings ascribed to them as set forth the Agreement.

2.  The Product Exhibit set forth at Exhibit A-3 attached hereto and incorporated herein by reference is hereby added to the Agreement and made a part of it.

IN WITNESS WHEREOF the parties have executed this Amendment No. 2 by their duly authorized representatives as of the Amendment Effective Date set forth above.

ValuSoft, a division of THQ, Inc.                    Constant Entertainment, LLP

PER:                                                PER:
Name: Scott Zerby                                   Name: Philip D. Ho
Title: Vice President                               Title:  Managing Partner

1

# EXHIBIT A-3

## PRODUCT EXHIBIT

### EFFECTIVE DATE: April 11, 2007

1.)    Products and Royalty Rates:

| # | COMPANY PRODUCT TITLE<br><br>All titles Win 2000/XP unless otherwise noted | Royalty Rate per Unit | Distribution Term Limitation(s) |
|---|---|---|---|
| 1 | 18 Wheels of Steel Convoy | $0.50 | None |
| 2 | 18 Wheels of Steel: Across America | $0.50 | None |
| 3 | 18 Wheels of Steel: Haulin' | $0.50 | None |
| 4 | 18 Wheels of Steel: Pedal to the Metal | $0.50 | None |
| 5 | 100+ Great Games Volume 2 | $0.50 | None |
| 6 | 202 Game Collection | $0.50 | None |
| 7 | 303 Game Collection | $0.50 | None |
| 8 | 505 Great Games | $0.50 | None |
| 9 | Coffee House Chaos | $0.50 | None |
| 10 | Cribbage Quest | $0.50 | None |
| 11 | Crystalize 2: Quest for the Jewel Crown | $0.50 | None |
| 12 | Crystalize! | $0.50 | None |
| 13 | Domino Lounge | $0.50 | None |
| 14 | Ewe Turn | $0.50 | None |
| 15 | F.R.O.G. | $0.50 | None |
| 16 | Fetch! | $0.50 | None |
| 17 | Hunting Unlimited 4 | $0.50 | None |
| 18 | Ice Caps/Army The Spider | $0.50 | None |
| 19 | Las Vegas Casino: Players Collection | $0.50 | None |
| 20 | Let's Ride: Corral Club | $0.50 | No Manufacture after 26 February, 2009. No Distribution after 26 August, 2009 |
| 21 | Living Underwater Worlds | $0.50 | None |
| 22 | Mahjongg Ascension | $0.50 | None |
| 23 | Millennium Gold | $0.50 | None |
| 24 | Monster Truck Rumble | $0.50 | None |
| 25 | MX vs. ATV Unleashed | $0.50 | None |
| 26 | Pop Pop Pop | $0.50 | None |
| 27 | Quick Conversation Spanish | $0.50 | None |
| 28 | Super Aneurysm | $0.50 | None |
| 29 | Texas Hold 'Em: High Stakes Poker | $0.50 | None |
| 30 | Ultimate Gamepak | $0.50 | None |
| 31 | Ultimate Mahjongg 20 | $0.50 | None |
| 32 | Prison Tycoon 2 | $0.50 | None |

2.)    <u>Sublicense/OEM/Bundled Product</u>.    The royalty rate for Product distributed through sublicensing, the OEM channel or through bundling any of the Products with any other product shall be equal to fifty percent (50%) of Net Receipts.

3.)    <u>Distribution Term(s)</u>.  Subject to any restrictions set forth in the tables above on a per-Product basis, and subject to early termination in accordance with the provisions contained in the

2

Agreement, the Distribution Term of the Products set forth in this Product Exhibit shall begin on the Effective Date of this Product Exhibit and continue for a period of two (2) years.  Company may grant an extension(s) to any Distribution Term, in its sole discretion, by providing written notice thereof to Distributor.

4.)     Advance Payments.  As a fully recoupable advance against Royalty amounts otherwise payable to Company pursuant to this Product Exhibit, Distributor shall pay Company the amount of Eighty Thousand Dollars (US $80,000), due upon execution of this Product Exhibit by both parties.

5.)     The Third Party Elements shall be deemed to include the following: NONE

6.)     Territory:  Russia, Belarus, Estonia, Latvia, Lithuania, Ukraine, Armenia, Azerbaijan, Georgia, Kazakhstan, Kyrgyzstan, Republic of Moldavia, Tajikistan, Turkmenistan and Uzbekistan.

3

**From:** Sherry Heller [mailto:sherry@valusoft.com]
**Sent:** 20 November 2007 05:43
**To:** Serguei An
**Cc:** Kerry Forsyth
**Subject:** Constant-Akella lists of VS titles
**Importance:** High

Hello Sergei – attached is the list of titles you believe you have licensed from Constant Entertainment. There are six titles which are showing on your list but are not part of the titles which we have licensed to Constant Entertainment.

**Let's Ride Silver Buckle Stables** – which I believe is already published

**Ride Carnival Tycoon** – also called Ride! Midway Tycoon – can you confirm that you have not received these assets?

**Border Defense** – you believe you have published this title yet ValuSoft has not received a GM on this title? May we see this product?

**Prison Tycoon 3** – you believe Akella has published this title also in Sept., however, it's not on the Constant licensed titles and we didn't provide assets for this game. Could this be Prison Tycoon 2? We would like to see this title

**King's Collection** – this title shows on your list but is not part of the licensed content to Constant. Can you confirm if you are in possession of these assets?

**Sprint Cars Road to Knoxville** – also on your list, but not on the Constant agreement, can you confirm assets as well?

I have highlighted the file you sent and copied legal on it as well. I'm unsure how to regain the assets you have collected and shipped, but I would like to halt all production of any title on this list until we get this straightened out. I know you are anxious to do the same.

I'm in Europe this week and will return to my office Monday, Nov. 26th. Perhaps we could catch up then.

Thanks so much for your cooperation.

**Sherry A. Heller**
International Licensing Manager
ValuSoft, *a division of THQ*
Office: 281-379-6774
Cell:    713-907-2910
Corp:   952-442-7000

**From:** Serguei An [mailto:serguei@labcroft.com]
**Sent:** Thursday, November 15, 2007 12:02 PM
**To:** Sherry Heller
**Subject:** FW: Valusoft list

Hi Sherry,
Please, see the full list of Valusoft titles we have signed via Constant for all contracts that we have.

Rgds,
Serguei

**From:** Andrew Chernikov [mailto:chernikov@akella.com]
**Sent:** 15 November 2007 05:26
**To:** Serguei An
**Subject:** Valusoft list

Best regards,

Andrey Chernikov
Acquisition Manager
Akella
12/1 Bolshaya Novodmitrovskaya str., Moscow, Russian Federation
www.akella.com
ICQ: 308852608
T: +7.495.363.4612
F: +7.495.363.4615

| Titles | Rights | Produced? | Comments |
|---|---|---|---|
| 200+ Great Games for PDA | y | | |
| Midnight Outlaw: Illegal Street Drag | y | | |
| Midnight Outlaw: Nitro Edition | y | | |
| Navy Seals 2 | y | | |
| Prison Tycoon | y | | |
| Super Stunt Spectacular | y | | |
| Tabloid Tycoon | y | | |
| Ultimate Pinball Extreme | y | | |
| Ultimate Puzzles 1000 | y | | |
| Ultimate Solitair 750 | y | | |
| World Poker Championship | y | | |
| Your Complete Landscape& Garden Design | y | | |
| Your Custom Home | n | | I don't see these titles on any of the old or new ammendments we have done with Constant. When do you believe this transaction took place? It is not part of the ammendment I signed with Philip back in March so I suspect it happened the previous year? |
| Chris Moneymaker's World Poker | n | | |
| Construction/Destruction | c | | |
| Dogs Playing Poker | c | | |
| Hunting Unlimited 3 | c | | |
| WWII Desert Rats | c | | |
| Laser Arena | n | | |

| Titles | Rights | Produced? | Comments |
|---|---|---|---|
| 18 Wheels of America: Hauling | y | | These titles enclosed in this box are the latest set of titles believed to be licensed from Constant Entertainment to Akella |
| Prison Tycoon 2 | y | | |
| Sprint Cars | n | | |
| 100+ Volume 2 | y | | |
| 18 Wheels of Steel Convoy | y | | |
| 18 Wheels of Steel: Across America | y | | |
| 18 Wheels of Steel: Pedal to the Metal | y | | |
| 202 Game Collection | y | | |
| 303 Game Collection | y | | |
| 505 Great Games | y | | |
| Coffee House Chaos | y | | |
| Cribbage Quest | y | | |
| Crisis Team Ambulance Driver | y | | |
| Crystalize 2: Quest for the Jewel Crown | y | | |
| Crystalize! | y | | |
| Domino Lounge (SlingDot) | y | | |
| Ewe Turn  (SlingDot) | y | | |
| F.R.O.G | y | | |
| Fetch! | y | | |

There are the following titles which are not part of the Constant agreement but are on Akella's list and Akella may be in possession of assets from these titles:

Let's Ride SBS - Akella has the assets and has shipped this title

Border Defense - Akella is saying it has produced this title but we don't have finished assets yet??

Ride Carnival Tycoon - On Akella's list but should have no assets

Prison Tycoon 3 - Akella is saying it has published and shipped this title, yet we have not delivered assets

Kings Collection - On Akella's list and they should not be in possession of the assets

Sprint Cars RTK - On Akella's list but should not be in possession of assets.

| Title | | Notes |
|---|---|---|
| First Line of Defense: Border Patrol | n | |
| Hunting Unlimited 4 | y | |
| I was An Atomic Mutant | n | |
| Ice Caps/Army The Spider | y | |
| King's Collection:Classic Card Games | n | |
| Las Vegas Casino: Pleaers Collection | y | |
| Let's Ride: Corral Club | y | |
| Let's Ride: Silver Buckle Stables | n | |
| Living Underwater Worlds | y | I believe you are already publishing this title. |
| MahJongg Ascension | y | |
| Millennium Gold | y | |
| MX vs. ATV Unleashed | y | |
| Pop Pop Pop | y | |
| Quick Conversation Spanish | y | |
| Ride! Midway Tycoon | n | |
| Sea Scene: Living Underwater Worlds | y | same as living underwater worlds |
| Super Aneurysm | y | |
| Texas Hold 'Em: High Stakes Poker | y | |
| Ultimate Gamepak | y | |
| Ultimate Mahjongg 20 | y | |
| Prison Tycoon 3 | n | |
| Border Patrol | n | same as First line of Defense: Border Patrol |
| Ride! Carnival Tycoon | n | same as Ride! Midway Tycoon |
| Monster Truck Rumble | y | |

JS 44   (Rev. 12/07) (cand rev 1-08)   **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
3A ENTERTAINMENT LTD. and LABCROFT LTD.

**DEFENDANTS**
CONSTANT ENTERTAINMENT, INC.

(b) County of Residence of First Listed Plaintiff Tortola, British Virgin Islands
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Santa Clara
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Philip T. Besirof and Alexei Klestoff
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 941005   (415) 268-7000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

[ ] 1 U.S. Government Plaintiff

[ ] 3 Federal Question (U.S. Government Not a Party)

[ ] 2 U.S. Government Defendant

[X] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [X] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
[ ] 110 Insurance
[ ] 120 Marine
[ ] 130 Miller Act
[ ] 140 Negotiable Instrument
[ ] 150 Recovery of Overpayment & Enforcement of Judgment
[ ] 151 Medicare Act
[ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
[ ] 153 Recovery of Overpayment of Veteran's Benefits
[ ] 160 Stockholders' Suits
[X] 190 Other Contract
[ ] 195 Contract Product Liability
[ ] 196 Franchise

**TORTS**
PERSONAL INJURY
[ ] 310 Airplane
[ ] 315 Airplane Product Liability
[ ] 320 Assault, Libel & Slander
[ ] 330 Federal Employers' Liability
[ ] 340 Marine
[ ] 345 Marine Product Liability
[ ] 350 Motor Vehicle
[ ] 355 Motor Vehicle Product Liability
[ ] 360 Other Personal Injury

PERSONAL INJURY
[ ] 362 Personal Injury — Med. Malpractice
[ ] 365 Personal Injury — Product Liability
[ ] 368 Asbestos Personal Injury Product Liability
PERSONAL PROPERTY
[ ] 370 Other Fraud
[ ] 371 Truth in Lending
[ ] 380 Other Personal Property Damage
[ ] 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
[ ] 610 Agriculture
[ ] 620 Other Food & Drug
[ ] 625 Drug Related Seizure of Property 21 USC 881
[ ] 630 Liquor Laws
[ ] 640 R.R. & Truck
[ ] 650 Airline Regs.
[ ] 660 Occupational Safety/Health
[ ] 690 Other

**LABOR**
[ ] 710 Fair Labor Standards Act
[ ] 720 Labor/Mgmt. Relations
[ ] 730 Labor/Mgmt.Reporting & Disclosure Act
[ ] 740 Railway Labor Act
[ ] 790 Other Labor Litigation
[ ] 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
[ ] 422 Appeal 28 USC 158
[ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 Copyrights
[ ] 830 Patent
[ ] 840 Trademark

**SOCIAL SECURITY**
[ ] 861 HIA(1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 Taxes (U.S. Plaintiff or Defendant)
[ ] 871 IRS—Third Party 26 USC 7609

**REAL PROPERTY**
[ ] 210 Land Condemnation
[ ] 220 Foreclosure
[ ] 230 Rent Lease & Ejectment
[ ] 240 Torts to Land
[ ] 245 Tort Product Liability
[ ] 290 All Other Real Property

**CIVIL RIGHTS**
[ ] 441 Voting
[ ] 442 Employment
[ ] 443 Housing/Accommodations
[ ] 444 Welfare
[ ] 445 Amer. w/Disabilities - Employment
[ ] 446 Amer. w/Disabilities - Other
[ ] 440 Other Civil Rights

**PRISONER PETITIONS**
[ ] 510 Motions to Vacate Sentence
Habeas Corpus:
[ ] 530 General
[ ] 535 Death Penalty
[ ] 540 Mandamus & Other
[ ] 550 Civil Rights
[ ] 555 Prison Condition

**IMMIGRATION**
[ ] 462 Naturalization Application
[ ] 463 Habeas Corpus - Alien Detainee
[ ] 465 Other Immigration Actions

**OTHER STATUTES**
[ ] 400 State Reapportionment
[ ] 410 Antitrust
[ ] 430 Banks and Banking
[ ] 450 Commerce
[ ] 460 Deportation
[ ] 470 Racketeer Influenced and Corrupt Organizations
[ ] 480 Consumer Credit
[ ] 490 Cable/Sat TV
[ ] 810 Selective Service
[ ] 850 Securities/Commodities/Exchange
[ ] 875 Customer Challenge 12 USC 3410
[ ] 890 Other Statutory Actions
[ ] 891 Agricultural Acts
[ ] 892 Economic Stabilization Act
[ ] 893 Environmental Matters
[ ] 894 Energy Allocation Act
[ ] 895 Freedom of Information Act
[ ] 900 Appeal of Fee Determination Under Equal Access to Justice
[ ] 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)
[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from another district (specify)
[ ] 6 Multidistrict Litigation
[ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. §1332
Brief description of cause:
Rescission, breach of contract, fraud, negligent misrepresentation

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 984,482.00 additional damages
CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
[ ] SAN FRANCISCO/OAKLAND   [X] SAN JOSE

DATE
March 4, 2008

SIGNATURE OF ATTORNEY OF RECORD
Philip T. Besirof

American LegalNet, Inc.
www.FormsWorkflow.com

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**                    Example:           U.S. Civil Statute: <u>47 USC 553</u>
                                                                    Brief Description: <u>Unauthorized reception of cable service</u>

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

American LegalNet, Inc.
www.FormsWorkflow.com