IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| 3A Entertainment Ltd., et al., | NO. C 08-01274 JW |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT** |
| v. | |
| Constant Entertainment, Inc., et al., | |
| Defendants. | |

## I. INTRODUCTION

3A Entertainment Ltd. ("3A") and Labcroft Ltd. ("Labcroft") (collectively, "Plaintiffs") bring this diversity action against Constant Entertainment, Inc. ("Constant") and Philip Ho ("Ho") (collectively, "Defendants") alleging breaches of various contracts, fraud and negligent misrepresentation.

Presently before the Court is Plaintiffs' Motion for Default Judgment. (hereafter, "Motion," Docket Item No. 25.) The Court conducted a hearing on December 15, 2008. Based on the papers submitted to date and oral argument, the Court GRANTS Plaintiffs' Motion for Default Judgment.

## II. BACKGROUND

In a Complaint filed on March 4, 2008,[1] Plaintiffs allege as follows:

   Plaintiff 3A is a British Virgin Islands corporation with its principal place of business in Tortola, British Virgin Islands. Plaintiff Labcroft is a Cyprus corporation with its

---

[1] (Complaint for Rescission, Breach of Contract, Fraud, and Negligent Misrepresentation ¶ 2, hereafter, "Complaint," Docket Item No. 1.)

principal place of business in St. Omologites, Nicosia, Cyprus. (Complaint ¶ 3.) Defendant Constant is a California corporation with its principal place of business in Sunnyvale, California. (Id. ¶ 4.) Defendant Ho is a citizen of California, residing in Sunnyvale, California. (Id. ¶ 5.)

In September 2005, 3A and Constant entered into a contract whereby Constant was to develop an adaptation of game developer Capcom's highly popular *Resident Evil 4* game for distribution in Russia, and 3A paid Constant $200,000 as a licensing fee and $200,000 to begin development. (Complaint ¶ 8.) 3A was to make additional payments totaling $600,000 when certain development milestones were met. (Id.) Roughly one month after the parties entered into the *Resident Evil 4* contract, Constant informed 3A that Capcom would not allow Constant to develop a game based on *Resident Evil 4*, but would only allow a spin-off game based on the *Resident Evil* "brand." (Id. ¶ 9.) 3A cancelled the *Resident Evil 4* contract because Constant would not be able to deliver the product 3A sought. (Id.) Constant decided to continue development of a spin-off game and orally agreed with 3A to sell the spin-off game to 3A, with the $400,000 already paid to Constant serving as consideration. (Id. ¶ 10.) Constant never completed the spin-off game, cancelled its development, and refused to return the $400,000 paid by 3A. (Id. ¶ 11.)

In November 2005, 3A and Constant entered into a contract whereby 3A purchased the right to manufacture, sell, and distribute two games developed by the game developer Namco: *Warhammer: Mark of Chaos* and *Mage Knight*. (Complaint ¶ 12.) 3A paid Constant $300,000 up front, and was to pay an additional $150,000 when Constant delivered the master copies of the games. (Id.) Roughly three months after the contract was entered into, Constant informed 3A that Namco had withdrawn Constant's rights to the two games. (Id. ¶ 13.) 3A cancelled the *Warhammer* contract and Constant acknowledged that it must return the $300,000 already paid by 3A, but only refunded $167,518. (Id. ¶ 13.)

In December 2006, Ho represented to Sergei An ("An"), a Labcroft employee acting on behalf of 3A, that Constant had secured the distribution rights to Microsoft Corporation's

2

*Flight Simulator X*.  (Complaint ¶ 14.)  At 3A's request, Ho faxed An a copy of a signature page purportedly from a Constant contract with Microsoft for the distribution rights to *Flight Simulator X*.  (Id.)  3A and Constant entered into a contract assigning Constant's distribution rights to 3A.  (Id. ¶ 15.)  3A paid Constant $110,000, which was a discounted price from the $145,000 based on 3A's forgiveness of $35,000 of Constant's debt owed under the *Warhammer* contract.  (Id.)  After undergoing efforts to create an advertising campaign for *Flight Simulator X* in Russia, Microsoft informed 3A that Constant did not have the distribution rights to the game.  (Id. ¶ 17.)  3A cancelled the *Flight Simulator X* contract and its forgiveness of $35,000 of Constant's debt under the *Warhammer* contract.  (Id. ¶ 18.)  Constant acknowledged that it must return the $110,000 paid to 3A, but never did.  (Id.)

In October 2006, Ho represented to An that Constant owned the distribution rights to several of Microsoft's "back catalog" games.  (Complaint ¶ 21.)  Labcroft paid Constant $128,000 for the distribution rights to those back catalog games and entered into a contract with 3A to sublicense the distribution rights to 3A.  (Id. ¶ 22.)  Ho later informed An that Microsoft had withdrawn the rights to the back catalog games and Labcroft cancelled its contract with Constant.  (Id. ¶ 24.)  Constant acknowledged that it must return the $128,000 Labcroft paid, but never did.  (Id.)

In 2006, over the course of several months, Constant and 3A entered into three contracts for the distribution rights to twenty-two games created by Valusoft, for which 3A paid a total of $172,000.  (Complaint ¶ 26.)  The last of the three contracts was a November 13, 2006, contract for the distribution rights to, among other games, *Sprint Cars*.  (Id. ¶ 27.) On March 30, 2007, 3A and Constant entered into an agreement in the form of an Addendum to the November 13, 2006 contract whereby 3A purchased the distribution rights to additional Valusoft games, for a total of forty games, whereby 3A paid $170,000 for the additional distribution rights.  (Id. ¶ 29.)  In October 2007, Valusoft informed 3A that Constant did not have the distribution rights to several of the titles included in Constant's contract with 3A, and that Valusoft was cancelling all of Constant's distribution rights to

3

Valusoft titles in Russia. (Id. ¶ 31-32.) Valusoft contacted 3A again in November 2007 and informed 3A that several of the game titles licensed to 3A by Constant were actually the same game. (Id. ¶ 33.)

On the basis of the allegations outlined above, Plaintiffs allege eighteen causes of action:

|    | **Plaintiff** | **Defendant(s)** | **Cause of Action** |
|----|---------------|------------------|---------------------|
| 1  | 3A | Constant | Rescission of *Resident Evil 4* Contract |
| 2  | 3A | Constant | Breach of *Resident Evil 4* Contract |
| 3  | 3A | Constant | Rescission of *Warhammer* Contract |
| 4  | 3A | Constant | Breach of *Warhammer* Contract |
| 5  | 3A | Constant | Rescission of *Flight Simulator X* Contract |
| 6  | 3A | Constant | Breach of *Flight Simulator X* Contract |
| 7  | 3A | Constant and Ho | Fraud Arising Out of *Flight Simulator X* Contract |
| 8  | 3A | Constant and Ho | Negligent Misrepresentation Arising Out of *Flight Simulator X* Contract |
| 9  | Labcroft | Constant | Rescission of Microsoft Back Catalog Contract |
| 10 | Labcroft | Constant | Breach of Microsoft Back Catalog Contract |
| 11 | Labcroft | Constant and Ho | Fraud Arising Out of Microsoft Back Catalog Contract |
| 12 | Labcroft | Constant and Ho | Negligent Misrepresentation Arising Out of Microsoft Back Catalog Contract |
| 13 | 3A | Constant | Rescission of Valusoft Contracts |
| 14 | 3A | Constant | Breach of Valusoft Contracts |
| 15 | 3A | Constant and Ho | Fraud Arising Out of November 13, 2006 Contract |
| 16 | 3A | Constant and Ho | Negligent Misrepresentation Arising Out of November 13, 2006 Contract |
| 17 | 3A | Constant and Ho | Fraud Arising Out of Addendum to November 13, 2006 Contract |
| 18 | 3A | Constant and Ho | Negligent Misrepresentation Arising Out of Addendum to November 13, 2006 Contract |

4

Plaintiffs filed their Complaint on March 4, 2008.  Pursuant to Cal. Code Civ. Proc. § 415.20, Plaintiffs' service of the Summons and Complaint upon Defendants became effective on March 23, 2008.  (See Docket Item Nos. 6, 7.)  On April 22, 2008, the Clerk of Court entered default as to Defendants.  (See Docket Item No. 13.)

Presently before the Court is Plaintiffs' Motion for Default Judgment.

### III. STANDARDS

Pursuant to Fed. R. Civ. P. 55(b)(2), a party may move the court for an entry of default judgment.  The grant of a default judgment is within the discretion of the court.  Draper v. Coombs, 792 F.2d 915, 924 (9th Cir. 1986).  In the Ninth Circuit, the district court must consider which of seven factors supports the entry of a default judgment: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### IV. DISCUSSION

**A.    Default Judgment**

The decision to grant or deny a default judgment under Fed. R. Civ. P. 55(b) is within the discretion of the Court.  See Eitel, 782 F.2d at 1471-72.  Although there is a strong public policy favoring decisions on the merits, it is only one factor among several to be considered.  Thus, the Court examines whether under the other factors, default judgment is appropriate in this case.

First, Defendants have failed to defend the action or otherwise communicate with the Court.  Thus, Defendants have made no showing of excusable neglect.  Further, Plaintiffs allege that Constant has acknowledged that it owes Plaintiffs significant amounts of money under the various contracts and yet has neglected to pay.  (See Complaint ¶¶ 13, 18, 24.)  If Plaintiffs are not granted default judgment, they may be without any recourse for recovery.  See Pepsico, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  The Court finds that Defendants' failure to

demonstrate excusable neglect, measured against the possibility of prejudice to Plaintiffs, favors default judgment.

Second, once the Clerk of Court enters default, all well-pled allegations regarding liability are taken as true except as to the amount of damages. Fair Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002). Here, the Clerk of Court entered default on April 22, 2008, thus the merits of Plaintiffs' claims are deemed valid. Since the allegations are taken as true, there is no possibility of a dispute concerning material facts.[2]

Third, although the amount of money at stake is significant, Plaintiffs have provided support for their prayer for relief. Plaintiffs provide evidence showing that Constant received substantial payments from Plaintiffs and that Plaintiffs suffered a large amount of damages as a result of Constant's fraud.

In sum, the Court finds that the Eitel factors support the grant of default judgment. Accordingly, the Court GRANTS Plaintiffs' Motion for Default Judgment.

**B.      Remedies**

**1.      Breach of Contract Damages**

Under Cal. Civ. Code § 3300, a plaintiff that establishes a breach of contract is entitled to recover the "amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

Plaintiffs contend that 3A is entitled to a total of $816,982 plus interest under the various contracts. (Motion at 9.) Plaintiffs submit the declaration of An, a Labcroft employee who negotiated each of the contracts on behalf of 3A and Labcroft. An attaches the various contracts to his declaration for the Court's evaluation. An's declaration and the attached documents show the following:

---

[2] The Court's finding includes the heightened pleadings required for actions sounding in fraud under Fed. R. Civ. P. 9(b). Each fraud cause of action in Plaintiffs' Complaint contains the who, what, when and where regarding Defendants' fraudulent statements. See Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007).

6

- 3A paid Constant $400,000 pursuant to the *Resident Evil 4* contract.[3] Constant never developed the *Resident Evil 4* game as required under the contract, never developed a spin-off game pursuant to an oral agreement and never refunded any of the $400,000. (An Decl. ¶¶ 8-10.) Thus, 3A is entitled to $400,000 plus interest[4] in compensatory damages for Constant's breach of the *Resident Evil 4* contract.

- 3A paid Constant $300,000 pursuant to the *Warhammer* contract. (An Decl. ¶ 11, Ex. B at 10, Appx. 5.) After Constant informed 3A that it could not perform under the contract, 3A cancelled the contract and Constant refunded approximately $167, 518 of the $300,000. (Id. ¶ 12.) Thus, 3A is entitled to $132,482 plus interest in compensatory damages for Constant's breach of the *Warhammer* contract.

- 3A paid Constant $172,000 pursuant to the three Valusoft contracts, including the November 13, 2006, contract. (An Decl. ¶ 29.) $5,000 of the original $172,000 paid by 3A was attributable to a title that Constant had no rights to. (Id. ¶¶ 30, 35.) 3A paid Constant an additional $170,000 pursuant to the March 2007 Addendum to the November 13, 2006. (Id. ¶ 33.) $53,000 of the Addendum payment was attributable to games that Constant did not have rights to. (Id. ¶¶ 32-33, 35.) In performing pursuant to the Valusoft contracts, 3A incurred $160,000 in localization and testing expenses and made a profit of roughly $70,000 before Valusoft informed 3A that it could not distribute the Valusoft games because Constant had no distribution rights in the contracted-for titles. (Id. ¶¶ 39-40.) 3A incurred $15,500 in personnel expenses and destroyed $4,500 in inventory as a result of Constant's breach. (Id. ¶ 40.) Thus, not including the $53,000 and $5,000 3A paid for games that Constant did not own rights to,[5] 3A is entitled to $394,000 plus interest in compensatory damages for Constant's breach of the three Valusoft contracts.

On the basis of this evidence, the Court finds that 3A is entitled to $926,482[6] plus interest. Since the contracts in this case do not specify a legal rate of interest in case of a breach, the Court applies California's ten percent statutory interest rate from the date of the breach. See Cal. Civ. Code § 3289(b). Plaintiffs shall submit a Proposed Amended Judgment with the appropriate interests calculated and added to the Court's award of $926,482 in compensatory damages.

### 2. Fraud Damages

---

[3] (See Declaration of Sergei An in Support of Plaintiffs' Application for Default Judgment ¶7, Ex. A at 11, hereafter, "An Decl.," Docket Item No. 26.)

[4] The interest rate for damages under Plaintiffs' breach of contract claims is 10% *per annum*. See Cal. Civ. Code § 3289(b).

[5] 3A seeks recovery for those titles under its fraud claim, and therefore has subtracted those amounts from the total amount of compensatory damages it seeks based on Constant's breach of the Valusoft contracts. (Motion at 8 n.2.)

[6] Although Plaintiffs seek only $816,982, Plaintiffs' requested compensatory damages indicates that they failed to include the $15,500 in personnel expenses, $4,500 in lost inventory and $160,000 in localization and testing costs. Plaintiffs also failed to subtract $70,000 from the total amount due to their profits from selling Valusoft games. (See Motion at 10; Proposed Default Judgment at 1-2, Docket Item No. 28.)

Under California law, a plaintiff may recover for fraud in the inducement in "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." See Cal. Civ. Code §§ 3333, 1709; Foggy v. Ralph F. Clark & Assoc., Inc., 192 Cal. App. 3d 1204, 1214 (1987).

Plaintiffs contend that 3A is entitled to a total of $168,000 plus interest from Constant and Ho, jointly and severally, for their fraud relating to the *Flight Simulator X* contract, the November 13, 2006, Valusoft Contract and the Addendum to the November 13, 2006, Valusoft contract. (Motion at 9-10.)  With respect to Labcroft, it contends that it is entitled to a total of $128,000 plus interest from Constant and Ho, jointly and severally, for their fraud relating to the Microsoft Back Catalog contract. (Id.)  Plaintiffs provide the declaration of An to support the recovery they seek. An's declaration and the attached documents show the following:

- Based on Ho's representation that Constant had secured the distribution rights to Microsoft Corporation's *Flight Simulator X*, 3A paid Constant $110,000 pursuant to the *Flight Simulator X* contract.[7] (An Decl. ¶¶ 13-16, Ex. C at 25.)  Constant never returned this money to 3A. (Id. ¶ 18.)  Thus, 3A suffered a detriment of $110,000 plus interest.

- Pursuant to the November 13, 2006, Valusoft contract, $5,000 of the total $72,000 contract price was attributable to the game *Sprint Cars*. (An Decl. ¶ 30, Ex. H at 25.)  Valusoft had never licensed the distribution rights for *Sprint Cars* to Constant. (Id. ¶¶ 36-37, Ex. J.)  Thus, 3A suffered a detriment of roughly $5,000 plus interest.

- Pursuant to the Addendum to the November 13, 2006, Valusoft contract, $53,000 of the total $170,000 contract price was attributable the following games: *Crisis Team Ambulance Driver*; *I Was an Atomic Mutant*; *King's Collection–Classic Card Games*; *Let's Ride Silver Buckle Stables*; *Prison Tycoon 3; Ride! Midway Tycoon*; *Ride! Carnival Tycoon*; *Border Patrol*; and *First Line of Defense: Border Patrol*. (An Decl. ¶¶ 32-33.)  Valusoft had never licensed the distribution rights for these games to Constant. (Id. ¶¶ 36-37, Ex. J.)  Thus, 3A suffered a detriment of roughly $53,000 plus interest.

- Based on Ho's representations that it owned the distribution rights to Microsoft's Back Catalog, Labcroft paid Constant $128,000 pursuant to the Microsoft Back Catalog contract.[8] (An Decl. ¶ 22.)  Constant never refunded the $128,000 to Labcroft. (Id. ¶ 27.)  Labcroft expended roughly $43,774.50 in localization and testing the games that Constant purportedly licensed to Labcroft. (Id. ¶ 26.)  Thus, Plaintiffs suffered a detriment of $171,774.50.

---

[7] Although the *Flight Simulator X* contract expressly required 3A to pay $145,000 up front, the parties agreed that 3A would receive a $35,000 discount in exchange for $35,000 of Constant's debt pursuant to the *Warhammer* contract being forgiven. (An Decl. ¶ 14, Ex. C at 25.)

[8] The contract states that the advance for the contract is $130,000. (An Decl., Ex. E at 3.) However, the Court accepts the declaration of An, who negotiated the contract, that Labcroft only paid $128,000.

On the basis of this evidence, the Court finds that 3A is entitled to a total of $168,000 plus interest from Constant and Ho, jointly and severally, for their fraud relating to the *Flight Simulator X* contract, the November 13, 2006, Valusoft Contract and the Addendum to the November 13, 2006, Valusoft contract. Labcroft is entitled to a total of $171,774.50 plus interest from Constant and Ho, jointly and severally, for their fraud relating to the Microsoft Back Catalog contract. Although Labcroft seeks only $128,000 based on Constant and Ho's fraud concerning the Microsoft Back Catalog contract, it failed to add the $43,774.50 localization and testing expenses Labcroft suffered as a result of Defendants' fraudulent inducement.

Since there is no relevant legislative act specifying a rate of prejudgment interest for a fraud claim, the Court applies the constitutional rate of 7% from the date this action was filed. See Cal. Const., Art. XV, § 1; Continental Airlines, Inc. v. McDonnel Douglas Corp., 216 Cal. App. 3d 388, 424 (1989). Plaintiffs shall submit a Proposed Amended Judgment with the appropriate interests calculated and added to the Court's award of $168,000 to 3A and $171,774.50 to Labcroft in compensatory damages.

## V.  CONCLUSION

The Court GRANTS Plaintiffs' Motion for Default Judgment. Judgment will be entered in favor of Plaintiffs against Defendants as follows:

(1) Defendant Constant shall pay Plaintiff 3A $926,482 plus interest;

(2) Defendant Constant and Ho, jointly and severally, shall pay Plaintiff 3A $168,000 plus interest;

(3) Defendant Constant and Ho, jointly and severally, shall pay Plaintiff Labcroft $171,774.50 plus interest.

Plaintiffs shall submit a Proposed Amended Judgment with the appropriate calculation and addition of the interests awarded as of the date of the Judgment.

Dated: January 30, 2009

JAMES WARE
United States District Judge

9

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alexei Klestoff aklestoff@mofo.com
Philip T. Besirof PBesirof@mofo.com

**Dated: January 30, 2009**               **Richard W. Wieking, Clerk**

                                        **By:   /s/ JW Chambers**
                                              **Elizabeth Garcia**
                                              **Courtroom Deputy**

United States District Court
For the Northern District of California